UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE SCOTTS MIRACLE-GRO COMPANY, JAMES HAGEDORN, CHRISTOPHER J. HAGEDORN, MATTHEW E. GARTH, DAVID C. EVANS, and CORY J. MILLER,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff City of Hialeah Employees' Retirement System ("Hialeah ERS" or "Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (i) regulatory filings made by The Scotts Miracle-Gro Company ("Scotts" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning Scotts; and (iv) other public information regarding the Company.

**I.      INTRODUCTION**

1.    This securities class action is brought on behalf of all persons or entities that purchased Scotts common stock between November 3, 2021, and August 1, 2023, inclusive (the "Class Period"). The claims asserted herein are alleged against Scotts and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2. Based in Marysville, Ohio, Scotts produces various lawn, garden, and agricultural products for both consumer and professional purposes. It is also the world's largest marketer of branded consumer products for lawn and garden care. Its main brands are Scotts, Miracle-Gro, and Ortho. Scotts is the exclusive agent of Monsanto for distribution of its consumer Roundup products. Scotts sells a vast majority of its products through third-party distributors. In 2014, Scotts formed a wholly owned subsidiary, The Hawthorne Gardening Company ("Hawthorne"), which focuses on hydroponics for the emerging cannabis growing market. The Company divides its business into three reportable segments: U.S. Consumer, Hawthorne, and Other.

3. During the Class Period, Scotts was highly leveraged, with its senior secured credit facilities containing various restrictive covenants and cross-default provisions that require the Company maintain specific financial ratios. A breach of any of these covenants could result in a default, enabling the Company's lenders to declare all outstanding indebtedness immediately due and payable. A key covenant required Scotts to maintain a debt-to-EBITDA ratio under 6.25. This dynamic created an incentive for the Company to saturate its sales channels with inventory to avoid breaching its debt covenants. At the beginning of the Class Period, Scotts held $2.3 billion of debt. By the end of the Class Period, Scotts' debt had ballooned to $3.1 billion.

4. Scotts missed out on millions of dollars in sales in 2020 and 2021 due to a lack of inventory as it faced surging demand. In response to this strong demand, Scotts significantly increased its inventory for both its U.S. Consumer and Hawthorne segments to "ensure [it] could service the needs of [its] retail partners." However, the Company quickly realized that it had purchased too much inventory. Rather than write down the inventory or otherwise disclose the

issue to investors, Scotts executives engaged in a scheme to saturate the Company's sales channels with more inventory than could be sold to end users. Through this scheme, Scotts booked as revenue the sales to its distributors and thereby maintained earnings to debt ratios that just barely exceeded those required by its debt covenants.

5. Scotts pushed product into its sales channels at a pace that outstripped demand while it repeatedly assured investors that its inventory levels were appropriate, that the Company was having peak or record selling, and that the Company was not going to breach its debt covenants. For example, throughout the Class Period, Defendants assured investors that the Company "[didn't] have [an] inventory problem at all" and was "in a very good place," while attributing strong sales to "selling through high-cost inventory," which resulted in "peak selling" and "record shipments." With regard to its debt covenants, Scotts touted that the Company beat internal targets and had "net leverage of 5.9 times debt-to-EBITDA comfortably within covenant maximum of 6.25 times." The Company also stated it was "optimistic we will remain within the bounds of our bank covenants" and "[did] not see leverage compliance issues going forward." The Company claimed it was "tracking to do even better" than its guidance, which the Company later stated was "really, really important for us to avoid covenant hell."

6. These statements, and similar statements made during the Class Period, were materially false or misleading. In reality, by the start of the Class Period, Scotts had an oversupply of inventory that far exceeded consumer demand. Recognizing that problem, Scotts executives engaged in a scheme to saturate the Company's sales channel with more product than those retailers could sell through to end users, a practice that required Scotts sales personnel to pressure retailers to purchase more inventory than they wanted or needed. Further, as Scotts later admitted, the Company was critically close to violating its debt covenants and would have required an

"exceptional year" to remain in compliance with its covenants. Ultimately, Scotts was only able to satisfy the covenants through the channel stuffing scheme. In its fiscal fourth quarter of 2022, Scotts even changed its definition on how it calculated EBITDA in order to stay within the bounds of its debt covenants, as EBITDA was the main metric to calculate the Company's compliance.[1] As a result of these misrepresentations, Scotts common stock traded at artificially inflated prices throughout the Class Period.

7. The truth began to emerge on June 8, 2022, when Scotts admitted that replenishment orders from its U.S. retailers were more than $300 million below target in the month of May alone. The Company told investors that 2022 full-year earnings would be roughly half of its prior guidance. The Company also announced plans to take on additional debt to cover restructuring charges as it attempted to cut costs. In response to these disclosures, the price of Scotts common stock declined by $9.05 per share, or nearly 9%, from a closing price of $102.18 per share on June 7, 2022, to a closing price of $93.13 per share on June 8, 2022.

8. These disclosures came mere weeks after the Company promised that it was "tracking to do even better" than its guidance. Indeed, analysts were shocked by the disclosures, as reflected in a report by Truist commenting that, "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]." However, throughout the rest of the Class Period, Defendants continued to downplay the Company's inventory and debt compliance issues.

9. On August 2, 2023, Scotts revealed that quarterly sales for its fiscal third quarter had declined by 6%, and that gross margins fell by 420 basis points. The Company also slashed fiscal year EBITDA guidance by a staggering 25% and announced a $20 million write down of "pandemic driven excess inventories." The Company also disclosed that it had to modify its debt

---

[1] Scotts' fiscal year ends on September 30.

covenants to 7.00 times debt-to-EBITDA ratio, from the former ratio of 6.25 times debt-to-EBITDA ratio.

10. These disclosures caused the price of Scotts common stock to decline by $13.58 per share, or 19%, from a closing price of $71.44 per share on August 1, 2023, to a closing price of $57.86 per share on August 2, 2023.

11. As a result of Defendants' wrongful acts and omissions, and the resulting decline in market value of Scotts common stock, Plaintiff and other class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Scotts maintains its headquarters in Marysville, Ohio, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III. PARTIES

#### A. Plaintiff

14. Plaintiff City of Hialeah Employees' Retirement System is a benefit pension plan based in Hialeah, Florida that provides pension services and benefits to employees, retirees, and beneficiaries of the City of Hialeah. As indicated on the Certification submitted herewith, Plaintiff purchased Scotts common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### B. Defendants

15. Defendant Scotts is incorporated in Ohio and maintains its corporate headquarters at 14111 Scottslawn Road, Marysville, Ohio. The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "SMG." As of May 3, 2024, Scotts had over 56 million shares of common stock outstanding, owned by hundreds or thousands of investors.

16. Defendant James Hagedorn ("CEO Hagedorn") has served as Scotts' Chief Executive Officer and Chairman of the Board since 2001 and 2003, respectively.

17. Defendant Christopher J. Hagedorn ("Division President Hagedorn") has served as Scotts' Executive Vice President and Division President of Hawthorne since January 2021.

18. Defendant Matthew E. Garth ("Garth") has served as Scotts' Chief Financial Officer and Executive Vice President since December 2022.

19. Defendant David C. Evans ("Evans") served as Scotts' Interim Chief Financial Officer from August 2022 to December 2022.

20. Defendant Cory J. Miller ("Miller") served as Scotts' Executive Vice President and Chief Financial Officer from January 2021 to August 2022. Miller also served as Vice President of Finance of Hawthorne from 2016 to 2020.

21. Defendants James Hagedorn, Christopher J. Hagedorn, Garth, Evans, and Miller are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their position with Scotts, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading.

## IV. BACKGROUND

22. Scotts produces various lawn, garden, and agricultural products for both consumer and professional purposes. It is also the world's largest marketer of branded consumer products for lawn and garden care. Its main brands are Scotts, Miracle-Gro, and Ortho. Scotts is the exclusive agent of Monsanto for distribution of its consumer Roundup products. Scotts sells a vast majority of its products through third-party distributors. In 2014, Scotts formed a wholly owned subsidiary, Hawthorne, which focuses on hydroponics for the emerging cannabis growing market.

23. During the Class Period, Scotts was highly leveraged, with its senior secured credit facilities containing various restrictive covenants and cross-default provisions that require the

Company maintain specific financial ratios. A breach of any of these covenants could result in a default, enabling the Company's lenders to declare all outstanding indebtedness immediately due and payable. A key covenant required that Scotts maintain a debt-to-EBITDA ratio under 6.25.

24. In 2020 and 2021, Scotts missed out on millions of dollars in sales due to a lack of inventory as it faced surging demand. In response to this, Scotts significantly increased its inventory for both its U.S. Consumer and Hawthorne segments to "ensure [it] could service the needs of [its] retail partners." However, the Company quickly realized that it had purchased too much inventory.

25. Rather than write down the inventory or otherwise disclose the issue to investors, Scotts executives engaged in a scheme to saturate the Company's sales channels with more inventory than could be sold to end users. This scheme enabled Scotts to book as revenue the sales to its distributors and maintain earnings to debt ratios that just barely exceeded those required by its debt covenants.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

26. The Class Period begins on November 3, 2021, the day that Scotts announced its financial results for its fiscal year 2021 fourth quarter and full year ended on September 30, 2021. On that same day, Scotts held an earnings call with analysts and investors to discuss the Company's financial results. During the call, CEO Hagedorn claimed, "we see a higher level of sustainable growth with our existing brands . . . based largely on our ability to reach a new generation of consumers." CEO Hagedorn also emphasized that the Company "just finished [its] third straight record year and remain extremely optimistic." Further, he stated, "every cut of the data tells us

8

[consumers] have stayed with the category and our brands throughout this past season." Defendant Miller added "as it relates to inventory, we find ourselves in a very good place right now."

27. On May 3, 2022, Scotts held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2022 second quarter ended on April 2, 2022. During the call, CEO Hagedorn explained to investors that "the lack of capacity in the short term meant we also had to build and hold more inventory to ensure we could service the needs of our retail partners." However, CEO Hagedorn assured investors that the Company was "tracking to do even better," and that weather was Scotts' "biggest challenge" when it came to moving through inventory. Moreover, Division President Hagedorn claimed that although inventories were high, "peak selling is happening now."

28. On August 3, 2022, Scotts held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2022 third quarter ended on July 2, 2022. During the call, Defendant Miller assured investors that any difficulty the Company was encountering in selling its products was primarily caused by "every unit just costing more."

29. On November 2, 2022, Scotts issued a press release announcing its financial results for its fiscal year 2022 fourth quarter and full fiscal year ended September 30, 2022. In the press release, which was also filed with the SEC on Form 8-K, the Company stated that "[b]eginning with the three months ended September 30, 2022, equity in income / loss of unconsolidated affiliates is excluded from the calculation of non-GAAP Adjusted EBITDA. This exclusion is consistent with the calculation of that measure as required by the Company's borrowing arrangements. This change has been reflected in the calculation of Adjusted EBITDA for the three and twelve months ended September 30, 2022. The prior period amounts have not been reclassified to conform to the revised calculation."

9

30. That same day, Scotts held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2022 fourth quarter and full year ended on September 30, 2022. During the call, an analyst asked about the Company's EBITDA growth and how the Company was going to sustain its leverage ratio compliance. Defendant Evans responded by stating, "I can just tell you that the EBITDA growth that we have built in our plan is, today, I mean, we're not presenting a plan that says we're going to be in default. I mean, we're presenting a plan that says we will be in compliance." On the same call, CEO Hagedorn claimed, "I'm optimistic we will remain within the bounds of our bank covenants."

31. On February 1, 2023, Scotts held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2023 first quarter ended on December 31, 2022. During the call, CEO Hagedorn presented the Company's financial performance "against [the Company's] internal targets." He stated, "[n]et sales that beat the plan by nearly $25 million; gross margin improvement of almost 300 basis points against our plan; EBITDA of $21 million against an internal forecast of zero; net leverage of 5.9 times debt-to-EBITDA comfortably within the covenant maximum of 6.25 times." Also on that call, CEO Hagedorn claimed, "I don't think we have a[n] inventory problem at all." Defendant Garth also touted that Scotts had "record December shipments."

32. On March 6, 2023, Scotts presented at the Raymond James Institutional Investors Conference. Defendant Garth represented to investors that the "[f]irst quarter proved that we were able to stay within our covenant 5.9 times against the 6.25 covenant." He continued by claiming the Company experienced "record December shipments."

33. On May 3, 2023, Scotts held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2023 second quarter ended on April 1, 2023.

10

Defendant Garth represented to investors that the "lower shipment volumes are related to our expectation for reduced retail inventory levels." He also claimed that "we've pulled back on production volumes and we are selling through higher cost inventory." On the same call, CEO Hagedorn stated the Company "do[es] not see leverage compliance issues going forward as [it's] looking at the low-5 times range by fiscal year end." He continued by touting that the "team on consumer has just really killed it," which was "really, really important for us to avoid covenant hell" in the first half of the year.

34. The statements set forth above in ¶¶ 26-33 were materially false and misleading. In truth, by the start of the Class Period, Scotts had an oversupply of inventory that far exceeded consumer demand. Recognizing that problem, Scotts executives engaged in a scheme to saturate the Company's sales channel with more product than those retailers could sell through to end users, a practice that required Scotts sales personnel to pressure retailers to purchase more inventory than they wanted or needed. Ultimately, Scotts was only able to satisfy the covenants through the channel stuffing scheme.

## VI. THE TRUTH EMERGES

35. The truth began to emerge on June 8, 2022, when Scotts issued a press released admitting that replenishment orders from its U.S. retailers were more than $300 million below target in the month of May alone. The Company told investors that 2022 full-year earnings would be roughly half of its prior guidance. The Company also announced plans to take on additional debt to cover restructuring charges as it attempted to cut costs.

36. Analysts were shocked by these disclosures, as reflected in a report by Truist commenting that, "[w]e have not seen anything similar occur in the 20 years we have covered [Scotts]." As a result of these disclosures, the price of Scotts common stock declined by $9.05 per

share, or nearly 9%, from a closing price of $102.18 per share on June 7, 2022, to a closing price of $93.13 per share on June 8, 2022.

37. Despites these disclosures, Defendants continued to downplay the Company's inventory and debt compliance issues, as set forth above in ¶¶ 28-33. These statements were materially false and misleading. In reality, by the start of the Class Period, the Company had overpurchased inventory that it was not able to sell and was burdened with debt covenants that it was on the verge of breaching.

38. On August 2, 2023, Scotts issued a press release announcing its financial results for its fiscal year 2023 third quarter ended July 1, 2023. In the press release, which was also filed with the SEC on Form 8-K, Scotts disclosed that it had amended its debt covenants. The most significant amendment was that the Company had to modify its debt covenants to permit a 7.00 times debt-to-EBITDA ratio, from the original covenant that only permitted a 6.25 times debt-to-EBITDA ratio.

39. On the same day, Scotts held an earnings call with analysts and investors to discuss the Company's financial results for its fiscal year 2023 third quarter. Scotts revealed that quarterly sales for its fiscal third quarter had declined by 6%, and gross margins fell by 420 basis points. The Company also slashed fiscal year EBITDA guidance by a staggering 25% and announced it had to take a $20 million write down for "pandemic driven excess inventories."

40. As a result of these disclosures, the price of Scotts common stock declined by $13.58 per share, or 19%, from a closing price of $71.44 per share on August 1, 2023, to a closing price of $57.86 per share on August 2, 2023.

## VII. LOSS CAUSATION

41. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Scotts common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Scotts common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Scotts common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII. CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Scotts common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Scotts and their families and affiliates.

43. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 3, 2024, there were over 56 million shares of Scotts common stock outstanding, owned by hundreds or thousands of investors.

44. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A. Whether Defendants violated the Exchange Act;

B. Whether Defendants omitted and/or misrepresented material facts;

C.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.      Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

E.      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

F.      Whether the price of Scotts common stock was artificially inflated;

G.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

H.      The extent of damage sustained by Class members and the appropriate measure of damages.

45.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

46.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

47.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

48.    To the extent that any of the alleged false statements described in this complaint were forward-looking, Scotts' "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

49.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was made, the speaker knew the statement was

14

false or misleading and the statement was authorized and/or approved by an executive officer of Scotts who knew that the statement was false or misleading. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.     PRESUMPTION OF RELIANCE

50.     At all relevant times, the market for Scotts common stock was an efficient market for the following reasons, among others:

- A.     Scotts common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- B.     As a regulated issuer, Scotts filed periodic public reports with the SEC and the NYSE;

- C.     Scotts regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- D.     Scotts was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for Scotts common stock promptly digested current information regarding Scotts from all publicly available sources and reflected such information in the price of Scotts common stock. Under these circumstances, all purchasers of Scotts common stock during the Class Period suffered similar injury through their purchase of Scotts common stock at artificially inflated prices and the presumption of reliance applies.

52. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Scotts' business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Company's ability to manage inventory and debt compliance requirements, and the negative impact that a failure to do so could have on the Company's business, that requirement is satisfied here.

## XI. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

53. Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

54. During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Scotts common stock at artificially inflated prices.

55. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

16

to maintain artificially high market prices for Scotts common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

56. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

57. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Scotts' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

59. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Scotts common stock. Plaintiff and the Class would not have purchased Scotts common stock at the prices they paid, or at all, had they been aware that the market prices for Scotts common stock had been artificially inflated by Defendants' fraudulent course of conduct.

60. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

61. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

62. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

63. The Individual Defendants acted as controlling persons of Scotts within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Scotts, the Individual Defendants had the power and ability to control the actions of Scotts and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII. JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 6, 2024

/s/ John C. Camillus
**LAW OFFICES OF JOHN C. CAMILLUS LLC**
John C. Camillus, Trial Attorney (0077435)
P.O. Box 141410
Columbus, OH 43214
Phone: (614) 992-1000
Fax: (614) 559-6731
jcamillus@camilluslaw.com

*Liaison Counsel for Plaintiff City of Hialeah Employees' Retirement System*

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

Hannah Ross
Avi Josefson
Scott R. Foglietta
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
scott@blbglaw.com

*Counsel for Plaintiff City of Hialeah Employees' Retirement System*

**KLAUSNER KAUFMAN JENSEN
 & LEVINSON, P.A.**

Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33315
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Plaintiff City of Hialeah Employees' Retirement System*

19