**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| *In re The Scotts Miracle-Gro Company Securities Litigation* | Case No.: 2:24-cv-03132-ALM-CMV<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 6

A. Lead Plaintiffs .......... 6

B. Defendants .......... 7

IV. OVERVIEW OF THE FRAUD .......... 9

A. Company Background .......... 9

B. Before The Class Period, Scotts Misses Out On Lucrative Sales By Failing To Maintain Sufficient Inventory To Satisfy Surging Pandemic-Driven Demand .......... 12

C. During The Class Period, As COVID Lockdowns Ended, Defendants Repeatedly Assured Investors That Demand For Scotts' Products Remained "Extremely Strong" And There Was No "Inventory Problem At All" .......... 16

D. In Truth, By Mid-2021, Defendants Knew That Pandemic-Driven Demand Had Already Reversed And That Scotts' Customers Were Overstocked With Inventory, But Pushed Unneeded Product On Customers To Maintain A Façade Of Enduring Demand And Financial Stability .......... 23

1. External, Real-Time "Point of Sale" Data From Retailers Revealed Slowing Demand For Scotts' Products .......... 24

2. Scotts Collected And Analyzed A Plethora Of Internal Sales And Inventory Data And Disseminated It To The Highest Levels Of The Company Through Software, Daily And Weekly Reports, Regular Meetings, Peer-to-Peer Updates, And At Conferences .......... 31

3. Declining Demand For Scotts' Products Saddled The Company With Massive Excess Inventories .......... 43

4. To Offload Excess Inventory, Scotts Pressured Customers To Take Unneeded Product .......... 46

5. Scotts Could Not Right-Size Inventory Levels, So It Implemented Extensive Cost-Cutting Measures To Improve The Bottom Line .......... 55

E. The Truth Gradually Emerges But Defendants Continue To Mislead Investors .......... 58

1. The June 8, 2022 Press Release .......... 59

2. The August 3, 2022 Q3 Earnings Release and Conference Call .......... 62

3. The August 31, 2022 Announcement of CFO Miller's Immediate, Unplanned Departure from Scotts ........ 64

4. In Late 2022 and Early 2023, Defendants Claimed To Have Righted The Ship ........ 66

5. The May 3, 2023 Q2 Earnings Release and Conference Call........ 69

6. The August 2, 2023 Q3 Press Release and Earnings Call........ 71

F. Following The Class Period, Scotts' Own CEO, Defendant Hagedorn, Confirms Defendants' Culpability And Admits That Hawthorne Is Totally And Completely Worthless ........ 74

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 75

A. Second Quarter 2021........ 76

B. Third Quarter 2021 ........ 79

C. Fourth Quarter 2021........ 83

D. First Quarter 2022........ 87

E. Second Quarter 2022........ 88

F. Third Quarter 2022 ........ 91

G. Fourth Quarter 2022........ 94

H. First Quarter 2023........ 96

I. Second Quarter 2023........ 100

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ........ 101

A. The Individual Defendants Updated Investors Every Quarter (Or More) About Demand, Inventory, and Hawthorne—Subjects Critically Important to Investors—Including In Response To Analysts' Direct Questions........ 101

B. The Individual Defendants Were Extremely Hands-On Executives Who Received Regular Reports And Meticulously Tracked the Company's Key Performance Metrics........ 102

C. The Individual Defendants Were Directly Involved In Making Sales To Scotts' Largest Customers, So Much So That CEO Hagedorn Referred to These Relationships As "Friendships"........ 105

D. By Their Own Admissions, Defendants Demonstrate They Knew Demand For Both U.S. Consumer and Hawthorne Had Dropped Precipitously By The Start Of 2022........ 106

E. Defendants Spouted False Reasons For Scotts' Shortfall Which Analysts Eventually Identified As Illegitimate........ 107

F. The U.S. Consumer And Hawthorne Segments Are Scotts' Core Business Operations Providing Nearly All Of The Company's Revenue .......... 109

VII. LOSS CAUSATION .......... 110

VIII. PRESUMPTION OF RELIANCE .......... 114

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE .......... 116

X. CLASS ACTION ALLEGATIONS .......... 116

XI. CLAIMS FOR RELIEF .......... 118

XII. PRAYER FOR RELIEF .......... 123

XIII. JURY DEMAND .......... 123

Lead Plaintiffs Employees Retirement System of the City of St. Louis and the Detectives Endowment Association Annuity Fund (collectively, "Lead Plaintiffs"), by and through the undersigned counsel, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of The Scotts Miracle-Gro Company ("Scotts," "SMG," or the "Company") between May 5, 2021, and August 1, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below).

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon, among other things, the investigation of Lead Plaintiffs and their counsel, which includes review and analysis of: (a) Scotts' public filings with the SEC; (b) the Company's press releases, reports, and postings on the websites of Scotts and The Hawthorne Gardening Company ("Hawthorne"); (c) shareholder communications, conference calls, and investor presentations; (d) research reports concerning Scotts by securities, financial, and lawn/garden/cannabis industry analysts; (e) data reflecting the price of Scotts' common stock; (f) interviews with dozens of former employees of Scotts and Hawthorne; (g) consultation with industry and financial consultants; (h) pleadings, filings, evidentiary matter, and court orders in other litigation involving Scotts and/or Hawthorne; and (i) additional materials and data concerning Scotts, Hawthorne, the Individual Defendants (as defined below), and the consumer branded lawn and garden market and cannabis market.

Lead Plaintiffs' investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Scotts is one of the nation's largest producers of lawn and garden care products. In recent years, Scotts made a major push into the cannabis industry, investing upwards of $1.7 billion on a new division called "Hawthorne Gardening Company," which Defendants touted to investors as a "growth engine" that would provide "pillars of growth" for years to come.

2. During the Class Period, by far the most important issues facing Scotts was whether weakening demand and excess inventory after COVID-19 restrictions were lifted were materially impacting the Company's operations, and whether Hawthorne would be the growth catalyst that Defendants promised. To that end, throughout the Class Period (May 5, 2021 – August 1, 2023), Defendants made a series of false statements touting Scotts' purportedly positive demand and inventory positions, and extolling Hawthorne's performance and position in the cannabis industry. Defendants repeatedly touted to the market that demand for the Company's lawn, garden and cannabis products was "***strong***" in "***every major product category***," that "***every cut of the data***" confirmed that consumers "***stayed with***" the Company post-pandemic, and that Scotts continued to see "***record***" levels of sales and "***consumer engagement***."

3. Indeed, when inventories spiked at the Company and its largest retailers during the Class Period, Defendants repeatedly assured investors that they were entirely "comfortable" with Scotts' inventory position given the purportedly high level of consumer demand for its products, and went so far as to claim that the Company's large amount of inventory was a "***competitive advantage***" precisely because "***competitors continue[d] to struggle to meet demand***." As a result,

Defendants consistently assured investors throughout the Class Period that Scotts' "***retail inventories [were] reasonable***" and remained "***in a very good place***."

4. Similarly, with respect to Scotts' cannabis operations, Defendants at all times insisted that Hawthorne provided Scotts with a "competitive advantage" in the marketplace that differentiated the Company from its industry peers. Indeed, even as Scotts reported declining sales in cannabis growing products during the Class Period, Defendants continued to emphasize to investors that Hawthorne would be Scotts' "***growth engine***" that was "***position[ed] for long-term success***," and that Scotts would "***retain Hawthorne's competitive advantage in [] cannabis***" because it was "***the leading solution provider for growers, which differentiates us from those who are primarily distributors***." Even as late as May 3, 2023—just three months before the end of the Class Period—Defendants maintained that "***Hawthorne [was] uniquely positioned to thrive***" because it supposedly provided "the complete solution" and "a significant value for [Scotts'] customers."

5. Defendants' statements were false. As over one dozen former Scotts' employees ("FEs") who worked across the country uniformly confirmed, at the time that Defendants made these statements, the exact opposite was true: by the start of the Class Period in May 2021, demand for Scotts' products had rapidly declined as pandemic restrictions were lifted. Significantly, numerous FEs confirmed that "***reports every day from Home Depot of their sales of Scotts Miracle-Gro . . . [showed] the decline in sales once people started returning to the office and customers cutting back on their spend***." Those FEs also reported that Scotts and its retailer customers were "stuffed" with so much excess inventory that the Company was forced to "dump" significant amounts of product that retailers were returning: Scotts had "***barns stuffed with inventory***" because Scotts "***didn't have any customers that had the ability to buy it***." In fact,

because Scotts' warehouses were "at capacity" with excess inventory, when the Company's retailers returned unneeded inventory, the FEs were instructed to "***throw it away or dump it***." Tellingly, Defendants ignored employees' explicit warnings regarding this weakening demand and excess inventory; even though employees "started to tell management mid-pandemic that sales were slowing" and to "stop buying inventory and be ready for the downturn, [] ***executive management never wanted to hear about it***."

6. The truth regarding Defendants' misrepresentations to investors emerged over a series of disclosures beginning in mid-2022. Tellingly, each time Scotts disclosed negative information about its business, Defendants took pains to blame the developments on outside factors while concealing the true extent of the Company's weakening demand and excess inventory problems. For example, on June 8, 2022, when Scotts slashed its full year guidance and disclosed poor financial results, Defendants claimed that Scotts' disappointing sales were due in part to unusually wet weather in March and April, while assuring investors that demand for Scotts' products remained strong, with a "***surge***" of sales in May 2022 that were "***near record levels***." Then, after Scotts again reported disappointing earnings and a write-down of goodwill relating to Hawthorne on August 3, 2022, Defendants falsely blamed a cannabis glut for the write-down and blamed large retailers for purportedly changing "the way [they] are managing their inventory" by "destocking" in the middle of the lawn care season. Although Scotts' stock price declined after these disclosures, Defendants' explanations and continuing deception of the market cushioned those drops, and analysts responded in kind, reporting that the "thesis remains that Scotts' leading core brand portfolio, emerging growth opportunity in hydroponics, and financial position support solid shareholder return."

7. Accordingly, it was not until August 2, 2023 that the full truth emerged. On that day, Scotts reported massive sales declines across the Company, forcing it to write-down millions of dollars in "pandemic-driven excess inventories," and Defendant Hagedorn finally admitted to what Defendants had consistently denied for two years: that, rather than inclement weather or changing retailer inventory habits, in reality, Scotts' poor financial results were directly attributable to "***pandemic-driven excess inventories***" that materially impacted the Company as consumer demand plummeted post-COVID. In addition, just three months after representing to investors that Hawthorne remained "uniquely positioned to thrive" in the cannabis industry, Defendants now revealed that the exact opposite was true: Hawthorne was such a debacle that the Company was actively seeking to extricate itself from the business.

8. Scotts' stock price plummeted in response, falling more than $13.50 per share on August 2, 2023, a staggering decline of over 21%. Analysts were stunned, emphasizing that Defendants had destroyed "decades of earnings" through Scotts' massive build-up of excess inventory and its disastrous foray into the cannabis supply business. Wells Fargo called the disclosure a "***total earnings destruction***," while highlighting that the "***eye-popping***" revelations, including inventory write-offs, had erased "***several decades of earnings***." Similarly, Truist underscored the market's shock regarding Scotts' inventory revelations, noting that "***[w]hat is a surprise is that the company came into FY23 season with such high levels of inventory for its US Consumer business***."

9. In the ensuing months, Defendants shed further light on the collapse of Scotts' stock price, which lost more than $6 billion in market capitalization during the Class Period. On November 1, 2023, Hagedorn acknowledged that Defendants had no one to blame but themselves for the "total earnings destruction" the Company experienced, telling investors: "***you can throw***

***sh*t at us[,] we deserve it***." One month later, Hagedorn admitted that, after years of touting Hawthorne as the Company's "growth engine," in truth, Hawthorne ***had no value whatsoever, and was utterly and completely worthless***. In Hagedorn's own words, Hawthorne was worth "***zero, or less***," and the losses attributable to cannabis "***almost took [Scotts] down***."

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Scotts maintains its headquarters in this jurisdiction, and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading statements, occurred in substantial part in this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III. PARTIES

### A. Lead Plaintiffs

14. Lead Plaintiff Employees Retirement System of the City of St. Louis ("St. Louis Employees") is a public pension system organized for the benefit of current and retired public employees of the city of St. Louis, Missouri. As of September 30, 2024, St. Louis Employees had pension assets under management of approximately $887.5 million. As reflected in its PSLRA

certification (ECF No. 16-3), St. Louis Employees purchased Scotts common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

15. Lead Plaintiff Detectives Endowment Association Annuity Fund (the "Detectives Fund") is a multi-employer defined benefit union pension fund based in New York, New York. As reflected in its PSLRA certification (ECF No. 16-4), the Detectives Fund purchased Scotts common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**B. Defendants**

16. Defendant Scotts Miracle-Gro is incorporated under the laws of Ohio with its principal executive offices located in Marysville, Ohio. The Company's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SMG."

17. Defendant James Hagedorn ("Hagedorn" or "CEO Hagedorn") has served as Scotts' Chief Executive Officer ("CEO") and Chairman of the Board since 2001 and 2003, respectively.

18. Defendant Christopher J. Hagedorn ("C. Hagedorn") has served as Scotts' Executive Vice President and Division President of Hawthorne ("Division President") since January 2021.

19. Defendant Cory J. Miller ("Miller") served as Scotts' Executive Vice President and Chief Financial Officer ("CFO") from January 2021 to August 2022. Miller also served as Vice President of Finance of Hawthorne from 2016 to 2020.

20. Defendant Matthew E. Garth ("Garth") has served as Scotts' CFO and Executive Vice President since December 2022.

21. Defendant David C. Evans ("Evans") served as Scotts' Interim CFO from August 2022 to December 2022.

22. Defendant Michael C. Lukemire ("Lukemire") served as Scotts' Chief Operating Officer ("COO") from February 2016 until September 2023. Lukemire served the Company as COO and in other roles for nearly 28 years.

23. Defendants Hagedorn, C. Hagedorn, Miller, Garth, Evans, and Lukemire are collectively referred to herein as the "Individual Defendants."

24. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Scotts, were privy to confidential, proprietary and material adverse non-public information concerning Scotts, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Scotts' business.

26. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

27. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information about Scotts' financial condition and performance, growth, inventories, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Scotts, common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28. The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Scotts' publicly traded common stock by disseminating materially false or misleading statements and/or concealing material adverse facts.

## IV. OVERVIEW OF THE FRAUD

### A. Company Background

29. Based in Marysville, Ohio, Scotts is one of the nation's largest makers of branded consumer products for recreational and professional lawn and garden care. The Company's main

brands are Scotts, Miracle-Gro, and Ortho. Scotts is also the exclusive agent for distribution of Roundup weed killer products manufactured by Monsanto.

30. Scotts began as a seed company in 1868 and, by the early 1900s, began selling grass seed to homeowners. Thereafter, the Company increasingly focused on consumer products for lawn and garden care. In 1992, Scotts became a publicly traded company and, in 1995, merged with Miracle-Gro Products, Inc., to become The Scotts Miracle-Gro Company.[1] For years, the Company reported flat or slow growth. Indeed, between 2010-2020, the Company's core U.S. Consumer segment reported average annual growth of less than 5%, and for most of that time period, Scotts reported only 0-2% annual growth.

31. In 2015, Scotts launched a bold new strategy to boost its growth. The Company would expand into the nascent cannabis market by providing hydroponic and other indoor growing supplies designed for consumer, and later commercial, cannabis cultivation. Scotts formed a wholly owned subsidiary, Hawthorne, to implement the strategy. Following its formation, Scotts rapidly expanded Hawthorne through a series of acquisitions, targeting sellers and manufacturers of virtually all products used to grow cannabis, including lighting, plant nutrients, water filtration, and ventilation. Between 2015 and 2022, these acquisitions, made to support Hawthorne, cost Scotts more than $1 billion. This aggressive acquisition strategy made Hawthorne stand out in the cannabis industry, which had largely been developed around smaller, "mom and pop" operations. Ultimately, Scotts would pour over $1.7 billion into Hawthorne, representing over six years of the Company's earnings (net income), beginning with the launch of the division in 2015.

[1]Miracle-Gro Products, Inc. was founded by Horace Hagedorn, father of Defendant CEO Hagedorn and grandfather of Defendant C. Hagedorn.

32. Together, the U.S. Consumer and Hawthorne segments collectively accounted for more than 90% of the Company's reported revenue and earnings during the Class Period. Within the U.S. Consumer segment, approximately 60% of the business was concentrated in the "Big Three Retailers": Home Depot, Lowe's, and Walmart.

33. The U.S. Consumer segment's business is extremely cyclical, with the largest volume of sales typically occurring in Scotts' third and fourth fiscal quarters, the spring and summer growing period of April through September. Before the Class Period, Scotts historically posted losses in the first fiscal quarter, a period in which it traditionally produced inventory in advance of the spring season. Given the cyclical nature of the U.S. Consumer business, for decades, Scotts relied on a revolving credit facility with lenders that allowed the Company to draw on as much as $1.5 billion to meet manufacturing, distribution, and other operational costs. Scotts would typically pay down the debt in the ensuing quarters with revenues from the high-volume sales from the peak periods.

34. The most important factor determining Scotts' cost of borrowing under the credit facility was the Company's debt-to-earnings ratio (the "Leverage Ratio"). For over a decade, Scotts benefitted from a low Leverage Ratio—typically about 3% or less—resulting in low borrowing costs to profitably manage the seasonality in the Company's business. Indeed, for over two years prior to the start of the Class Period, Scotts reported an average leverage ratio of only 2.65x, comfortably within the bounds of its debt covenant, and resulting in an interest rate of only about 1% over the referenced rate under the terms of the operative credit facility.

35. Scotts' historically low borrowing costs helped boost its bottom line. Indeed, the U.S. Consumer segment consistently reported profit margins of over 30% in each of the three fiscal years leading up to the Class Period. Significantly, under the Company's credit agreement with its

lenders, the reported Leverage Ratio (i.e., the debt covenant) defined the borrowing costs, which would in turn impact Scotts' profitability. At all times, the Company was required to remain within a certain Leverage Ratio range, and within that range, the cost of borrowing would increase or decrease depending on the actually reported Leverage Ratio.

36. As discussed below, Scotts' Leverage Ratio began to sharply rise during the Class Period because of substantial sales declines, increased inventories, and staggering costs associated with the Company's cannabis strategy, which forced the Company to negotiate two amendments to its credit facility to avoid breaching the maximum allowable Leverage Ratio. By the end of the Class Period, these amendments ultimately expanded the maximum permitted Leverage Ratio to as high as 7x. Expanding the maximum allowable Leverage Ratio dramatically increased the Company's borrowing costs, which then significantly reduced its profit margins, and diminished its ability to profitably operate the business.

### B. Before The Class Period, Scotts Misses Out On Lucrative Sales By Failing To Maintain Sufficient Inventory To Satisfy Surging Pandemic-Driven Demand

37. In early 2020, as the pandemic caused prolonged cessation of normal, face-to-face business and social interactions, the U.S. population "sheltered in place" at home. Specifically, in March 2020, the World Health Organization declared COVID-19 a global pandemic and U.S. states and territories began implementing stay-at-home orders that limited the ability of consumers to travel outside their homes. Stuck at home, millions of American took up gardening, tending to their lawns, and growing and consuming cannabis. Scotts, in turn, experienced an unexpected surge in demand for its core lawn and garden products, and Hawthorne's cannabis growing supply business also experienced record sales.

38. Soon after the COVID lockdowns began in March 2020, Scotts announced strong financial results for Q2 2020[2] driven by an influx of new customers for the U.S. Consumer segment and a surge in Hawthorne sales. As CEO Hagedorn told investors during the accompanying earnings call on May 6, 2020, "the [home gardening] category has expanded, and our job going forward is to keep those new customers engaged." Scotts' executives described in September 2020 how the lawn and garden market "surged" in March 2020 when COVID lockdowns drove "massive" demand and "consumers became more accustomed to working from home, and focused on their yards." As CEO Hagedorn stated during the Company's Q1 2022 earnings call, by the beginning of 2021, Scotts' business was "insane."

39. Leading up to the Class Period, Scotts continued to report record sales and profits driven by the COVID-fueled surge in demand for garden and lawn products, and an accompanying boom in cannabis consumption. For example, on July 29, 2020, the Company reported Q3 2020 sales growth well above management's "most optimistic expectations," including a 21% increase in the U.S. Consumer segment and a 72% increase at Hawthorne. Similarly, on November 4, 2020, Scotts announced "record fourth quarter and full year results driven by strong product demand in both major reporting segments." Demand was so strong that, as then-CFO Coleman described, "retailers were working to rebuild depleted inventory levels," and "if things were ideal, we would have probably had about another $100 million of inventory versus where we finished the year."

[2] Scotts' fiscal year is October through September. Its fiscal first quarter ends on December 28, fiscal second quarter on March 29, fiscal third quarter ends on July 3, and fiscal fourth quarter ends on September 30. Given the seasonality of Scotts' business, the Company customarily reports comparisons in performance in a given reporting period against the same period in the prior year. Accordingly, unless otherwise noted, all comparisons of Company performance in a given period set forth herein are measured against the same period in the prior fiscal year.

40. Caught off guard by the surge in demand, Scotts announced it was substantially ramping up its production. In announcing Q4 2020 earnings on November 4, 2020, CEO Hagedorn doubled the number of lost sales to $200 million, stating that the Company "left sales on the table over the last 2 quarters, probably $200 million in U.S. Consumer and Hawthorne combined, just because we couldn't keep up." Similarly, on February 3, 2021, Scotts reported "record" results for Q1 2021, including a 147% increase in U.S. Consumer sales and a 71% sales increase at Hawthorne. CEO Hagedorn updated the market on the Company's efforts to rapidly build inventory, explaining that "shipments are significantly outpacing POS[3] right now as retailers build inventory ahead of the season," and "we are also building more inventory" because "we don't want to find ourselves where we were last year and leave sales on the table." When analysts expressed concern that Scotts was overproducing and had built up too much inventory, Defendants responded that to the contrary, Scotts still had not built *enough* inventory. For example, on the same Q1 2021 earnings call, CEO Hagedorn specified that "we think between Hawthorne and Scotts, all of the consumer side, that we probably lost nearly $300 million in sales last year that we couldn't ship," adding, "we didn't have the product we needed."

41. Accordingly, as of the start of the Class Period, Defendants had consistently touted an influx of millions of new customers who purportedly remained so engaged in gardening, lawn care, and cannabis that Scotts could not produce and ship and enough product to meet the surge in demand. Defendants assured investors that the growth was sustainable based on Scotts' deep understanding and meticulous tracking of consumer purchases, and that the Company's rising inventory levels were of no cause for concern—indeed, if anything, inventory was still too low as

[3] The abbreviation "POS" stands for "Point of Sale" and refers to the transaction in which the end-customer completes a purchase at a retailer.

Scotts had already missed out on well over hundreds of millions of dollars in lost sales. At the same time, Defendants held Hawthorne out as the leader in the cannabis growing industry, already delivering record sales and poised to drive years of profitable growth. Indeed, less than a month before the Class Period, Scotts updated its full-year financial guidance, with Hawthorne now expected "to perform on the high-end of its sales growth guidance range of 20-30 percent." At the Company's Investor Day conference on April 8, 2021, CEO Hagedorn affirmed that at Hawthorne, "the potential for sustainable double-digit growth in the coming years … is real" and "requires us to look harder at what's required to meet the future needs of this business."

42. Fueled by the unprecedented COVID-fueled surge in demand for Scotts' products, between the onset of the pandemic in March 2020 and the Class Period start in May 2021, Scotts' stock price soared nearly $150, from a closing price of nearly $93 per share on March 12, 2020, to a closing price of over $242 per share on May 5, 2021, an increase of more than 160%.

43. As discussed below, Defendants knew but concealed from investors that the COVID-fueled demand surge that Scotts enjoyed during the pandemic was not sustainable, and in fact had already begun to reverse by early 2021. Indeed, granular POS data provided by all of Scotts' major retailers, and a variety of other sophisticated sales tracking and reporting systems maintained by Scotts and its retail customers, made it clear that the COVID related growth was substantially declining in key regions across the country no later than May 2021—months after COVID-lockdowns lifted—with especially steep declines of 40-50% at Hawthorne. Moreover, having massively overproduced during the pandemic, by the start of the Class Period, Scotts and its customers were loaded with enormous amounts of excess inventory. Rather than disclose the truth, Defendants continued to flood their sales channels with unneeded product while falsely representing to investors that Scotts' purported millions of new consumers remained "highly

engaged in the category"; inventory levels were "reasonable" to meet consumer demand; and, critically, that the Company's $1.7 billion foray into the cannabis industry was being executed flawlessly such that "sustainable double-digit growth" in the coming years was "real" and "achievable."

### C. During The Class Period, As COVID Lockdowns Ended, Defendants Repeatedly Assured Investors That Demand For Scotts' Products Remained "Extremely Strong" And There Was No "Inventory Problem At All"

44. During the Class Period, Defendants repeatedly assured investors of the "strong" and "record" demand for the Company's lawn, garden and cannabis products, reporting that "every cut of the data" confirmed that consumers "stayed with" the Company after pandemic restrictions lifted and consumers were free to leave their residences and return to face-to-face business and social interactions. On virtually every earnings call from the state of the Class Period to the first partially corrective disclosure, Defendants claimed that demand for Scotts' products—especially its core lawn and garden products—remained strong. Moreover, throughout the Class Period, Defendants assured investors that they purportedly closely monitored and effectively managed demand and inventory—which provided Defendants with excellent "visibility" into current and future demand, sales, and inventory levels—and that neither Scotts nor its retail customers were experiencing any excess inventory issues. Likewise, with respect to Scotts' cannabis growing supply operation, Defendants at all times during the Class Period assured investors that Hawthorne provided Scotts with a "competitive advantage" over its cannabis market competitors and that Hawthorne was a "growth engine" that positioned the Company "for long-term success."

45. The Class Period begins on May 5, 2021, when Scotts announced "Record Second Quarter Results," including a 23% increase in U.S. Consumer sales with "strong growth in all product categories," and an even greater 66% increase in Hawthorne sales. During the accompanying Q2 2021 earnings call, CFO Miller proclaimed that "the business is operating as

well as I've seen during my 20-year tenure here." Defendants reiterated that Scotts desperately needed to increase production to meet the record consumer demand. CEO Hagedorn stated, "I think we're leaving a lot of sales on the table … on both businesses, to be honest," and clarified, "we were leaving sales on the table when we couldn't deliver." Following Defendants' positive statements, the price of Scotts' common stock increased on May 5, 2021, by 6%, or over $14 per share, on unusually heavy trading volume.

46. Defendants' assurances that demand for Scotts' products remained at record levels were highly material to investors because, at the time the statements were made, the pandemic's stay-at-home restrictions had ended and consumers were free to leave their residences and resume face-to-face business and social interactions. Indeed, as of May 1, 2021, virtually every U.S. state had either entered the final phase or completed their reopening plan, which permitted businesses, activities, and other venues to resume operations with minimal or no limitations.

47. With COVID lockdowns lifted, Defendants specifically impressed upon investors that the end of the lockdowns had absolutely no adverse impact on the Company's business. For example, during an earnings call on August 4, 2021, CEO Hagedorn proclaimed that: "For more than a year, I've been telling anyone who would listen that I believe Scotts Miracle-Gro would exit COVID as a fundamentally stronger company. And the deeper we dig, the more we analyze, the more I'm convinced that is exactly what's happened. Our consumer base today is vastly bigger and more engaged than prior to the pandemic." According to Hagedorn, consumer demand remained so strong that it exceeded the Company's expectations and "allowed us to call up our numbers twice this season," with consumer participation "up 8%" based on the Company's data.

48. Defendants were equally emphatic in extolling the success of the Company's cannabis-focused growth strategy. For example, during the same Q3 2021 earnings call, CEO

Hagedorn hailed Hawthorne as the Company's "***growth engine***," and specified that it "***continues to outperform the market and is positioning itself for long-term success***." Hagedorn emphasized that Hawthorne had "***built competitive advantages that others in the industry can't match***" and enjoyed "extremely strong" growth trends of 48% that quarter and projected "growth of 40% to 45% on a full year basis."

49. Defendants continued to promote the Company's cannabis-focused business during virtually every earnings announcement during the Class Period. For example, the Company's Q4 2021 earnings release, issued on November 3, 2021, touted Hawthorne's achievement of 39% growth in fiscal 2021, and during the accompanying earnings call, CEO Hagedorn lauded the Company's "unique level of expertise in the cannabis industry," and outlined how Hawthorne was driving the "next step in our evolution" through its "pillars of growth." His son, C. Hagedorn, doubled down, stating that Hawthorne had "***distanced [itself] from the competition***" and that "the cannabis industry still has miles of runway ahead of it." Shrugging off concerns of a glut of cannabis in the market, C. Hagedorn minimized the oversupply as a "temporary" situation in California that "should solve itself once the current supply makes its way through the marketplace."

50. Further underscoring Hawthorne's success, on January 4, 2022, Scotts issued a press release announcing the completion of Hawthorne's acquisition of Luxx Lighting, a leading provider of indoor growing lights. Scotts reported that the $215 million purchase—an amount equal to more than 50% of Scotts' publicly reported earnings for all of FY 2021 and the second largest acquisition in Scott's history—would add "approximately $100 million in sales and $20 million in operating income to Hawthorne on an annualized basis." Scotts also reiterated its EPS guidance of $8.50-$8.90, and reassured investors that while it had lowered projections of organic

sales at Hawthorne, the cut was largely due to short term "supply chain disruptions" that "will be corrected by the end of January" thus enabling the Company "to meet the continued demand we're seeing for our industry-leading signature [cannabis] products." Barclays and Wells Fargo both issued reports maintaining their ratings following the announcement of the Luxx Lighting acquisition, Scotts' reiterated earnings guidance, and Defendants' further reassurances regarding Hawthorne's performance.

51. In addition, and significantly, throughout the Class Period, Defendants silenced any market concerns that Scotts or its retail partners had an over-accumulation of inventory that outstripped consumer demand. For example, during the Q3 2021 earnings call on August 4, 2021, when an analyst questioned the state of "retail inventories and [Scotts'] own inventories on your own balance sheet," COO Lukemire pointed to prior shortages in 2020, responding, "we are holding on to those consumers" and "naturally retail inventory is going to be higher to support that business… we were way behind last year." CEO Hagedorn added rhetorically: "lessons learned coming out of COVID? … We have to like build all kinds of capacity" and "we can't operate in a world where everything is beyond capacity."

52. Similarly, in announcing Q4 2021 earnings on November 3, 2021, Defendants emphasized the need for the Company to maintain higher levels of inventory due to the strong consumer demand that existed "in every major product category." During the accompanying earnings call, CEO Hagedorn proclaimed that the size of the Company's market had more than ***doubled*** over the past year, necessitating even higher inventories. According to Hagedorn, as of November 2021, U.S. Consumers' total addressable market grown to approximately "20 million new gardeners" who were "highly engaged" and "showing us that lawn and garden is an essential part of their lives." Hagedorn was definitive, stating that: "***Every cut of the data tells us they have***

***stayed with the category and our brands throughout this past season*.**" Given this exceptionally strong, broad-based consumer demand, CFO Miller reinforced that "as it relates to inventory, we find ourselves in a very good place right now" and "we do not expect to have any problems getting our customers at the appropriate inventory levels either." Miller added that with inventories "up $500 million from fiscal '20," "***it's hard not to feel good about where we sit right now***."

53. At the end of Q1 2022, the Company's inventory stood at $1.6 billion, an increase of $590 million or nearly 60%. During the Q1 2022 earnings call, CFO Miller told investors Defendants were not only "comfortable" with the Company's large amount of inventory, but that it was "***a competitive advantage***" as they expected to see other "competitors continue to struggle to meet demand this year." Miller likewise assured investors that Scotts' retailers finished the quarter with inventory levels in line with where they were a year ago—"the best-case scenario for us." He explained that retailers "remain committed to the category through the fall season and kept appropriate levels of inventory in their stores as we approach the slowest weeks of the year. That leaves them well positioned as we pivot into our key selling season."

54. On the same Q1 2022 earnings call, CEO Hagedorn specified that one-third of Scott's $1.6 billion in inventory was "just getting back where we should have been last year" (alluding to supply shortages), and that "the rest of it is investing to make sure we can actually supply for the spring." Like Miller, Hagedorn assured investors that Defendants were not only comfortable but "pretty happy" with both Scotts' level of inventory and its retailers' levels of inventory, and he brushed aside concerns of any excess inventory build: "We do not feel overextended ourselves. And we don't feel that way about retailers. Retailers are ordering heavy right now. ***So there's no indication there's any sort of inventory at retail or with us that's an issue***."

55. Defendants also assured investors about Hawthorne's increasing inventories, calling them a "competitive advantage." As with the U.S. Consumer division, Defendants told investors that not only were Hawthorne's high inventories not a cause for concern, they uniquely positioned Hawthorne for success. For example, during the Q1 2022 earnings call, C. Hagedorn highlighted Hawthorne's inventory build as a differentiator between it and its competition, stating "all the indicators that we got within our business are pretty positive right now," adding, "we are going to benefit from that [inventory level] much more than anybody else because of our positioning… you've got people that want to order product and you just don't have the profit [sic] to fill those orders. So we're just not going to leave ourselves in that position again." Beyond rising inventories, C. Hagedorn touted Hawthorne's ongoing success in expanding Hawthorne's operations, noting that "we've doubled our distribution center footprint" and "increased headcount pretty significantly just to match the scale and the growth of the category over the past few years."

56. During the first half of 2022, Defendants continued to tout the continued strong demand, sales, and inventory levels in both of the Company's businesses. For example, in announcing Scotts financial results for Q1 2022, Defendants highlighted that the U.S. Consumer segment was profitable in the quarter "for only the second time in company history." In the February 1, 2022 earnings release, CEO Hagedorn boasted that the "U.S. Consumer segment continues to exceed our expectations," touting the "continued level of consumer and retailer support" with increased sales by both volume and dollar value "at our largest retail partners." During the accompanying earnings call, Hagedorn underlined that "a continued high level of consumer engagement had led to a second straight year of Q1 profitability in the U.S. Consumer segment with strong momentum." Hagedorn also touted demand for Hawthorne's lighting

business, which had been enhanced by the December 2021 purchase of Luxx Lighting, declaring: "Our best light source is building as fast as we can make them." [4]

57. On May 3, 2022, Scotts announced its Q2 2022 financial results, reporting "record second quarter sales in its U.S. Consumer segment driven by continued support from its major retail partners." During the Q2 2022 earnings call, Defendants continued to allay market concern about Scotts' levels of inventory, which remained at approximately $1.6 billion. CFO Miller explained that about half of the inventory was in U.S. Consumer and the other half at Hawthorne, but assured investors that the inventory levels would quickly fall through sales, emphasizing that "[w]e're kind of right about the peak as peak sell-in is happening now."

58. Significantly, Scott's strategy of ramping production, maintaining large inventories, and ongoing acquisitions and other efforts to grow Hawthorne was increasing pressure on the Company's Leverage Ratio. By the end of Q1 2022, Scotts' Leverage Ratio had increased to over 3.3x for the first time since the pandemic. To quell investor concern, Defendants had assured investors during the earlier Q1 2022 earnings call that its Leverage Ratio remained well below internal targets but even if it were to exceed them, Scotts would remain well within its debt covenants. CFO Miller stated: "Given our current outlook for the business and our expected outlay of capital, we could slightly exceed our leverage target of 3.5x by the end of the fiscal year. We were at 3.3x at the end of Q1. If we exceed our 3.5x target, we expect to get back below that level within a quarter or 2, and we would still be well within our current debt covenants." During the Q2 2022 earnings call, Defendants continued to reassure the market about the Company's Leverage Ratio, which had increased to 3.8x. Once again, CFO Miller reiterated that that as sales

[4] In March 2022, Hawthorne privately put Luxx Lighting on notice that there were defects relating to the characteristics, quality, compliance, and condition of Luxx products included in the December 2021 acquisition of Luxx by Scotts.

went out the door, the Company's Leverage Ratio would improve, as the Company paid down its credit facility balance: "[a]s we start collecting on the sales that are happening now, we'll start paying down that revolver balance to get down to where we normally are at the end of the year." Pushing credit facility balances down had become increasingly critical because, as Miller reported, the higher Leverage Ratio drove interest expense $9 million higher in the quarter and $17 million higher year to date.

### D. In Truth, By Mid-2021, Defendants Knew That Pandemic-Driven Demand Had Already Reversed And That Scotts' Customers Were Overstocked With Inventory, But Pushed Unneeded Product On Customers To Maintain A Façade Of Enduring Demand And Financial Stability

59. Defendants' claims throughout the Class Period that pandemic-driven demand for Scotts' products remained "strong," that additional production was allowing the Company to "meet the demands of the customers," that Scotts' largest customers required even more inventory amid "paranoia" "of not being able to stock" Scotts' products, and that the Company's own inventory levels were "in a very good place," giving it a "competitive advantage" were materially false and misleading and omitted material facts.

60. In truth, Defendants knew as early as mid-2021 that the pandemic-driven demand for Scotts' products was not sustainable and, in fact, had already started to subside. Indeed, by no later than July 2021, the Company's internal indicators showed customer demand waning and that Scotts and its retailers were "stuffed" with excess inventory that could not be sold. The inventory overstocking was so severe that Scotts literally had no room to accept customer returns and was forced to "dump" returned product. Nevertheless, to boost gross sales and conceal declining demand, Defendants ramped up production in both relevant business segments and pushed inventory onto its retail and distributor customers in amounts that far exceeded those necessary to meet consumer demand, creating a "glut" of excess inventory at Scotts and in its sales channels.

61. The truth about Defendants' scheme, beginning in mid-2021 and continuing through the Class Period, to create a false impression of strong demand by stuffing Scotts' sales channels with hundreds-of-millions-of-dollars-worth of excess inventory, is confirmed in cross-corroborating and overwhelmingly detailed accounts of over one dozen Scotts' former employees from both the U.S. Consumer and Hawthorne segments.[5] These former employees each have direct knowledge of the facts they have reported, because their accounts describe observations made in the ordinary course and scope of their employment at nearly every level of the Company, whether as a sales manager, a regional director, an in-store merchandiser, and on up through executives responsible for merchandising, marketing, and strategy in locations across the country, including at Scotts' corporate headquarters in Marysville, Ohio. Collectively, these former employees describe the scale, purpose, timing, and methods used to present what the Defendants knew was a false appearance of high demand for Scotts' U.S. Consumer and Hawthorne products, through a channel stuffing scheme designed to increase EBITDA that became increasingly desperate as the Company came ever-closer to "busting" their debt covenant when inventory began to accumulate and the cost to produce and store it rose and demand waned.

### 1. External, Real-Time "Point of Sale" Data From Retailers Revealed Slowing Demand For Scotts' Products

62. Numerous former employees confirmed that Scotts got caught off-guard in 2020 when the Company lacked sufficient inventory to fulfill retail customer orders and meet soaring consumer demand for its U.S. Consumer and Hawthorne products as pandemic restrictions kept

---

[5] Certain of the Complaint's allegations are based on information provided by former employees of Scotts and/or Hawthorne, who were personally interviewed by Lead Counsel's attorneys. To maintain their confidentiality, throughout this Consolidated Complaint, all confidential witnesses are referred to as "former employee #" or "FE #" and use feminine pronouns. Unless otherwise indicated by use of a more specific date or date range, FEs observations are limited to incidents that occurred during the Class Period.

people at home. As a result, Scotts publicly stated many times that it had "missed" a minimum of $100 million in indoor/cannabis related sales revenue and $200 million in traditional lawn & garden sales revenue. To avoid any future "misses," Scotts told the market it was ramping up production of its products in both segments to unprecedented levels to satisfy the purportedly "strong" demand growth. These assertions were wrapped in a cloak of reliability created by Defendants' investor communications touting the "visibility" Scotts' sophisticated data systems provided into demand by, among other things, aggregating granular point-of-sale data delivered daily from its retail partners.

63. However, unbeknownst to the market, starting in mid-2021, former employees stated that this highly sophisticated retailer sales data—including a variety of "point of sale" or "POS" data, which was updated daily—showed no such demand growth. Specifically, by March or April 2021, the Company was already experiencing a 20% year-over-year decline in demand for the U.S. Consumer segment. Nevertheless, the Company created "fatter" levels of inventory that rapidly began to accumulate. Former employees also confirmed that by mid-2022, Scotts' major retail partners became so "stuffed" with excess inventory that they literally had no room to take additional shipments and were, therefore, returning excess product and demanding reimbursement for it, and Scotts itself had so much excess inventory yet to be sold that it was forced to "dump" it—along with the sizeable amounts of product that retailers were returning. According to the former employees, the entire "house of cards" came crashing down in 2022, although Defendants concealed the true scope and severity of the problem for another year.

64. According to multiple FEs, Scotts had access to granular POS data for the U.S. Consumer segment's top customers, including Home Depot, Lowe's, and Walmart (which collectively comprised over 60% of segment sales), which clearly showed consumer demand was

reversing no later than in ***mid-2021*** and had cratered by ***late 2021***. For instance, FE 1,[6] a Senior Analyst-Sales Strategy and Execution at Scotts from May 2019 until May 2022, stated that she received "***reports every day from Home Depot of their sales of Scotts Miracle-Gro***," which included ***all*** Home Depot stores nationwide, because her job was to analyze Home Depot's daily sales data and roll up that information into Tableau[7] dashboards for senior management.

65. Based on the daily reports she received, FE 1, a Senior Analyst-Sales Strategy and Execution at Scotts from May 2019 until May 2022, recalled that in the beginning of 2021, sales trends were all up as people were "still reaping COVID benefits," but ***by August or September 2021***, those trends had started to reverse as pandemic restrictions loosened. She confirmed that this downward sales trend was visible through the Tableau dashboards provided to senior management, which rolled up and visualized the retailers' granular POS data. In particular, FE 1 said the data showed sales were down for fertilizer, grass seed, and Scotts' other ***best-selling and most expensive lawn and garden products***.

66. Across a variety of levels and different functions, departments, and geographic regions Scotts' personnel had regular visibility into up-to-date sales performance, and other key metrics, of Scotts' products at its top retail customers. For example, FE 2,[8] a former Sales Manager for Scotts' U.S. Consumer segment, recounted that throughout the Class Period she had access to

[6] FE 1 served as a Scotts Senior Analyst in Sales Strategy and Execution in Atlanta, Georgia from May 2019 until May 2022. FE 1 said her role was to support the business development managers by ensuring that inventory and sales data ran smoothly from Home Depot to Scotts and vice versa. FE 1 worked out of Scotts' Atlanta, Georgia office and reported directly to Sales Analytics Manager David Wilcox as well as the Vice President of Business Development for the Southeast region.

[7] Tableau is a leading provider of interactive data visualization, and business intelligence and analytics software. Tableau specializes in providing dashboards that empower companies to find insights in their data, create intuitive dashboards, and share them within the organization.

[8] FE 2 served as a Sales Manager in the Southwest region throughout the entire Class Period, and was responsible for servicing primarily Home Depot and Lowe's retail stores in that region.

customer data showing the amount of fertilizer, grass seed, plant food, and soil sold on a daily, weekly, and monthly basis, and could see the slowdown in demand for these products by the beginning of 2022. FE 2 commented, "***we could see exactly what was not selling and fertilizer definitely dropped as well as grass seed***," which she recalled "***was no surprise because people weren't stuck at home anymore***." FE 2 stated that the Company expected sales to decline post-COVID, "***[w]e all assumed it was going to happen, and it did. We saw it in the data that we had access to every week***."

67. FE 3,[9] Scotts' former Manager of Strategy, who reported directly to the Chief of Staff to the COO and was responsible for, *inter alia*, preparing daily operational reports and bi-weekly slide decks for the COO, corroborated FE 1's account that Scotts received daily reports from its top customers, including Lowe's and Home Depot, ***which allowed Scotts' senior executives to see its key retail partners' sales performance on a daily basis***. FE 3 confirmed through this "***daily feed***," Scotts had visibility into the uptick in sales during the pandemic, and the drop in sales when COVID restrictions were lifted.

68. Indeed, by the end of 2021 and into the beginning of 2022 demand was so low that, according to FE 1, Scotts employees were actually "***told to visit Home Depots on the weekend and meet with the merchandisers to help them sell more products***."

---

[9] FE 3 worked for Scotts in various roles from June 2006 to August 2022, including as Manager of Strategy at the Company's corporate headquarters in Marysville, Ohio from March 2015 until August 2022. In this role, she reported directly to Peter Supron ("Supron"), Chief of Staff to the COO, Lukemire (and Supron reported directly to Lukemire) and was responsible for preparing daily operational updates for the COO on a wide array of Company-wide issues, running cross-departmental meetings, handling various special projects (multi-million-dollar supply chain initiatives), and organizing slide decks for quarterly shareholder meetings. FE 3 also organized, attended, and prepared the slide decks for regular COO-led weekly meetings.

69. Significantly, Scotts' major retailers provided the Company not only with key performance metrics showing actual declines in sales in 2021, but also detailed forecast ranges for 2022 that predicted negative numbers to at most 1% growth.

70. Likewise, the pandemic surge in demand for Hawthorne's indoor/cannabis growing products also began to sharply decline by the start of the Class Period. Multiple former Hawthorne employees responsible for sales in different regions confirm that ***beginning in May 2021*** and continuing through 2022, as demand significantly declined, Hawthorne's retail customers, already flush with inventory far exceeding demand, overwhelmingly reduced and canceled orders.

71. Numerous former Hawthorne employees described that as the cannabis market became saturated, demand for growing products waned, causing Hawthorne's sales to plummet. Detroit was already struggling by May 2021, with sales down more than 50% by that time, and down 80% by Q4 2021. In the Los Angeles market—Hawthorne's key territory and largest market—sales began slowing in May 2021, continued to weaken throughout the remainder of 2021, and ***by the end of 2021 were down by 80%.*** In the Northwest region (a top-two region by revenue that provided, together with the Southwest region, about 80% of Hawthorne's revenue), ***sales declines were down to negative 30% to negative 40%,*** by ***May to July 2021,*** and by the fall of 2021, had declined by 70-80%.

72. As FE 3 recalled, ***Hawthorne sales were down in its leading regions by 30-50% on average in mid-2021.*** This decline accelerated over the following months and, according to FE 3, ***by fall 2021,*** sales declines were a severe nationwide issue, ***down 70-80% across all regions nationwide.***

73. FE 4,[10] a former Hawthorne Territory Sales Manager in Central California, stated that it was ***clear to her by mid-2021 that the pandemic boom was over*** because cannabis prices were plummeting. She explained that Hawthorne's "main metric" for evaluating demand was "the price of weed," emphasizing that this "told us everything we needed to know," because "[o]nce the price starts dropping, everything starts changing." FE 4 reported that Scotts closely tracked this metric by aggregating external public sources and proprietary information, and, by mid-2021, could see the cannabis market becoming oversaturated as prices dropped from $3,500-$2,500/pound at the height of the pandemic, to $1,500/pound, and eventually plummeting to $300/pound in late 2021. FE 4 emphasized that Hawthorne's sales teams across the country saw the downturn on the horizon and "***started to tell management mid-pandemic that sales were slowing,***'" and to ***"stop buying inventory and be ready for the downturn,*** but executive management never wanted to hear about it."

74. As the cannabis market tanked in mid-2021, FE 4 stated that sales of "hardware" (*i.e.*, lights and other durables used to set up grow operations) dramatically dropped off, citing this as another ***"huge indicator" COVID growth trends had reversed.***

75. FE 5,[11] the former Hawthorne Regional Sales Director for the Northeast, confirmed Hawthorne had experienced unprecedented growth during the pandemic, but ***it was clear around February 2021 that "never can we make those numbers again."*** She explained that during the

[10] FE 4 was a Hawthorne Territory Sales Manager from June 2018 through September 2022, responsible for sales in Northern California and Nevada. FE 4 reported to Hai Truong, then, after he was laid off, to Michele White, a Sales Director in California, and finally to Travis Farrell, then Sales Director for the Northwest.

[11] FE 5 served as Hawthorne's Regional Sales Director for the Northeast from April 2017 until May 2022. Her territory spanned from Ohio to Maine. Prior to that role, FE 5 served as an Account Manager in the Northeast from April 2017 until October 2020, and prior to that had served in various roles at Sunlight Supply for over a decade.

pandemic, customers were "***triple ordering to ensure that they could get some (lights), and then when inventory finally arrived, a large majority of them stopped their orders***." She recalled that when "[e]verybody went back to work and sales stopped," retailers were "very honest," and made it "abundantly clear" that sales were down and the record sales they experienced during COVID were ***"never going to happen again."*** FE 5 estimated that ***by mid-2021, sales had dropped off 60-80%*** from COVID highs and only got worse through the year. FE 5 confirmed sales never recovered by the time she left the Company in May 2022.

76. FE 6,[12] a former Hawthorne Commercial Sales Manager in the New England region, similarly described slowing growth in her region ***by the summer of 2021***, and noted that there were even "***earlier signs of slowing***" in "***some of the more distressed markets***." ***By May 2021***, she said retail sales in her market had ***declined by 40-50%***, and by ***October-November 2021***, the ***decline had increased to 70%*** in her market and nationwide, which she said was clear based on conversations with her peers in other markets. She recalled that by the second half of 2021, many customers were declining orders because their "***funding had dried up***." Retailers who had placed orders for "200 or 500 grow lights" refused delivery when their capital had dried up, which she explained was "***a huge problem***" because "***you have all these goods and now you are just sitting on them***." FE 6 confirmed that demand never improved by the time she left Hawthorne and provided examples of two large commercial growers in Massachusetts whose $10 million-plus projects were put on hold in 2021 and have only recently become operational after a three-year delay.

[12] FE 6 worked as a Hawthorne Commercial Sales Manager in the New England region from October 2020 through February 2022. FE 6 was responsible for ensuring commercial cultivators received product for their operations.

77. As FE 3 explained, "***customers just didn't have the cash and space to take [Hawthorne's] products because they weren't selling them to the end consumer because there was a glut of inventory***." She added that by November 2021, the glut of Hawthorne inventory had become a national issue.

### 2. Scotts Collected And Analyzed A Plethora Of Internal Sales And Inventory Data And Disseminated It To The Highest Levels Of The Company Through Software, Daily And Weekly Reports, Regular Meetings, Peer-to-Peer Updates, And At Conferences

78. Numerous former employees confirm that by mid-2021, Defendants knew that Scotts' pandemic-fueled growth was over. These former employees confirm that not only did Scotts' management have full visibility into product performance at each its largest customers though granular POS data and other reports from retail customers, but senior management also had access to a host of internal data analytics – available on their Company-issued iPhones, iPads, laptops, and desktop computers – that aggregated this POS data with other information the Company maintained about its own key performance indicators like inventory, storage, production, and sales to retailers.

79. *First*, multiple former employees reported that throughout the Class Period, Scotts' management received regular reports showing demand, sales, and inventory levels for Scotts' lawn and garden products. For instance, FE 3 stated that Scotts' executives, including COO Lukemire and CFO Miller, received detailed daily reports tracking key metrics including: (i) external sales performance figures for each of Scotts' top customers, including Home Depot and Lowe's; and (ii) internal data related to Company inventory levels, production levels, and sales, including the terms of each sale (*e.g.*, discounts, payment terms). These reports gave Scotts' management, including the Individual Defendants, real-time visibility into the business, including the drop in demand when pandemic restrictions were lifted. FE 3 stated she was privy to the daily report email

distribution list and, therefore, could confirm that from at least mid-2021, Defendants Lukemire and Miller and "all of the other executives" (aside from maybe CEO Hagedorn) received these daily reports, which were also available on their iPads. In addition, and, as discussed more fully below, she knew these reports were discussed during routine COO-led meetings. FE 3 emphasized that these sales trends reports showed the decline in sales versus the prior year, commenting, "[w]e would see our results from the day before and one year before that same day." She said the sales trends reports contained granular details, including sales broken down by category and family within each category, the amount of product that was shipped on time, items in short supply, and days of projected sales by SKU. She underscored that the corporate office saw these numbers on a national level, and they had the ability through the Company's sophisticated software to drill down and analyze a particular region or state, even down to a particular store.

80. FE 3 further confirmed that the Company received daily reports from each of its top customers, including Home Depot and Lowe's, through a ***"daily feed"*** which allowed Scotts' management to see all sales trends, positive or negative, in real time. She also stated that Scotts maintained inventory reports showing production levels and shipments to customers. She reported that this information was rolled up into the Company's dashboard, which was widely used by management. FE 3 observed, "***we were constantly updated with information on inventory levels, production levels, and shipments to customers***."

81. *Second,* multiple former Scotts and Hawthorne employees confirm that across the Company, employees and managers, including the Individual Defendants, had access to software and other reporting tools, including Salesforce, Power BI,[13] Tableau, and SAP, which contained

[13] Power BI is an interactive data visualization software product that provides business intelligence.

critical metrics showing that by mid-2021, demand was declining, and inventories were accumulating. FE 2 explained that through Salesforce and Tableau dashboards she could see inventory levels and sales for each of Scotts' lawn and garden customers, on a daily, weekly, and monthly basis. She confirmed that anyone with access to these programs could see declining consumer sales reflected "***in the data that we had access to every week***." She added that she knew the increased guidance Defendants issued for the U.S. Consumer segment in early 2022 was "completely unrealistic," and emphasized, there's no way upper management "could be so wildly out of touch." Even without customer data, she said, it was obvious internally that demand was declining, stating, "the writing was on the wall and everyone knew why we had seen the spikes in our business and that is not going to hold." She added, "every single rep was saying this at the time, and I don't know anyone in my district that was not complaining about this."

82. FE 7[14] advised that the Company utilized Salesforce and Power BI to track sales information and inventory levels, and that those metrics were made available to the entire sales organization, including Scotts' executives. FE 7 stated that Power BI contained both real-time and historical sales information, and anyone who looked at the database could see sales declining quarter-over-quarter and week-over-week. She explained based on this real-time data, it was clear to her that ***Scotts' "expectations [for 2022] were based on market conditions that no longer existed."*** She stated that the numbers reported in Salesforce "definitely didn't reflect" management's public projections. She relied on these data systems in the ordinary course of her work to analyze sales trends and would "pull numbers" on a weekly or bi-weekly basis to help set

[14] FE 7 was a Hawthorne Area Sales Manager in the Northeast region from October 2020 until February 2022, handling sales to larger accounts (purchasers of $1 million or more) for hydroponic retailers in that geographic area. FE 7 reported to FE 5, the Regional Sales Director for the Northeast.

sales targets for her team. FE 7 reported that the C-Suite knew their projections had no basis in fact, stating, ***"they (the C-Suite) absolutely saw the numbers, but they still projected the same rate of growth as the previous year."*** She added, ***"pie in the sky is a really good way to describe it."***

83. FE 5 also confirmed that management had full visibility into the dwindling demand for Hawthorne's products through Salesforce and Power BI. FE 5 explained that these databases contained a host of information, including everything from year-over-year sales data for each customer, to how each of Hawthorne's products were selling, and explained, "not a lot of companies give you that amount of transparency." FE 5 stated that "***anybody can go in and look at this [information],"*** including Scotts' directors and executives, which she knew because senior managers were ***"up in our business like a helicopter mom when it came to sales and inventory."*** She said, Scotts was "***sh*tting bricks because they weren't selling" and*** "***they analyzed numbers every 15 f**cking minutes***." "They didn't want people looking in Power BI to see the numbers." She elaborated that Scotts' management created a department just to "***f**cking run [Hawthorne] reports for them***," and reiterated, "***[t]here is no denying they didn't see the numbers, there is no f**king way***." FE 5 also recalled apart from within Salesforce and Power BI, "***there was a spreadsheet showing how much was coming in versus sold***" and that "***we knew the numbers were inflated***."

84. FE 8[15] recalled that at Hawthorne, all sales and potential deals were tracked in real time through Salesforce, including deviation requests from standard sales (*e.g.*, special terms, discounts, etc.), as deviations required management approval. FE 8 stated that "all the higher ups"

---

[15] FE 8 was a Hawthorne Area Sales Manager from October 2021 until March 2024. FE 8 sold both to retail hydroponic businesses and commercial growers within the New England area.

had access to Salesforce, and ***"they all knew what was going on with sales [because] deals got passed up the chain*** including deviation requests." FE 4 confirmed that such information was tracked in Salesforce and stated that ***anyone that "cared to look" could see the declining sales and margins***.

85. FE 9,[16] a former Territory Sales Manager for the U.S. Consumer segment, described how all Scotts employees from manager level and above, including executives, tracked sales, inventories, prices and other key metrics for each of Scotts' retailers on Company issued-iPhones and iPads. FE 9 stated the iPhones and iPads used a Scotts App that was updated "weekly." She explained that the App contained sales and inventory metrics in granular detail and could be viewed at the individual store level, regional level, district level, and even nationally for not only Scotts' major retailers—Home Depot, Lowe's, and Walmart—but also its independent retail customers. FE 9 confirmed that all manager-level and above employees, including executives, had access to the App via company-issued iPads or iPhones, where "they could pull [] up" this information during store visits. FE 9 recalled managers would "log in to our laptops and we could see the sales" as well as "inventory numbers … [and] information for all major retailers [*e.g.*, Home Depot, Lowe's and Walmart] plus independents such as Ace Hardware and Tractor Supply." According to FE 9, managers would "report out" using the App, which was used "companywide" and accessed by managers at her level up through senior management. On the App, FE 9 could "see what everyone was doing" and sales managers would use the App in regular Monday calls

[16] FE 9 worked as a Territory Sales Manager for Scotts from 2012 until April 2020, when she was laid off by the Company. She started at Scotts as a merchandiser and was promoted to Territory Sales Manager where she oversaw three separate territories in the Dallas, Texas area. FE 9 was responsible for writing product purchase orders, securing retail floor space and managing inventory for Home Depot and Lowe's.

would include the nine other sales managers in her district and the district market manager who reported to the Regional Manager.

86. FE 10,[17] a former Sales Manager for the U.S. Consumer segment, reported that retailer inventory levels were also visible on Company-issued devices, including laptops and iPhones, and said she saw demand dropping nationwide around August 2021, and to an even greater extent in 2022. She explained that through her Company-issued iPhone's Salesforce app she could see Scotts' sales to individual retail locations, including in dollars and units. FE 10 also had a company laptop which she frequently used to check this data. She could look up sales data for all of Scotts' retailers on the U.S. Consumer, as well as historical sales with those retailers. FE 10 could see what sales were for the current week and could see what the four-week projection had been at the same point in the previous year. "I could see by SKU, by category, description, and dollar breakdowns."

87. FE 11,[18] a former merchandiser for Scotts, confirmed that manager-level and higher employees had company issued iPhones, which were used to communicate with other managers and track orders, deliveries, inventory, and a variety of other company information. She explained that "[m]y bosses all had iPhones that they could use to track sales, inventories, and related information for their stores," and said the app used to track this information was "Salesforce."

88. FE 10 said Scotts' sales to individual Home Depot retail locations and inventory levels within those retail stores, were also available through Home Depot's "first phone," along

[17] FE 10 served as a Sales Manager for Scotts' U.S. Consumer segment from March 2020 until she was laid off in October 2023. FE 10 covered approximately 15 retail stores in the northwest Chicago suburbs up to the Wisconsin border and had up to ten merchandisers working for her during her tenure.

[18] FE 11 worked as a Merchandiser for Scotts from March 2021 until July 2024, and was responsible for merchandising, stocking, and handling the return of inventory in retail stores in the area of Concorde, North Carolina, primarily at Lowe's.

with inventory levels at other Home Depot locations. FE 10 advised that there was also some visibility into projected sales, stating that you could see sales figures and could compare them to sales in the previous year. "You could see what you've done so far this year every week in units, and you could also see what you did last year and compare them." She added that competitor sales to Home Depot were also reflected in "first phone." FE 10 recalled how Hawthorne's executives had access to this same data during site visits to Home Depot stores and knew how to use the First Phone. She explained, "I know that Crabtree was aware of how to work the phone and how to check" these metrics because he made a visit to the Algonquin Home Depot in June or July 2021 and asked if she had a first phone on her, so that he could check the units in stock at that store as well as projected sales.

89. *Third*, former employees confirmed that waning demand and inventory buildup were well known issues that were regularly discussed at the highest levels of Scotts throughout the Class Period. For instance, FE 3, who reported to the Chief of Staff to the COO, recalled that there were three types of regular meetings that she prepared her boss for or attended: COO-led meetings, held on Tuesdays through Thursdays; COO Staff Meetings, held weekly on Mondays; and twice-weekly pre-scheduled briefings. She recalled that inventory buildups at U.S. Consumer and Hawthorne were "definitely" discussed during meetings, commenting ***"[p]eople were talking about that pretty much every day especially when it started hitting critical mass."*** She recalled that by May 2021, Hawthorne had accumulated so much inventory that Tom Crabtree ("Crabtree"), Hawthorne's COO, was looking to identify sufficient incentives for Hawthorne's sale reps to motivate them to move products out of the Company's barns.

90. FE 3 stated that COO Lukemire led regular meetings on Tuesdays through Thursdays ("Regular Meetings") and they were regularly attended by CFO Miller, and the

department head for every function: supply chain, research and development, marketing, and certain key finance and sales employees. FE 3 helped to organize these meetings and attended them. She would also help leadership prepare their presentations for these meetings. She knew firsthand that sales trend reports were a frequent topic of discussion at these meetings.

91. FE 3 stated that sales and inventory issues were also discussed among Scotts' senior management and executive leadership during weekly staff meetings every Monday ("Weekly Meeting"). FE 3 confirmed that she, along with everyone else who attended Regular Meetings, and other key personnel attended this Weekly Meeting. She reported that Lukemire and Miller were very involved in the preparation for the Weekly Meeting, including setting the agenda. She observed, "***the COO and the CFO were hand-in-hand in the COO staff meetings***." She also noted that it was not unusual for Defendant Hagedorn to "pop in" to Weekly Meetings, and Regular Meetings, emphasizing that ***Hagedorn was an "extremely hands-on CEO."***

92. According to FE 3, the purpose of the Weekly Meeting was to discuss sales numbers from the prior week, supply chain issues, Scotts' progress on KPIs, customer delivery percentages, marketing initiatives, and, importantly, where things stood with Scotts' "Big 3": Home Depot, Lowe's, and Walmart. As inventory levels grew, FE 3 recalled, there were also "a lot of conversations around what the distribution network needed to be and a lot of discussions about how large the warehouses needed to be and what needed to be in those warehouses and cleaning those warehouses of obsoleted product." FE 3 added that Scotts' senior management was concerned about the declining sales and the growing inventory levels. Senior management also discussed whether COO Lukemire should meet with particular customers during upcoming sales calls. She also recalled that compliance with all debt covenants, including the leverage ratio, was a regular topic of the Weekly Meeting. She observed that the COO's regular meetings focused on

performance at both U.S. Consumer and Hawthorne, but starting in 2022, senior management began to have a separate meeting to discuss each segment to facilitate "deeper conversations and more focused conversations on the Hawthorne business."

93. Moreover, Scotts' executives openly acknowledged that demand for Scotts' lawn and garden products was declining during monthly video conferences, held over "Google Meets." FE 10 attended those meetings and recalled CEO Hagedorn constantly referred to 2020 as an "***asterisk year, an anomaly, a blip year, a footnote in history***," and saying, "***it would throw our data off for the next 15 to 20 years***" and should be ignored. She said CEO Hagadorn started pushing this line in the middle of 2021, and referring to 2020 as a "one-off year" with artificially inflated growth.

94. Declining demand for Hawthorne's products and mounting inventory levels were also a regular topic of discussion during regular weekly meetings of Hawthorne's Sales Directors ("Directors Meeting") which were held every Friday to discuss sales trends, inventory levels, and other key performance indicators. These meetings, recalled FE 5, were attended by CFO Miller, the sales director for each region, and high-level Hawthorne executives. Each week in advance of the Directors Meeting, each attendee would receive a slide deck by email, detailing Hawthorne's sales performance, broken down by region and area, including comparisons against prior periods. FE 5 reported that these slide decks were presented during the meetings, and when your slide came up "you would make your case," and explain your numbers for the week. She recalled that by mid-2021, the slides showed declining sales nationwide, and said it was clear to her from the data that the hardest hit areas were California and Michigan. She recalled that Michelle White, the Sales Director in California, was very blunt about the challenges in her area, which FE 5 noted were similar to difficulties she was facing in the Northeast. FE 5 reported she and her peers

discussed regularly at the Directors Meeting that "***there is no possible way" to meet the Company's sales goals***.

95. FE 4 confirmed that she reported to her superiors that demand was waning during regular weekly sales meetings and she and the other territory managers discussed it peer-to-peer. FE 4 recalled that she expressed concern to her superiors, in 2021, when the cannabis market "tanked." She said she repeatedly warned her manager Hai Truong, as well as other senior executives like Doug Hargraves and Crabtree, to "stop buying inventory and be ready for the downturn." FE 4 reported that Truong and Hargraves said they had conveyed her concerns to Hagedorn, C. Hagedorn and Lukemire, but "they didn't want to hear sales were slowing." She lamented, it was like they were "drunk on the sales" they had made during COVID.

96. The declining demand for Hawthorne's cannabis growing equipment was also regularly discussed during monthly sales meetings, attended by Hawthorne's executive management. FE 12[19] recalled the "need to get numbers up all over the board was definitely discussed" during these monthly meetings. According to FE 12, during these meetings Hawthorne's executive team were informed of all issues affecting sales, including the industry's hostility towards Hawthorne, but management swept that concern under the rug.

97. The issues plaguing Hawthorne were also widely discussed at all levels of the business during the MJBizCon national sales conference in October 2021. Among other Hawthorne senior leaders, C. Hagedorn attended this event. FE 12 recalled that during the conference, executives were "harping down hard on the numbers," when analyzing performance

[19] FE 12 served as a Sales Manager for Hawthorne's Northwest region from May 2019 until May 2022. FE 12 was responsible for handling between 150 to 300 accounts, which were primarily mid-sized, Tier-3 customers, defined as businesses spending up to $250,000 annually. She reported to Hawthorne's VP of Sales, Hai Truong.

in each territory, area, and region. She reported that C. Hagedorn had one-on-one "in depth" conversations with Hawthorne's sales personnel about sales trends and issues affecting sales, underscoring that based on these conversations, C. Hagedorn knew that sales reps were struggling to meet targets and why.

98. FE 12 also confirmed that in addition to having the opportunity to share challenges directly with C. Hagedorn, they spent time discussing sales issues peer-to-peer at MJBizCon. Based on these conversations, she knew there were "***definitely struggles nationwide***" due to the declining demand, and "***everyone nationwide***" was "***struggling***" and "***fighting an uphill battle***." FE 12 explained that by late 2021, that in her region, the cannabis market had leveled off, and she was routinely hearing from retail customers that retail sales had slowed significantly. Even one of her largest customers said, "I just can't afford this anymore." FE 12 stated, "***the majority of my territory suffered***." For example, she recalled a customer reporting that he had been able to sell six pallets of soil in one month at the height of the pandemic boom, and as restrictions lifted, he was able to sell only one pallet of soil in six months. As demand ebbed, FE 12 said sales "really slowed down" in 2021 and into 2022, emphasizing, "***my numbers were down across the board***" as customers were refusing to take on additional inventory, and it was clear "***year-over-year growth wasn't happening***."

99. FE 4 confirmed that based on her conversations with sales managers in other regions, including during regular meetings and at MJBizCon, it was clear demand was slowing nationwide as, "***[a]ll the TM's [Territory Managers] on the ground were all looking at each other saying, 'yeah, this sh** isn't going to last for long***.'" She added, "[w]e all knew each other. We were friends so ***we would constantly talk about the sales problems we were experiencing*** throughout the United States." She emphasized that even her top ten biggest retailers were

struggling by late 2021 and into 2022 and were purchasing ***"millions of dollars" less*** inventory than they had during the pandemic. ***"They stopped making million-dollar PO's on a monthly basis*****,"** she reiterated.

100. Members of the Hawthorne sales team relied on their relationships with one another, across every region, to discuss sales trends at both formal and informal meetings. FE 7 reported that based on conversations with sales managers in other markets, the same problems she was experiencing during this period were happening ***across the board*** at Hawthorne. Of her struggles, she reported that when she first joined Hawthorne in late 2020, she was "pushing truckloads" of inventory, but by the second half of 2021, market conditions had declined. FE 7 recalled that, in and around April 2021, to spark sales, the Company required each sales manager, herself included, to meet with each customer within the territory to discuss needs for the upcoming year. During these conversations, she recalled most of her customers, including her largest accounts, reported that retail sales had slowed and either wanted to cut back their usual orders or refused to commit to any orders in 2022. Towards the end of 2021, FE 7 reported that the second- or third-largest customer in her territory reported that its ***business was down by 75%*** and would therefore, be reducing its purchase orders by the same percentage. FE 7 said she was instructed to threaten to revoke this customer's "pricing" tiers (*i.e.*, discounts) unless the customer agreed ***to increase its purchase order***.

101. FE 4 confirmed that Hawthorne sales team members shared information about their individual struggles and about industry trends they were observing. In mid-2021, she estimated that her sales fell by approximately 25%. FE 4 relayed that, during this period, although she avoided the reduction in quantities sold that she knew other sales managers were experiencing, it was only because she was selling to larger customers who were "***now starting to distribute to other***

***stores***," but, just like many other managers, she saw a massive reduction in margins. FE 4 recalled that prior to and during COVID, Hawthorne did not allow its retailers to sub-distribute merchandise, however, "[o]nce the market started to shift, that's when Hawthorne basically said, we don't care where the inventory goes, we just want the dollars to show the top line revenue and make the numbers look good."

### 3. Declining Demand For Scotts' Products Saddled The Company With Massive Excess Inventories

102. Diminishing end-user demand leading to declining sales of Scotts' and Hawthorne's core products left the Company saddled with excess inventory. The FEs confirm that Scotts' substantial excess inventory was a widespread problem that persisted throughout the Class Period, affecting products from every category of the Company's business. By late 2021, Scotts had amassed so much excess inventory that its warehouses were incapable of storing it all, and Scotts was forced to destroy large quantities of unsold inventory in both the U.S. Consumer and Hawthorne segments.

103. FE 3 described that Scotts had "***barns stuffed with inventory***" buildups because it "***didn't have any customers that had the ability to buy it***." She recalled in ***November or December 2021***, inventory buildups became a concern for the U.S. Consumer segment.

104. FE 3 described how the Company amassed massive amounts of inventory and had "***barns" stuffed with inventory*** because "***[Scotts] didn't have any customers that had the ability to buy it***," and recalled this being a significant concern on the U.S. Consumer side in ***November or December 2021***. FE 3 also confirmed that the inventory buildup was a concern for Hawthorne, which she said, Scotts' management knew "because we saw their inventory levels and [] tried to contact customers and give customers deals," but "***customers just didn't have cash and space to take our products because they weren't selling them to the end consumer***" given their own "***glut***

***of inventory***." She added there ***"was lots of concern over excess inventory"*** at both the U.S. Consumer and Hawthorne segments and concern for accumulating inventory ***never improved*** before she left the Company in August 2022.

105. FE 1 stated that Scotts had so much excess inventory the Company literally had nowhere to put product that it was required to repurchase from customers. She explained that due to "space constraints" at the Company's warehouses, Scotts was forced to dispose of product it repurchased from customers because the Company's warehouses were already "at capacity." She noted, "I was told to just get the inventory back and ***either donate it to a children's club or take it home or throw it away,*** " and added that advice "***that we should throw it away or dump it***" came directly from a Company Vice President.

106. FE 10 reported that Scotts was so overstocked with inventory in late 2021 and the beginning of 2022, they had products literally piling up on the ground outside the soil and mulch manufacturing plants because Scotts' storage facilities were at capacity. She stated, "they needed to get that product moved" into stores because it would get damaged by weather during the winter. By late 2021 or early 2022, there was so much excess product built up outside Scotts' manufacturing plants that it could be seen in satellite imagery. FE 10 recalled attending district wide calls where her supervisor, Jimmy Coughlin, a District Manager,[20] presented several PowerPoints with "satellite pictures" of mounting inventory being destroyed outside Scotts' soil and fertilizer plants.

107. Excess inventory was also a significant problem at Hawthorne. FE 12 explained that as sales slowed in 2021, Hawthorne was left with "***a large influx of inventory***." She confirmed these excess inventory issues existed ***nationwide***, explaining she knew warehouses "had

[20] Jimmy Coughlin reported to Crabtree who reported directly to CEO Hagedorn.

a lot more inventory" in 2021 compared to years prior because she could easily get product shipped to her from any warehouse, which was not what she "was used to from being there two years before."

108. During the Class Period, Scotts' excess inventory buildup from declining consumer demand was magnified by the Company's repurchase program, which forced the Company to buy unpurchased product from retailers—*i.e.*, a retailer's own excess inventory of Scotts product. Indeed, under Scotts' repurchase program with U.S. Consumer retailers, the Company was required to repurchase significant quantities of Scotts' products, including product Scotts pushed on the retailers through a variety of channel stuffing techniques. These techniques included extreme discounts on large bulk purchases, dramatically loosened payment terms, and split deliveries on large orders upfront, as well as extensive promotional campaigns (*e.g.*, "buy 3, get 3") on the same products, at the same stores, three times each season. When the repurchase program was implemented nationwide in fall 2021,[21] Scotts pulled forward sales by entering into contingent sales arrangements with Home Depot, Lowe's, and other larger retailers, which required the Company to buy back unsold inventory at certain intervals when the customers could not sell it to end-users. This provided no more than a temporary boost in gross sales since Scotts had already overstuffed these retailers with more products than necessary to meet consumer demand. Much of the inventory sold through the repurchase program was ultimately returned to Scotts.

109. Indeed, Home Depot—Scotts' largest customer by far—returned massive amounts of products, some of which Scotts had to write off. FE 1 confirmed that Scotts was forced to repurchase significant amounts of inventory from Home Depot, recalling certain stores demanded

---

[21] FE 3 confirmed the buyback program was implemented nationwide, for both the U.S. Consumer and Hawthorne segments, in fall 2021. She further confirmed that this, and all other incentive programs, were designed at the director level and approved by senior management.

Scotts buy back as much as $20,000 to $30,000 worth of excess inventory. She added that Scotts' policy required approval at the Vice President level or above for returns at that level.

110. By 2022, the excess inventory had reached crisis levels. FE 8, an Area Sales Manager in the New England region, recounted that by mid-2022, the industry came to a grinding halt, and "[management] ***started to sh** about overage and having too much product, too many days on hand, and they were overburdened by everything***." She added that the urgency surrounding declining demand and rising inventory levels persisted throughout 2022 and 2023, noting that "***there was a lot of discussion about excess product at the tail end of 2022***," and in 2023, demand was so low, they were "just trying to sell through anything that they possibly could at all costs."

#### 4. To Offload Excess Inventory, Scotts Pressured Customers To Take Unneeded Product

111. As demand declined and inventories soared, and to perpetuate the appearance to investors of strong demand for Scotts' products, the Company's senior management pressured sales personnel to force excess inventory on customers. Multiple FEs described that Scotts strongly incentivized retailers to accept shipments they did not need or want, including by shipping product early, or that was not even ordered, by applying heavy discounts—even giving away product, and through the previously described buyback program. Despite these aggressive sales practices, Scotts could not significantly reduce its excess inventory, resulting in disappointing financial performance and ever-increasing Leverage Ratio, requiring Scotts to negotiate two amendments to its credit agreement before the end of the Class Period.

112. On the U.S. Consumer side, FE 3 recalled that as consumer demand declined, Scotts offered increasingly longer payment terms to push sales through, a practice the Company referred to as "giv[ing] term," which meant giving customers products and not requiring them to pay for

three to six months. Starting in May 2021, Scotts began offering "very extended" payment terms on certain products, such as mulch, to lock up shelf space at big retailers, and by fall 2021, Scotts was offering those extended terms on additional items, including seed, and fertilizer. FE 3 stated that these incentives, offered within U.S. Consumer and Hawthorne, were designed at the director-level and required the full buy-in from senior management.

113. FE 1 described that toward the end of 2021 and into 2022, as Scotts was "not meeting goals," the Company increased pressure on its sales teams to "push product into the hands of the customer." FE 1 stated that Vice President Mike Davitt, who reported to Hawthorne's COO, Crabtree, was constantly instructing the sales teams to refuse to take no for an answer from retailers and to "make them believe that they want it even when they said no." FE 1 recalled customers pushing back against this pressure to take on unwanted inventory. For example, she recalled that "[d]uring meetings[,] [Home Depot] merchants would say that they did not need that much inventory because they were not expecting anything like they did during COVID," but Scotts' response was ***if you "don't sell it, we will cross that bridge when we get there."*** FE 1, reported that by fall 2021, "***Home Depot had so much inventory in their DCs (Distribution Centers) that they wanted it off of their hands***" because "***it was not selling***."

114. FE 2 similarly recalled that her team was trying to load in as much inventory as possible into stores and pressuring Home Depot to take on more inventory than it needed. She explained that "during COVID [customers] sold everything that we gave them because the demand was there," but in 2022 and 2023, as Scotts continued trying to load its customers with as much inventory as possible, Home Depot and other retailers were "pushing back because they knew that they were not going to sell it." FE 2 described how customers "were wrapping up and sending back a whole bunch of pallets," including substantial amounts of unsold fertilizer," because "they

knew that they were not going to sell it" and did not have the space to store it. She stated that Scotts had to go in and credit these stores for the returned inventory, and confirmed that in 2022, there was a "good amount of that." FE 2, reiterated in no uncertain terms in 2022 and 2023, Scotts' retailers "***definitely had excess inventory***" and the Company ***"had to do buybacks***."

115. FE 11, a former Scotts Merchandiser, confirmed that starting in 2021, Scotts was also using similar channel stuffing tactics with other large customers like Lowe's, including product promotions, delivery of unwanted and unordered merchandise, and buybacks of "excess inventory that could not be sold" by Lowe's. FE 11 explained that Scotts' product promotions increased in frequency, amounts, and degree each year during her tenure. For example, when she first started, the "buy 3 get 3" promotion was just once per season, but by the time she left, she was seeing "the same sale on the same product would be offered three times in a season, and then repeated again the next season." She added, "there was always some sort of promotion." FE 11 also noted that after the pandemic, she observed unexpected deliveries and unordered inventory showing up at Lowe's stores, which she knew had not been ordered by Lowe's because the order and delivery information was tracked in the individual in-store system. She said Lowe's would accept the deliveries because whatever did not sell could be returned for credit under Scotts' buyback program. FE 11 stated that buybacks would usually occur between May and June, with higher amounts of product typically being bought back month-over-month as the lawn and garden season progressed. FE 11, who was personally responsible for identifying and packing the unsold pallets of Scotts fertilizer, stated that she saw firsthand how "the returned merchandise and buy backs grew each year," and estimated a 50% increase in buybacks each year she was at Scotts.

116. In many regions, Scotts had the ability to control the levels of inventory and purchases at individual Home Depot locations, which facilitated Scotts' ability to dump excess

inventory on the retailer. For instance, FE 13,[22] a former Scotts Merchandiser responsible for a number of Home Depot stores in the Chicago area, reported that Scotts was loading up Home Depot stores in her area with so much unordered inventory that ***"we didn't know what to do with it."*** She explained that Scotts ***"just kept delivering [product], even though there was no room to put it,"*** and although Home Depot's managers were not happy about the excess product, "there was nothing they could really do" but "find a place to put it," because Home Depot had "***given Scotts the authority to manage their own inventory within HD locations."*** FE 13 further explained that "[i]t was not like the HD [Home Depot] store would order it," instead, ***"Scotts would just send it and say you need it."*** FE 13 recalled, Scotts shipped so much product to these Chicago stores that it had to be "***double or triple stacked.***" The motto was: "***stack it high and let it fly***."  FE 13 recalled a Home Depot store manager in her region once observed there was so much Scotts product on the shelves, "he thought he was at a Scotts distribution center." FE 13 said that at the end of the season the accumulated inventory Scotts had pushed on Home Depot was "wrapped, marked, tagged, and sent back" to Scotts.

117. FE 10 similarly advised that Scotts' salespersons were able to push excess inventory on Home Depot by manipulating the inventory levels in Home Depot's "first phone." She said, "we were encouraged to get the first phone and adjust the inventory numbers [downward] to force a re-stock." She elaborated that, after adjusting the inventory in the "first phone," Home Depot's system at the store would show that product was lacking to cover the next four weeks' worth of projections, and "[n]ine times out of ten, it forced more inventory into the store when you adjusted

[22] FE 13 was a Merchandiser for Scotts from March 2021 until December 2022. FE 13 was responsible for merchandising, stocking, and handling the return of inventory for approximately one dozen Home Depot stores in the region directly west of Chicago, Illinois. FE 13 reported to FE 10.

it." She cited the example of going into the "first phone" and showing that only 25 bottles of Weed-Be- Gone were on the shelves, when in actuality there were 300 bottles of it. This forced additional shipments of that product. She added that the chances of retailers getting stuffed with extra product were "pretty good." FE 10 directly stated, "I was actually encouraged and highly pressured to [manipulate inventory levels]."

118. FE 10 said that the pressure to maintain COVID sales numbers increased in early 2022. She recalled that she was constantly pressured to ramp up sales, especially for soil and mulch, but "in 2022 the pressure was turned up several notches." As Scotts was stuffing retails with inventory, FE 10 explained that retailers eventually began to push back telling her, "I'm at capacity or beyond capacity" and "actually refused trucks." FE 10 recalled being told by her supervisor, Coughlin, on multiple occasions that "they [stores] needed to take it [inventory] or else." She reiterated, "I was definitely pressured to force stores to take more truckloads and I was told to convince them to do it, and that it was in the stores best interest to do it." She said the pressure to push sales through unscrupulous sales practices was passed down to Coughlin from his supervisor, Crabtree.

119. FE 9, a former Territory Sales Manager for the U.S. Consumer segment, corroborated that Scotts had the ability and authority to manage inventory levels and order product for Home Depot in certain territories. FE 9, a former Territory Sales Manager for the U.S. Consumer segment, explained that she was able to monitor inventory and order product on Home Depot's behalf through Home Depot's "first phone," which, she said anyone given the proper code would be able to utilize. Through the "first phone," she could see inventory levels within the store, district, and region, as well as Home Depot's sales projections for the next four weeks. FE 9 said Scotts' managers could also "order at the store level" in Arkansas and Oklahoma, explaining that

she knew this because she witnessed it firsthand when she would help out at stores in those states, which were part of her region. Based on her experience, she said this practice likely existed nationwide, commenting that it existed at "most, if not all HD's [Home Depot's]."

120. Defendants also employed a variety of aggressive sales tactics to push excess Hawthorne merchandise. For instance, FE 3, recalled that as Hawthorne inventory levels grew, Scotts would call Hawthorne retail customers and offer "discounts on product" or would offer "potentially free product if they bought other products." FE 3 stated Scotts started to offer extraordinary monetary incentives to its sales team, "incentivizing reps to sell even at lower rates where they previously would not have received a bonus."

121. FE 6, a former Hawthorne Commercial Sales Manager in the New England region, stated that after July 2021, "pushing retail stores to buy more" became the norm. FE 6 said during the pandemic there were little or no discounts on the commercial side, as "people were buying everything they needed at the asking price." However, in July or August 2021, Hawthorne began offering 20-30% discounts on commercial sales for bulk orders shipped at a later date, on top of the traditional tiered pricing, and confirmed there would have been a corresponding 50% discount on the retail side, which always had bigger discounts. FE 6 further confirmed how Hawthorne began offering "financing" or a "line of credit" for customers who no longer had money to purchase product, including Net 30, Net 60 and Net 90 lines of credit.

122. FE 7, a former Hawthorne Sales Manager, confirmed that around fiscal Q1 2022, "***management was really becoming concerned about the drop in numbers***" and started pushing the sales teams to "offload" excess inventory. FE 7 recalled being told by District Managers that the message from the C-Suite was to "be creative and figure it out." As pressure from management increased, FE 7 explained that Hawthorne would provide "***huge discounts***," or would encourage

customers to place orders in advance but spread delivery over time, in exchange, Scotts would not require the customer to pay for the order up front, or would offer installment payments over a six-month period. FE 7 confirmed that the push to employ aggressive sales tactics "***absolutely***" came from ***executive management***.

123. FE 8 stated that by mid-2022, Hawthorne's customers were facing a glut in inventory and there was tremendous pressure to continue to "***stuff those shops to the gills and keep shoving product into them***." She explained that at this time Hawthorne began offering incentives and discounts for customers to take on more inventory, such as "special terms," including extended payment plans, free products for bulk purchases, "split invoices," and "bulk orders now and ship later." She explained that split invoicing meant Scotts would invoice and recognize a sale for a full order, but would only ship half of the order at the time of sale, agreeing to ship the second half in the future, when the customer needs it—a preorder in exchange for the promise of a better deal. FE 8 reiterated that by 2023, Hawthorne was "***just trying to sell through anything that they possibly could at all costs***." FE 8 stated that "***all they cared about was volume***," and when she told her supervisors that a shop could only take so much product, they told her to get the customer to take more in exchange for an extra 5% discount. She added, "***it was always like dangling a carrot to get them to buy more than they needed***."

124. FE 12 similarly reported that, in 2021, to offload excess inventory, management's focus shifted from EBITDA and margins to "mak[ing] deals and get[ting] product out." She stated that bulk sales (*i.e.*, truckload purchases) could reduce the price of "most of our products" ***by 50%***. She said, "we were a lot more willing to make deals" at that time, "any way we can," adding, we were told to "worry less about margins and just get revenue numbers back up." According to FE 12, this was "***another way of saying we have too much inventory and need to move it***." FE 12

stated, "I was doing everything I could to get customers to buy in bulk," but despite the Hawthorne's huge incentives, many customers could not afford large purchases, which only exacerbated the segment's worsening sales.

125. FE 4 recalled that to force retailers to "take inventory they didn't need nor want," Scotts implemented bulk buy programs and offered split sales and/or payment plans. She recalled being instructed to push the Company's more expensive products, like Gavita lights, explaining, if a retailer requested 500-lights, she was told to make them a "crazy deal" to increase the order to 1,000 lights. She also recalled, "[o]n those million-dollar deals, we were giving them so much margin and dated billing to take this inventory," and that in some instances, "***[o]ur margin went from 40-35 points down to 5 points just to show the revenue***." Describing an offer she made to customer Hydro City, FE 4 recalled a 35-40% discount with 90-day billing, as the "***craziest of deals to take stuff***." Adding, "[w]e knew this wasn't feasible long term," because the deals were "too good to be true." We were just tanking the margin to keep up the volume." The discounts were so enormous that she needed approval to offer them, explaining, "[a]s a TM (Territory Manager) ***we weren't allowed to give any discounts without approval from up above***."

126. FE 5, a former Regional Sales Director for the Northeast, confirmed that in 2021, as sales slowed, Hawthorne's sales tactics "***got very aggressive, very desperate***." She explained that Hawthorne was "completely overstocked with [] lights" in 2021, so "***that was what they were channel stuffing down people's throats for the million dollar POs [purchase orders]***." FE 5 explained that in order to push unwanted inventory, Hawthorne would offer "insane deals" which often included discounts for bulk purchases and "buy some get some free." She recalled that Hawthorne's executives personally engaged in aggressive sales tactics to move inventory, noting that "Tom [Crabtree] would give insane deals."

127. Multiple former employees confirmed that as the sales teams were instructed to deploy these increasingly aggressive sales tactics, Hawthorne's top executives, including those who reported to Scotts' C-suite, visited Hawthorne's top customers to close deals and force customers to buy unwanted and unneeded merchandise. For instance, FE 4 recounted that Hawthorne COO Crabtree (who directly reported to CEO Hagedorn) and another executive flew out to Sacramento, California to meet with her largest customer, Hydro City, who was preparing to move into a new 150,000 square foot facility. FE 4 recalled that during the meeting, Crabtree demanded, "[h]ow many PO's [purchase orders] are you going to give me to fill this warehouse up." She added, Crabtree was ***"already showing inventory down this guy's throat before he has moved in."*** Crabtree's approach was not well received. FE 4 recalled that after the meeting, before she was even out of the parking lot, the customer texted her saying not to bring Crabtree back.

128. FE 5 similarly confirmed that as sales declined, Scotts' executives "***started going to the largest retailers we had"*** and attempted to bully them into purchasing large and unnecessary amounts of merchandise, using "***incredibly aggressive***" sales practices, adding they were "***doing anything they could to get them to take a container here or a container there***." FE 5 recalled two such visits in early 2021, when executives flew to Michigan to visit two of Hawthorne's biggest retailers, Northern Lights Hydroponics and HydroDepot, and demanded the customers place million-dollar orders. The aggressive sales tactics used during the visits deeply offended these customers, recalling that HydroDepot's owner, referring to the visiting executive, said to the Hawthorne sales representative, "***get this f**king guy out of my store***," and the owner of Northern Lights Hydroponics had a similar reaction. FE 5 also observed another incident when on a phone call with another customer, Trulieve, CFO Miller "***started being aggressive and making threats***," over a $500,000 order.

### 5. Scotts Could Not Right-Size Inventory Levels, So It Implemented Extensive Cost-Cutting Measures To Improve The Bottom Line

129. Multiple former employees confirm that, beginning in July 2021 and continuing through 2023, Scotts' declining demand and excess inventory became such a severe problem that, unbeknownst to investors, Scotts was forced to implement extreme cost-cutting measures, including undertaking waves of mass employee terminations beginning in mid-2021. At that time, the Company began consolidating Hawthorne's leadership and terminated dozens of Hawthorne vice presidents. By the first half of 2022, hundreds of Hawthorne employees across all levels and departments were fired. FE 6 recalled that Hawthorne began "reducing headcount" in the east coast region in July 2021. FE 6 reported that in July 2021, during a conference she attended in Ohio with Hathorne's east coast team, several "pivotal people with experience" were laid off and their responsibilities were reassigned to inexperienced employees, including her.

130. FE 4 confirmed that layoffs began around July 2021, and reported that she survived "four rounds of layoffs," until she was laid off in September 2022. Her territory and responsibilities expanded as people were let go. By September 2022, she was covering not only sales her normal Central California market, but also parts of the San Francisco Bay area up through the northwest.

131. Likewise, FE 12 recalled that around October 2021, several experiences, high-performing sales representatives were terminated, including within two of Hawthorne's key markets, California and Nevada. By December 2021 or January 2022, FE 12 reported she began a job search, recognizing "we were in a bad spot." She was laid off in May 2022.

132. FE 1 recalled that in late 2021, there were talks around the office of layoffs because of the downturn in business. FE 1 described that between January 2022 through April or May of that year, the Company began offering its employees buyouts. Around the same time, she also

said, the Company implemented a hiring freeze and made leadership changes, including re-assigning managers and consolidating business development groups. FE 1 said these cost cutting measures continued until the time she left in May 2021.

133. FE 2 stated that in 2021, Scotts had announced twenty new sales manager positions across the country, including one in her district, but soon after that, the Company implemented a hiring freeze and did away with all twenty of the newly created positions. She added that the budgets for their merchandising teams were also cut. The Company wanted them to avoid spending money on their company credit cards such as business meals and to avoid printing documents as much as they could.

134. FE 7 stated that she first witnessed layoffs from her region in early 2022, and from then, continuing into 2023, when Hawthorne "wanted to make its numbers look good," the Company would "***fire people and get rid of inventory***." She added that "at least 90%" of the sales team was eliminated by 2023, and "every department was downsizing dramatically."

135. When deconstructing Hawthorne was not enough to stay within the Company's leverage ratio, Scotts began implementing mass layoffs on the U.S. Consumer side as well. As FE 10 explained, Scotts started cleaning house in 2022 and offering employees of the Company's core business incentives to leave. By 2023, she said, Scotts had significantly increased the amount of the incentive to further thin out personnel.

136. FE 3 described that by 2022, it was clear that Scotts needed to cut costs to remain within its leverage ratio. She recalled "there were debt covenants coming up in March 2023 that [Scotts] needed to ensure they met," adding "***the whole time that I was there in 2022 the whole thing was focused on staying within those covenants, or getting to those covenants since we were projected to be out of those covenants the way we were running***." According to FE 3, when the

Company first became concerned that it could not stay within its Leverage Ratio, management looked to improve inventory and sales. When the Company could not offload enough inventory or sufficiently increase sales, Scotts started slashing its workforce.

137. FE 3 recalled that beginning in July 2021 and continuing through 2022, many of Hawthorne's managers and other employees in leadership positions were terminated and replaced with managers from Scotts. She added that Scotts was forced to close a number of Hawthorne distribution centers, which helped reduce their leverage, but changed Hawthorne's business model, as product shipment within 24 to 48 hours could no longer be achieved.

138. In addition to the reversal in pandemic-driven demand the Company experienced across all segments, Hawthorne uniquely faced additional, steep sales obstacles. Former employees also report that these obstacles were temporarily masked by the pandemic-demand boom, but were widely-known within the Company, and yet were concealed from investors. First, Multiple FEs reported that the cannabis industry, in general, was extremely reticent to do business with Hawthorne because of Scotts' affiliation with Monsanto. This entrenched industry hostility towards Monsanto and against "big corporate" generally drove away long-term legacy Sunlight Supply customers starting when Hawthorne acquired Sunlight Supply in 2018. FE 5 stated that when Hawthorne began buying up soil, light, and fertilizer companies, growers lamented, "Oh my God, we have Monsanto coming into the cannabis industry." FE 5 reported that having been at Sunlight Supply before it was acquired by Hawthorne, she saw a drop off in business after the acquisition, noting she personally lost accounts over Hawthorne's affiliation with Scotts. The anti-corporate bias ***eliminated half of Sunlight Supply's pre-acquisition customer base***.

139. The cannabis industry's view of Hawthorne did not improve with time. FE 5 observed that many historically successful cannabis industry brands completely dropped off after

being acquired by Hawthorne. FE 5 recalled that after Hawthorne acquired General Hydroponics, the maker of a popular liquid nutrient product, stores refused to carry that product simply because it became a Hawthorne brand. She reported that Botanicare, a popular, best-in-class product line, met the same fate after Hawthorne acquired it. FE 12 estimated that over two dozen former Sunlight Supply customers told her directly they would not do business with Hawthorne due to its affiliation with Scotts, and that numerous others silently boycotted Hawthorne. As FE 12 recalled, after Hawthorne acquired Sunlight Supply, "[a] lot of" former Sunlight Supply customers with a track record of spending suddenly refused to return her calls and they ***stopped all purchases***.

140. In addition, multiple FEs described how Hawthorne's heavy-handed sales practices and onerous policies further alienated those customers who were willing (or had no other supplier option) to give Scotts a chance. FE 12 confirmed that Hawthorne's aggressive approach to selling into the cannabis industry contributed to its demise. She described Hawthorne's sales tactics as "strongarming" customers, including for instance, by suddenly forcing customers to buy ***2.5x more product*** or else risk being ***cut off*** from Hawthorne, and, therefore necessary supplies, altogether. FE 8 similarly confirmed that Hawthorne's heavy-handed sales practices and onerous policies, coupled with the industry's existing distrust of big business, sent legacy customers away in droves—and made it harder to retain customers and attract new business.

### E. The Truth Gradually Emerges But Defendants Continue To Mislead Investors

141. The truth regarding the sharp decline in demand for Scotts' products, its massive build-up of unwanted inventory, and the resulting devasting impact on the Company's performance and prospects, was gradually revealed to investors over the course of five partially corrective disclosures, each of which caused a substantial decline in Scotts' stock price. However, during

this period, Defendants buoyed the stock price by issuing a series of materially false and misleading statements that denied or minimized the disclosures, up until the final disclosure.

**1. The June 8, 2022 Press Release**

142. Before markets opened on June 8, 2022, Scotts issued a press release that announced sharply reduced sales and earnings guidance for fiscal 2022, and a significant increase in the Company's Leverage Ratio, driven by large declines in customer replenishment orders in the U.S. Consumer Segment (the "June 8, 2022 Press Release"). Despite Defendants having assured investors as recently as May 3, 2022 that the "fundamentals of our business remain strong," "retailers are ordering heavy right now," and "there's no indication there's any sort of inventory at retail or with us that's an issue," the June 8, 2022 Press Release revealed that those reassurances were not true.

143. In particular, the June 8, 2022 Press Release disclosed that, in reality, elevated inventory levels at Scotts' largest retailers were having a significant adverse impact on the Company's business. Indeed, according to the release, customer replenishment orders from Scotts' retailers for the month of May in the U.S. Consumer segment alone were more than $300 million below the Company's expectations. As a result, the release disclosed that Scotts was: (i) slashing its full-year sales guidance and now forecasting significant sales declines for fiscal 2022, including a 4% to 6% decline in the U.S. Consumer segment, and a 40% to 45% decline in the Hawthorne segment; (ii) slashing its full-year earnings from an EPS projection of "at least $8.00" to a range of just $4.50 to $5.00; and (iii) planning to take on significant additional debt, resulting in an increase in the Company's Leverage Ratio of up to 4.5 times debt-to-EBITDA, well above

Defendants' "comfort zone" of 3.5 times leverage. The Company also stated that it was discussing a "temporary increase" in the leverage ratio allowed under a revised credit facility.[23]

144. Analysts were alarmed by Scotts' mid-quarter announcement of such significant underperformance and questioned Scotts' explanation that the Company's disappointing sales were attributed to the fact that, for the first time in decades, retailers had decided not to replenish their inventories to customary levels. For example, Truist downgraded its rating on Scotts stock from "buy" to "hold," noting that "the company's retail partners did not replenish inventories to the typical historical level" but rather cut "reorders by $300M thus far," and pointedly added, "we have not seen anything similar occur in the 20 years we have covered [Scotts]." Similarly, J.P. Morgan downgraded Scotts shares and stated that "[p]articularly concerning is Scotts' commentary that retailers have not placed replenishment orders as the company had anticipated and that replenishment orders were more than $300 million below Scotts' expectations" for May, "which will likely lead to fix cost absorption and lower margins." Raymond James likewise slashed its target price for Scotts shares, citing the sharply lower-than-expected guidance on "[s]oft" replenishment orders and "[s]luggish" Hawthorne demand.

145. On this news, Scotts' stock price declined by approximately $9 per share, from a closing price of over $102 per share on June 7, 2022, to a closing price of approximately $93 per share on June 8, 2022, a decline of nearly 9%.

146. Significantly, however, Defendants prevented an even greater stock price decline by attributing the Company's poor financial results to external factors beyond Defendants' control. Specifically, Defendants blamed lost sales on "unusually wet" weather in March and April that

---

[23] Later that day, after market hours, Scotts filed with the SEC on Form 10-K, an amendment to its credit agreement that would increase the Company's maximum Leverage Ratio in exchange for significantly increased costs of borrowing.

supposedly prevented end-consumers from purchasing Scotts' products in those months. Defendants assured investors that business had rebounded in May—in fact, consumer demand was so strong that sales purported reached "near-record levels" for the month, and any excess inventory at Scotts' retailers would be cleared out by the end of fiscal 2022. Defendants highlighted a "surge" of end-consumer sales within U.S. Consumer in the past month based on POS data from retailers, which showed consumer engagement remained strong and was "trending toward [Scotts'] initial expectations," with "further gains" expected "as the year continues."

147. Defendants' reassuring statements that demand remained "near record levels" in May did assuage market analysts' concerns. For example, Barclays and William Blair repeated verbatim these assurances in emphasizing that consumer purchases at Scotts' largest retail partners were at "near record levels in May." Similarly, Wells Fargo positively reported "[m]uch better POS disproves the 'broken business' narrative in Garden," which "creates a dynamic where retailer inventories are likely to be ***very*** cleaning ending FY22."

148. The next day, CFO Miller attended the William Blair 42nd Annual Stock Growth Conference to "add some color" to "the information that went out" the prior day. In particular, Miller highlighted the Company's "long-term opportunities," reassuring investors that the U.S. Consumer segment would generate billions in free cash flow over the next three years, made possible by the Company's expanded Leverage Ratio.[24] Miller further hailed Hawthorne as "the leader in the durable side of the business" with an unparalleled "breadth" of "market-leading brands" for cannabis growers.

---

[24] Such focus on the benefits of the expanded Leverage Ratio blunted the impact of the after-hours announcement of the terms of the amendment to Scotts' credit facility.

### 2. The August 3, 2022 Q3 Earnings Release and Conference Call

149. Before the market opened on August 3, 2022, Scotts issued a press release announcing poor financial results for Q3 2022 and further reduced full-year guidance. Specifically, the Company disclosed that "Companywide third quarter sales decreased 26% driven by Hawthorne decline of 63% and U.S. Consumer decline of 14%," and a GAAP EPS loss in the quarter of $8.01 per share (which included $724 million in impairment and restructuring charges, $632.4 million of which related to goodwill and other intangible assets of Hawthorne). Defendants also abandoned their already lowered full-year sales guidance—issued less than two months prior—and now forecasted a full year sales decline of negative 8% to 9% for U.S. Consumer, with full-year adjusted EPS guidance lowered to $4.00 to $4.20. The Q3 2022 earnings release reiterated that the upper limit of Scotts' Leverage Ratio was increased in the quarter "up to 6.5 times debt-to-EBITDA." The reported Leverage Ratio was 3.81x.

150. During the accompanying Q3 2022 earnings call later that same day, Miller specified that the Company's inventory at quarter end was "$445 million higher than this time last year," and that as a result, Scotts would need to reduce inventory in fiscal 2023. In addition, Miller elaborated on the impairment charge, attributing it to "oversupply in the cannabis industry… combined with the overinvestment in the Hawthorne supply chain."

151. On this news, Scotts' stock price fell by over $5 per share, from a closing price of approximately $87 per share on August 2, 2022, to a closing price of approximately $82 per share on August 3, 2022, a decline of 6%.

152. Significantly, however, Defendants once again prevented a further decline in the Company's stock price by concealing the true reasons for Scotts' shortfall and attributing the Company's results to external factors that purportedly had nothing to do with customer demand and excess inventory problems. First, Defendants reiterated their prior excuse from June 2022 that

"lousy weather" prevented consumers from visiting retailers to purchase the Company's products. Second, Defendants again claimed the shortfall was not due to a lack of demand or Defendants own channel stuffing practices, but rather to a purported change in the way that retailers were managing their inventories. In CEO Hagedorn's words: "The single biggest change since May [was] the way retailers [were] managing their inventory," which "translate[d] directly into lower sales of our U.S. Consumer segment, negative fixed cost leverage in our P&L and higher levels of our inventory than we expected." When analysts questioned Defendants' claims, stating that they were "confused" by Hagedorn's attempt to blame the U.S. Consumer segments' poor performance on retailer inventory management and noted that this excuse meant that retailers "destocked in the middle of the season ***for the first time in 20 years***," Defendants continued to insist that there were no issues with the underlying business.

153. Indeed, Defendants went out of their way to claim that the Company's retailers were simply reducing or working through excess inventory, and that consumer demand remained strong. For example, in the Company's earnings release, Defendants stated that "***shipments to our retailer partners did not keep pace with consumer demand***, as retailers in all channels took steps to lower their own inventory levels" and during the earnings call that same day, Hagedorn asserted that "consumer engagement" remained strong, and retailers' POS data showed the "second highest on record" third quarter sales to consumers for Scotts' products.

154. In addition, to further assuage market concern, Scotts' August 3, 2022 earnings release announced the launch of a new Companywide cost-cutting initiative called "Project Springboard." Defendants implemented this "business transformation effort" that included a "series of aggressive steps" to "strengthen the balance sheet, expand margins, and improve free cash flow"—and thus "return the business to an appropriate level of performance."

155. Defendants' assurances had their intended effect and calmed the market's concerns. For example, despite the negative quarterly results and reduced annual guidance, Raymond James issued a "**Strong Buy**" rating on Scotts' shares, commenting that "much of the company's current struggles, as challenging as they are, should prove temporary, as we expect demand to stabilize and replenishment orders to improve in its U.S. Consumer segment in the coming quarters," and adding that "the shakeout in the cannabis market should eventually drive improving results for Hawthorne beginning in fiscal 2023." Similarly, William Blair reiterated its "Outperform" rating on Scotts, stating that "our thesis remains that Scotts' leading core brand portfolio, emerging growth opportunity in hydroponics, and financial position support solid shareholder return."

### 3. The August 31, 2022 Announcement of CFO Miller's Immediate, Unplanned Departure from Scotts

156. After the market closed on August 31, 2022, Scotts issued a press release announcing the sudden "departure" of Defendant Miller. Significantly, the Company jettisoned Miller despite the fact that no permanent successor had been named, Miller had served in the position for just one year, and his exit marked the second time in under two years the Company had exited its CFO. Although the press release claimed that "Miller's departure is not related to any disagreements regarding historical financial reporting, accounting, or legal matters," behind the scenes, Company employees knew the opposite was true. Specifically, multiple FEs confirmed that Miller's departure was directly linked to the Company's diminished financial condition. For example, FE 8 stated that Miller was fired due to a litany of financial and accounting issues, including the need to aggressively restructure the Company through Project Springboard, the disastrous consequences of the Luxx Lighting acquisition, and a massive free cash flow miss. FE 8 emphasized: "it was pretty clear there were some serious errors in their forecasting building everything out after November 2021."

157. In addition to Miller's sudden departure, Scotts' press release announced that David Evans, Scotts' former-CFO and current Board member, would fill the CFO role on an interim basis. The press release also stated that Scotts was lowering its projected full year free cash guidance to a range from negative $275 million to negative $325 million—a decline roughly double the magnitude of previously announced guidance at negative $150 million.

158. On this news, the price of Scotts' common stock fell by approximately $4.50 per share, from a closing price of nearly $67 per share on August 31, 2022, to a closing price of roughly $62.50 per share on September 1, 2022, a decline of 6.5%.

159. Analysts immediately linked the news of Miller's sudden departure to the Company's worsening financial condition. For instance, Wells Fargo issued a report on August 31, 2022, titled, "One SMG CFO Out, a Prior SMG CFO In (for Now)," which stated that the abrupt CFO "shake-up" was "[o]bviously not a constructive update[,]" and that it came at the same time the Company "lowered its FCF outlook," strongly suggesting that Scotts' Leverage Ratio "will likely be greater than 6.0x at year-end"—barely "in compliance" with its 6.5x maximum, a situation Wells Fargo bluntly characterized as "not ideal."

160. Even a week later, on September 6, 2022, analysts were continuing to publish critical reports on Scotts. For example, on August 6, 2022, in a report titled, "Dividend cut and asset sales likely," with the byline "FY22 FCF guidance cut and CFO Departure." (Emphasis in original), Barclays described that under its own updated model, "SMG's leverage will be at 6.3x in 4Q22" before declining in the fall of 2023 "as inventory is rightsized," while emphasizing that "we don't see much margin of error here for SMC." Barclays identified "[t]hree ways to reduce leverage,": "Cut dividend" to "$0," "Sell non-core assets" including Hawthorne, and "Sell International business."

161. Two weeks later, on September 15, 2022, *The Wall Street Journal* published an article titled: "From Shortage to Glut: Scotts Miracle-Gro is Buried in Fertilizer," which confirmed that Miller was let go because of Scotts' inventory issues. The article pointed out that in "November 2021, [Miller] assured investors Scotts was in a good place on inventory," and just a month later, Scotts' "total inventory was up 55% to $1.7 billion"—"almost doubl[e] its pre-pandemic level." The article further reported that Miller had been responsible for providing the erroneous guidance that grossly underreported the amount of cash Scotts was losing in 2022, which the Company had to then correct on August 31, 2022. Significantly, and in a stunning admission regarding his role in the Scotts debacle, the article quoted Defendant Hagedorn as stating that "***he is lucky it didn't get him fired***," and stating that "***this isn't exactly the s***hole I was planning to live in toward the end of my career, working my way out of a goddamn latrine***."

#### 4. In Late 2022 and Early 2023, Defendants Claimed To Have Righted The Ship

162. In view of the ongoing media attention placed on Miller's sudden departure, Defendants sought to assure investors that the Company's future business prospects remained positive by emphatically touting the purported benefits of Project Springboard. For the next two quarters, the Company's top-line financial results indicated an improvement in its financial condition. Notably, Scotts took *none* of the three actions that Barclays had suggested on September 6, 2022, would be necessary for Scotts to improve its financial performance, indeed lending support to the success of Project Springboard.

163. For example, on November 2, 2022, in connection with the announcement of Scotts' Q4 2022 and Full Year 2022 financial results, Defendants issued a press release that credited the first phase of Project Springboard for achieving "$100 million of annualized savings split between fiscal 2022 and fiscal 2023," primarily through employee terminations and SG&A

reductions. Scotts also announced a second phase of Project Springboard, listing a half-dozen additional measures the Company said would realize another $85 million in "cost reductions to be realized in fiscal 2023 and fiscal 2024," including reductions in closing points of distribution for U.S. Consumer and Hawthorne, further right-sizing of overhead expenses in Hawthorne through integration into Scotts Miracle-Gro, and enhancing profitability at Hawthorne by eliminating products. The press release also announced an intent to reduce the Leverage Ratio "into the 4s" by the end of fiscal year 2023.

164. Defendants' Project Springboard turnaround narrative continued to sway analysts. For example, Raymond James, in a November 2, 2022 report rating Scotts' stock a "Strong Buy," remarked, "we are starting to see early signs of progress, thanks in large part to Project Springboard," and concluded that the Company's "balance sheet-related struggles" appeared to be "temporary." Similarly, JPMorgan opined that Scotts "is weathering the storm by cutting costs ($100mn to date, $85mn to come), refocusing the businesses, and staying tight with banks."

165. In January 2023, Defendants announced a dividend of $0.66 per share, and better-than-expected Q1 2023 results, including 8% increases in U.S. Consumer net sales and higher profits from "record December shipments[,]" and Project Springboard was "ahead of schedule" with annualized savings expected to exceed $175 million.

166. Analysts applauded the Company's efforts. For example, on January 28, 2023, CFRA issued a positive report emphasizing "improving fundamentals from early planning and coordination with retailers to drive product sales and inventory optimization," and that "Project Springboard will help build a leaner and more cost-efficient company," and William Blair reiterated its "Outperform" rating on Scotts' stock, noting "***our thesis remains that Scotts's***

***leading brand portfolio, emerging growth opportunity in hydroponics, and financial position support solid shareholder returns***."

167. On February 15, 2023, the Company held a "Fireside Chat" or "Special Call" with Wells Fargo, which was livestreamed and later posted on the investor section of the Company's website. During the call, CFO Garth and C. Hagedorn discussed Garth's recent hire as the Company's new CFO, the progress of Project Springboard, the Company's successful execution through its "transition period" and its "conservative" guidance for 2023. CFO Garth stressed that despite the Company's post-pandemic experience – "the pandemic hit, things went booming on the upside" and then "things came back down" – the Company had a "brighter future" because the "fundamental basis of the company" and all of the "key themes that we put together as our strategies to grow the company are still in play." Addressing Hawthorne specifically, CFO Garth reported that "the long-term opportunity in that space is pretty robust," given Hawthorne's "really great strategy" and "really good growth program." The next day, Wells Fargo issued a report upgrading Scotts' rating to "Overweight," noting the favorable risk-reward with "good" visibility on the first half of the year.

168. In the ensuing months, Scotts continued to issue reassuring statements to investors. For example, on March 16, 2023, Defendant Garth presented at UBS's 12th Annual Global and Retail Conference, where stressing Scotts' successful post-pandemic turnaround efforts, he said, "the market, I don't think really understands the story, and there's probably more negative than in the story and what investors perceive than there actually is with what the company is doing on the ground." Garth touted Scotts' lawn and garden category had grown by "about 20 million more consumers" versus 2019, and that "about 50%" of Project Springboard's $185 million in promised Phase I & II savings were due to "adjusting Hawthorne to the level of market activity." As late as

on April 10, 2023, in a press release, the Defendants asserted that Scotts "anticipates achieving a net leverage ratio comfortably below the credit facility covenant of 6.5 times" for Q2 2023. The same day, Wells Fargo reported Scotts was set to "clear the covenant cliff," highlighting the Company's expectation to "be 'comfortably' below its 6.5x leverage threshold, more like in the 6.0x range," with "leverage tick[ing] down more" as the season progresses.

### 5. The May 3, 2023 Q2 Earnings Release and Conference Call

169. Despite Defendants' repeated assurances to investors over the prior nine months, before the market opened on May 3, 2023, Scotts issued a press release announcing disappointing financial results for Q2 2023. While CEO Hagedorn hailed Scotts' performance in the first half of 2023 was "marked by record retailer shipments, POS lifts, and reliable cash generation," the Company's quarterly financial results missed expectations and Scotts remained highly levered. The Q2 2023 press release disclosed sales declines of 9% Companywide, with U.S. Consumer sales down 2%, and Hawthorne sales reduced by 54%. The Q2 2023 press release also provided an update on Project Springboard, announcing that Scotts had accelerated the closure of four Hawthorne warehouses, and had sold its Hurricane fans business, resulting in pre-tax restructuring charges of $141 million in the quarter. Scotts announced that its Leverage Ratio had reached 6.01x.

170. Despite the disappointing financial results, Defendants again took pains to reassure investors that Scotts could work through the excess inventory levels in both the U.S. Consumer and Hawthorne segments, would restore strong free cash flow, and would remain within its Leverage Ratio moving into the second half of the year. Hagedorn insisted that Scotts' "collaboration with retailers is tighter than ever" to drive sales and move excess inventory, adding that retail inventories were "reasonable" as Defendants had worked with their customers "to get the volumes" Scotts needed despite "unit volume in retail being down". Notably, Hagedorn downplayed any concern related to the massive amounts of capital the Company had sunk into

Hawthorne. Instead, acknowledging a "wicked shakeout" underway in the cannabis sector, Hagedorn declared that the shakeout "will result in the top 25% getting even stronger" with Hawthorne "***in an enviable position***" and "***uniquely positioned to thrive***."

171. In the Q2 2023 earnings call that same day, Defendants updated the market on Project Springboard, with Garth stating that "approximately half of our Springboard savings are from Hawthorne." Hagedorn also noted that the Company maintained an acceptable Leverage Ratio on the strength of the U.S. Consumer segment's profit, while underscoring with respect to the Hawthorne segment that the cannabis industry was starting to realize that Hawthorne was an industry leader and other businesses could look to Hawthorne for guidance to scale up.

172. On this news, the price of Scotts' common stock fell by approximately $5.50 per share, or 8%, from roughly $69.50 per share on May 2, 2023, to a closing price of nearly $64 per share on May 3, 2023.

173. Significantly, following the call, analysts noted that the disclosures contradicted the "bullish" statements the Company had made earlier in the year, and openly questioned how Defendants could continue to make such positive statements about the business. Indeed, Truist underscored that, in light of Scotts' financial performance, it "***had hoped that management would have taken a more conservative tone on the conference call***," and expressed incredulity that Defendants had instead claimed that "***everything was going according to plan***":

> All in, we believe much of the reason for the 7.9% decline in the stock today (vs SPX -0.7%) was attributable more so to stronger investor expectations heading into the print from management's bullish commentary in late January and the press release re-affirming the debt covenants in April. ***We had hoped that management would have taken a more conservative tone on the conference call***. ***Instead, it implied that everything was going according to plan and that weather would be great for the next two months (seriously)***.

174. Shortly thereafter, Truist issued another report on July 11, 2023 titled, "***It's NOT About the Weathe***r" in which it criticized management for misleading investors with the ***false*** narrative that "poor weather trends" were to blame for U.S. Consumer's poor performance in 2022 and 2023, when in reality it was attributable to the post-pandemic collapse in demand for the Company's product:

> "***[W]e have been surprised by how much blame management has attributed to weather for the underperformance of its US Consumer business***. Prior to the pandemic, management consistently stated that weather can move point-of-sale (POS) 200 basis points either way in a given season but usually the geographic regions balance out a full season (i.e., a wet spring in the Midwest offset but perfect weather in Texas). However, over the past two spring seasons, management indicated that poor weather trends were the primary reason for the YoY decline in sales. ***In our opinion, the key issue that continues to plague the segment is a post-pandemic hangover***."

**6. The August 2, 2023 Q3 Press Release and Earnings Call**

175. After more than a year of downplaying the extent of Scotts' financial troubles, Defendants finally revealed the full truth on August 2, 2023. On that day, before the market opened, Scotts issued a press release announcing what analysts would describe as "***the climax of the series of the worst earnings results in the Company's history***." Despite Q3 historically showing peak sales performance in the year, on the top-line, Scotts announced third quarter sales declines of 6% Companywide "driven by a 40 percent decline in the Hawthorne segment" and a meager improvement of only 1% in the U.S. Consumer segment. On the bottom line, Scotts disclosed that adjusted gross margin fell 1.5%, from 19.9% to 18.4%, and that adjusted earnings per share plunged a staggering 41%, falling from $1.98 to $1.17 per share—which analysts noted was ***Scotts' lowest EPS in decades***. In addition, the Company further cut its full year sales and earnings guidance, now forecasting a full-year sales decline of 10% to 11% (compared to the Company's prior forecast of an 8% to 9% decline), and full-year adjusted EBITDA guidance to decline by 25% (compared to the prior forecast of a "[l]ow single-digits percentage decline").

176. Defendants also made the shocking revelation that, as a result of Hawthorne's implosion, and ongoing failure to reduce excess inventory levels, the Company had *again* renegotiated its maximum Leverage Ratio—announcing a second amendment to the 2022 Credit Agreement, despite Defendants' repeated assurances throughout the Class Period that Project Springboard would swiftly bring down the leverage ratio to 3.5x or less. The second amendment to the 2022 Credit Agreement provided a "revised covenant maximum" of 7x.

177. During the Q3 2023 earnings call held later that day, Defendant Hagedorn belatedly admitted what Defendants had known throughout the Class Period: that the Company's poor financial results and reduced outlook were not attributable to bad weather or retailers' inventory management practices, but to a shift in "***post-COVID consumer sentiment" that drove consumers to "shift the[ir] discretionary spending***" to activities ***other*** than lawn and gardening. Significantly, Hagedorn made clear that this "shift" had occurred at least 18 months earlier, by no later than the start of 2022, acknowledging that it "started in '22 as part of the post-Covid hangover and extended into '23." Indeed, Hagedorn admitted that the Company's own "consumer research" and a study it commissioned by the management consulting firm McKinsey & Company, showed that after COVID lockdowns lifted, consumer preferences had shifted to "spending money elsewhere." This stunning revelation was bolstered by CFO Garth's report that "the write-down of pandemic-driven excess inventories in the U.S. consumer business was $20 million higher than our expectations," and was the number one factor driving the significant decline in the Company's projected gross margin for fiscal 2023.

178. Turning to Hawthorne, Hagedorn stated that Hawthorne was "making negative earnings," forcing Scotts to "deploy[ ] like $1 billion into inventory and other capital areas. And that's the issue that we're fundamentally dealing with." Hagedorn revealed the extent and severity

of the issues created by Scotts' massive overproduction of inventory, stating: "[a] lot of what we're doing in the operating side of the business is slashing [and] burning on inventory, on the capital stuff that we invested in, in capacity on both Hawthorne and Scotts and wiping that out."

179. On this news, Scotts' stock price tumbled more than $13.50 per share, from nearly $71.50 per share on August 1, 2023, to approximately $58 per share on August 2, 2023, a decline of 17%. The revelation of Defendants' fraud resulted in a staggering decline of 67% from the Company's Class Period high, wiping out $6.6 billion shareholder market capitalization.

180. These disclosures stunned the market. Analysts excoriated Defendants for destroying "***decades of earnings***" through this massive build-up of excess inventory and disastrous foray into the cannabis supply business.

181. For instance, on August 2nd and 3rd, 2023, Wells Fargo issued reports lamenting the "***Total earnings destruction***" Defendants had caused and noted the Company's 41% EPS loss was "[***p]retty eye-popping to us—several decades of earnings gone (one will be hard-pressed to find any year below $2 let alone $1)***."

182. Similarly, Truist expressed shock that despite Defendants' repeated assurances that there would be a "***non inventory problem exiting the year***," the exact opposite was true: "***What is a surprise is that the company came into the FY23 season with such high levels of inventory for its US Consumer business***." Truist similarly reported that Hawthorne's "continued struggles" was yet another "surprise" with "sales down 40% YoY." UBS also issued a critical report that directly linked the day's massive stock price decline to Scotts' ongoing struggles to reverse the Company's across-the-board declines, emphasizing that Scotts' financial results "came in well below St. forecasts" and that the "magnitude of the decrease worse than feared, and shares reacted down -19% on the day."

### F. Following The Class Period, Scotts' Own CEO, Defendant Hagedorn, Confirms Defendants' Culpability And Admits That Hawthorne Is Totally And Completely Worthless

183. Following the Class Period, Defendants continued to make striking admissions that disclosed highly material information demonstrating that their Class Period statements to investors were false. *First*, on the Company's earnings call on November 1, 2023, CEO Hagedorn acknowledged that—despite relentlessly touting the Company's purportedly strong and sustainable post-COVID demand and growth—Scotts' business was decimated, and Defendants were to blame. As Hagedorn bluntly told investors and analysts: "***you can throw sh*t at us. We deserve it***." Hagedorn also acknowledged, under withering questioning from analysts, that despite his prior statements throughout the Class Period, weather was not to blame for the Company's poor performance, stating: "***I'm not blaming the weather***."

184. *Second*, just one month later Hagedorn admitted — in stark contrast to Defendants' statements throughout the Class Period that Scotts' cannabis business remained "uniquely positioned to thrive" and was a "competitive advantage" for the Company—the exact opposite was true: ***Hawthorne had absolutely no value as a business and was in fact totally and completely worthless***. Hagedorn's admissions were so powerful that they were the centerpiece of a *Forbes* feature story published on January 14, 2024, entitled: "*Weed Kills: How Investing In Cannabis Almost Took Down Scotts Miracle Grow*."

185. Specifically, *Forbes* interviewed Hagedorn in early December at a cannabis conference in Las Vegas. During the interview, and in remarkably frank language, Hagedorn admitted that Scotts' $1.7 billion investment in Hawthorne was such an "***abject failure***" that Hawthorne was utterly worthless: in Hagedorn's own words, Hawthorne was now worth "***zero, or less***." Hagedorn openly acknowledged the extent to which Hawthorne was an unmitigated disaster for the Company, noting that most of Scotts' $2.6 billion in debt belonged to Hawthorne, and

succinctly stating ***"pot almost took [Scotts] down***." Notably, both CEO Hagedorn and C. Hagedorn acknowledged to *Forbes* that there was no path for Hawthorne to remain part of Scotts moving forward: As CEO Hagedorn put it, "***Hawthorne and [C. Hagedorn] need to get out of 'Dad's basement***,'" and in response, C. Hagedorn confessed: "***I don't want to be the complete f**king idiot who damaged the family legacy***."

186. In addition, the *Forbes* article noted that Hagedorn bristled at the personal criticism he received from the cannabis industry for spending upwards of $1.7 billion on Scotts' bad Hawthorne bet despite the post-COVID demand and inventory realities affecting the cannabis industry. *Forbes* described that during the December 2023 Las Vegas cannabis conference, Hagedorn raised both arms in the air, extended his middle fingers, and exclaimed: "***I mostly just wanted to say 'f**k you' to the industry'" for "mak[ing] fun of Scotts for our investment in pot, how we f**ked it all up***."

187. On January 29, 2025, Hagedorn disclosed during Scotts' first quarter earnings call that Scotts was still seeking to jettison Hawthorne because it continued to drag down the Company's earnings, and "moving Hawthorne out" would provide a "significant uplift in gross margin." Despite seeking to extricate itself from Hawthorne for over a year, Scotts "***couldn't find a suitable partner***." In other words, Hawthorne, the Company's purported "growth engine" during the Class Period, was such an abject failure that ***there was no one willing to buy it***.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

188. During the Class Period, Defendants made materially false and misleading statements and/or omitted material necessary facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements

and omissions concerning Scotts' financial performance, operational condition, and growth prospects which included, among other misrepresentations, statements concerning consumer demand for the Scotts' U.S. Consumer products, inventory levels – both inside the Company and in retail channels, and the condition, performance, and prospects of Hawthorne, its cannabis-growing supplies subsidiary.

189. Each statement the Defendants made as set forth in this section, was materially false and/or misleading when made, and failed to disclose material facts necessary to make any otherwise true statements not misleading. Each such material misstatement or omission had the effect of creating an unrealistically positive picture of Scotts' business and operational status, including in its U.S. Consumer segment and in its Hawthorne segment, which caused Scotts' stock price to become artificially inflated during the Class Period. When the truth was revealed, this artificial inflation was stripped, causing the per share value of Scotts' common stock to decline, causing harm to Scotts' investors, including Lead Plaintiffs and all other similarly situated purchasers of Scotts' common stock during the Class Period.

**A. Second Quarter 2021**

190. On May 5, 2021, Scotts issued an earnings release and held an earnings conference call discussing the Company's "record" Q2 2021 results, which were purportedly driven by strong demand and growth across both the U.S. Consumer and Hawthorne segments. In the release, Defendants reported that overall sales increased a record 32% in the second quarter, "***driven by strong demand in both major segments***," including a 66% increase in Hawthorne sales "***with strong growth in all product categories***," and a 23% increase in U.S. Consumer sales "***driven by continued increases in consumer demand***." With regard to the U.S. Consumer segment, Hagedorn was effusive in his praise, touting that "***[t]he record level of consumer demand we have seen for our lawn and garden products is greater than we expected***," emphasizing that

Defendants were "***encouraged by the level of consumer participation we have been seeing so far this season***," and assuring investors that "***[r]etailer support for the category remains strong***."

191. During the earnings call held later the same day, CEO Hagedorn continued to tout that the post-COVID surge in demand remained strong Company-wide, and was so great that it exceeded Scotts' ability to meet that demand. Indeed, Hagedorn twice asserted that, because Scotts lacked sufficient inventory, it was "***leaving a lot of sales on the table … on both businesses, to be honest***." With respect to U.S. Consumer, Hagedorn again highlighted that Defendants were seeing broad-based demand and growth, stating, "***we're seeing encouraging trends in recent weeks,***" and ***"[e]ntering May, we remain up double digits in every region of the country with every major retailer. We continue to see a high level of engagement in all retail channels***."

192. The statements identified in ¶¶190-91 were materially false and misleading and omitted material facts when made. Contrary to Defendants' statements touting that Scotts was experiencing "strong demand in both major segments" and "strong growth in all product categories," such that it could not even meet the record consumer demand and was "leaving a lot of sales on the table," in reality, consumer and retailer demand for Scotts' lawn, garden and cannabis products was sharply declining. Indeed, numerous former employees of Hawthorne and Scotts stated that months before these statements were made, pandemic-driven demand for the Company's products had subsided. Specifically, rather than seeing "double digit[]" growth in every region with "every major retailer," these FEs uniformly confirmed that, by no later than March and April 2021, demand for Scotts' lawn and garden products was down 20%; by May 2021, sales were down in Hawthorne's leading regions by 30-50%; and demand in both segments continued to plummet through the remainder of 2021. As a result, the Company had "barns stuffed with inventory" because "[Scotts] didn't have any customers that had the ability to buy it." In fact,

demand was declining so rapidly that, as FEs confirmed, in May 2021, Scotts began offering a variety of incentives to push inventory and stuff its channels, including "very extended" three-to-six-month payment terms.

193. Defendants were also overwhelmingly positive about Scotts' cannabis business, with Hagedorn emphasizing that Hawthorne was a difference-maker in the industry. Indeed, Hagedorn reiterated that Scotts "***continue[d] to see strong growth in all Hawthorne categories***" and "***[t]he growth at Hawthorne continues in all geographies***." Hagedorn even touted Hawthorne's strong demand in key markets, stating that "***Michigan rose 60%***" and "***we saw triple-digit growth in 7 states, including Oklahoma, where the business grew 250%***." As a result, CEO Hagedorn emphasized the competitive advantage that Hawthorne provided the Company, stating: "***[w]e are not only driving growth, but continuing to distance ourselves from the competition***," "***we're confident we're outpacing our competitors***," and "***business simply continues to outperform all of our expectations***." C. Hagedorn was similarly positive about Hawthorne's business, adding that Hawthorne had "***continued pretty explosive growth***" from "***legacy cultivators***" and "***really, really strong growth from those large commercial accounts***."

194. The statements identified in ¶193 were materially false and misleading and omitted material facts when made. Contrary to Defendants' statements touting how Hawthorne was experiencing "explosive" and "triple-digit" growth "in all product categories," such that it could not even meet the record consumer demand, in reality, demand for Hawthorne's cannabis growing products was sharply declining in Hawthorne's leading regions by 30-50%. In fact, contrary to Defendants' claim that "Michigan rose 60%" and "Oklahoma grew 250%," in reality, sales were down in Detroit—Hawthorne's key region in Michigan—by more than 50% in May 2021, and Oklahoma was also suffering. As FEs confirmed, by May 2021, Hawthorne's customers across

the nation were reducing and canceling orders because they "didn't have the cash and space to take [Hawthorne's] products because they weren't selling them to the end consumer because there was a glut of inventory." On the commercial side, FE 6 recalled customers canceling massive orders for "200 or 500 grow lights" "because their capital had dried up," which created a "huge problem" because it left Hawthorne with "all these goods" that they were "just sitting on."

195. Further, contrary to Defendants' representations that Hawthorne was "continuing to distance ourselves from the competition," and "outpacing [its] competitors," in reality, Hawthorne's rapidly declining business was far from a competitive advantage and had become such a severe problem that Scotts would soon begin implementing layoffs beginning in July 2021 and continuing through 2022. Indeed, Defendants were ultimately forced to admit that Hawthorne was completely worthless (it was worth "***zero, or less***"), and the Company's nearly $2 billion investment had nearly "***took [Scotts] down***."

**B. Third Quarter 2021**

196. On August 4, 2021, Scotts issued its earnings release and held an earnings call to discuss the Company's "record" results for the third quarter of 2021, including an 8% overall sales increase "***driven by Hawthorne growth of 48%***." In the earnings release and during the ensuing conference call, Defendants made a series of false and misleading statements concerning the Company's demand and inventory in its U.S. Consumer and Hawthorne segments.

197. *First*, with respect to Scotts' cannabis operations, Defendants touted in the earnings release that "***Hawthorne saw growth in every product category and every major geographic market***." During the ensuing earnings call, CEO Hagedorn continued to tout that at Hawthorne, "***the trends are extremely strong***," "***we continue to see strength across the board***," and ***"[w]e've developed a highly successful business in Hawthorne***." In fact, Hagedorn made clear that Hawthorne was not only a "***growth engine***" that would fuel the Company's future growth, but that

it also gave Scotts a clear competitive advantage in the cannabis industry: "***Our growth engine, Hawthorne, continues to outperform the market and is positioning itself for long-term success. We've built competitive advantages that others in the industry can't match***."

198. The statements identified in ¶¶196-97 were materially false and misleading and omitted material information when made. Defendants' representations that Hawthorne was experiencing "growth in every product category and every major geographic market," and that "trends are extremely strong," were false and misleading because, in reality, consumer and retailer demand for Hawthorne's cannabis products was sharply declining. Indeed, as discussed herein, numerous FEs confirmed stark declines across the board in Hawthorne's leading regions by 30-50% by May 2021 and 70-80% reduction by Fall 2021. As the pandemic-driven demand for Hawthorne's products subsided, retailers were left "stuffed" with excess inventory, and by May 2021, customers across the nation were reducing and canceling purchase orders—they "didn't have the cash and space to take [Hawthorne's] products because they weren't selling them to the end consumer because there was a glut of inventory." For these reasons, it was materially misleading for Defendants to continue to portray Hawthorne as the Company's "growth engine" that gave it a "competitive advantage." In reality, Hawthorne's declining demand and accumulating inventory was so severe that Scotts began implementing layoffs beginning in July 2021. Ultimately, Defendants were forced to admit that Hawthorne was completely worthless (it was worth "***zero, or less***"), and the Company's nearly $2 billion investment had nearly "***took [Scotts] down***."

199. *Second*, with respect to the U.S. Consumer segment, Defendant Miller emphasized in the earnings release that "***consumer engagement has remained extremely solid throughout the season***." During the earnings call, CEO Hagedorn similarly emphasized that demand for Scott's lawn and garden products remained strong, declaring that: "***consumer engagement exceeded our***

***expectations***," and ***"[t]he most critical takeaway is this: Consumer engagement remains extremely high***" and that ***"[c]onsumer engagement***" remained so "***strong***" and sustainable that Defendants anticipated "***retain[ing] nearly all of the growth we captured in 2020***."

200. The statements identified in ¶199 were materially false and misleading and omitted material information when made. Contrary to Defendants' statements touting demand for Scotts' lawn and garden products, by Spring 2021, demand was down 20% and continued to plummet through 2021. As discussed herein, numerous FEs uniformly confirmed that by at least August or September 2021, this reversal in demand was clearly reflected "in the data that [Scotts] had access to," including a "daily feed" of sales data for every one of Scotts' customers, which was rolled up into daily "dashboards" available on the executives PCs, iPhones, and iPads, as well as a variety of other tools Defendants used to meticulously track U.S. Consumer's demand, sales, and inventories.

201. *Third*, Defendants also materially misrepresented the state of Scotts' inventory levels across the entire Company, which was a topic that was top of mind for investors. Indeed, during the earnings call, analysts specifically questioned whether investors should have concerns about Scotts' inventory levels, which were "notably high coming out of this quarter." Brushing aside any such concerns CEO Hagedorn asserted that higher inventory levels were necessary to meet the purportedly surging demand: "***we're just not under any pressure on the inventory side from retailers***." Hagedorn further insisted that, because of this demand, Scotts had to "***build all kinds of capacity***." Similarly, Defendant Miller also assured investors that while inventory levels recently increased, this was simply "***getting inventory levels back to where they needed to be***" to keep pace with surging consumer demand.

202. The statements identified in ¶201 were materially false and misleading and omitted material information when made. Contrary to Defendants' assurances to investors that increasing inventory levels were appropriate and nothing to worry about, in reality, demand had declined to such a degree that both Scotts and its retailers were "stuffed" with excess inventory. FEs described that by fall 2021, retailers had "so much inventory in their DCs (Distribution Centers)" that "was not selling," they were demanding the Company repurchase massive quantities of unsold merchandise. These repurchases left Scotts with "***barns stuffed with inventory***," to the point that by late 2021, Scotts' warehouses were "at capacity" and the Company was forced to dump returned and obsolete product, as employees were told to "take it home or throw it away." Further, in order to offload excess inventory, FEs recounted how Scotts tried to "give customers deals," but "customers just didn't have cash and space to take our products" given their own "glut of inventory."

203. *Fourth*, Defendants made crystal clear to investors that Scotts' financial rise was not due to a temporary pandemic-fueled increase in demand, but would continue even after pandemic restrictions were lifted. For example, Hagedorn proclaimed: "I've been telling anyone who would listen that I believe Scotts Miracle-Gro ***would exit COVID as a fundamentally stronger company. And the deeper we dig, the more we analyze, the more I'm convinced that is exactly what's happened***." Hagedorn emphasized that "***[o]ur consumer base today is vastly bigger and more engaged than prior to the pandemic***." CFO Miller concurred, ***"[w]e believed a year ago that we could come out of COVID a better and stronger company and I share [CEO Hagedorn's] conviction that this is exactly what happened.***"

204. The statements identified in ¶203 were materially false and misleading and omitted material information when made. As discussed above, Defendants' statements touting strong

growth across the entire company were false and misleading because, in reality, consumer and retailer demand for both Scott's lawn and garden products and Hawthorne's growing products was sharply declining. On the U.S. Consumer side, demand had reversed by Spring 2021, and was down 20% by March or April 2021. Trends were even worse at Hawthorne, with sales down in leading regions by 30-50% by May 2021, and 70-80% reduction by fall 2021. The Company's inventory levels were dramatically spiking as a result. Accordingly, it was materially misleading for Defendants to claim that Scotts was a "better and stronger company" post-COVID, while ignoring the myriad of data and other material adverse information confirming that the exact opposite was true.

### C. Fourth Quarter 2021

205. On November 3, 2021, Scotts issued a press release announcing record financial results for the fourth quarter and full fiscal year 2021. In the release, CEO Hagedorn touted the continued strong and broad-based demand for U.S. Consumer, including "***continued engagement by consumers throughout the lawn and garden season***," which led to "***growth in every major product category***." During the accompanying earnings call later the same day, Hagedorn underscored that U.S. Consumer's growth was not only strong but sustainable, stating: ***"We see a higher level of sustainable growth with our existing brands ….[b]ased largely on our ability to reach a new generation of consumers***." Hagedorn was emphatic that "***every cut of the data tells us [consumers] have stayed with the category and our brands throughout this past season***." Further, Defendant Miller assured that both Scotts and its retailers were maintaining appropriate levels of inventory commensurate with the existing demand, stating "***as it relates to inventory, we find ourselves in a very good place right now***," and "***we do not expect to have any problems getting our customers at the appropriate inventory levels either***."

206. The statements identified in ¶205 were materially false and misleading and omitted material information when made. Contrary to Defendants' representations that "every cut of the data" confirmed "extremely strong" consumer engagement and customer retention, in reality, consumer demand for Scotts' lawn and garden products was starting to reverse no later than mid-2021 and had cratered by late 2021. FEs reported that by at least August or September 2021, this reversal in demand was clearly reflected "in the data that [Scotts] had access to," including a "daily feed" of sales data for every one of Scotts' customers, as well as a variety of other tools Defendants used to meticulously track U.S. Consumer's demand, sales, and inventories. The decline in demand was also reflected in forecasts Scotts received from its major retail partners, who were all forecasting negative numbers to at most 1% growth for 2022. By the end of 2021 and into the beginning of 2022, demand was so low that Scotts was telling its corporate employees "to visit Home Depots on the weekend and meet with the merchandisers to help them sell more products."

207. Moreover, Defendant Miller's reassurances that Scotts' inventory levels were "in a very good place" and "appropriate" were false and misleading because, in reality, the sharp decline in demand had left both Scotts and its retailers "stuffed" with excess inventory post-pandemic. Indeed, Defendants themselves ultimately admitted that "***pandemic-driven excess inventories***" were the primary factor that ultimately led to the Company's massive losses at the end of the Class Period. This is consistent with the FEs accounts, which described that by fall 2021, retailers had "so much inventory . . . that they wanted it off of their hands" because "it was not selling," and were demanding that Scotts repurchase massive quantities of unsold merchandise. As a result, Scotts was left with "barns stuffed with inventory," and by late 2021, excess inventory had reached such critical levels that Scotts was forced to dump returned and obsolete product because its warehouses were completely "at capacity." In order to offload excess inventory, former employees

recounted how Scotts tried to "give customers deals," but "customers just didn't have cash and space to take our products" given their own "glut of inventory."

208. With regard to Scotts' cannabis operations, CEO Hagedorn touted to investors that Hawthorne represented "***pillars of growth***" for the Company's 5-year growth plan, underscoring that Defendants "***still expect sales growth on a full year basis***" for the segment. Similarly, C. Hagedorn emphasized that, despite some occasional "choppy" conditions in the cannabis market, including a temporary oversupply of cannabis in California that was putting downward pressure on wholesale cannabis prices, he "***urge[d]***" investors "not to lose sight of the bigger picture" because "***[t]here is no doubt that we're the clear leader in the industry***" and "***continue to lead the way in an industry, that remains poised for years of growth***."

209. The statements identified in ¶208 were materially false and misleading and omitted material information when made. Defendants had no basis to claim that they "still expect[ed] sales growth on a full year basis" given that demand for Hawthorne's cannabis products was sharply declining. Indeed, at all times during this quarter, numerous FEs stated that sales were down in Hawthorne's leading regions by 30-50% by May 2021, and continued to decline through the summer, reaching 70-80% by fall 2021. In fact, Hawthorne's declining demand and accumulating inventory had was so severe that to reduce expenses and improve its balance sheet, Scotts began implementing layoffs beginning in July 2021 and continuing through 2022. Further, contrary to Defendants' representations that Hawthorne was the "clear leader in the industry," and "remains poised for growth for years to come," Defendants ultimately admitted that the exact opposite was true: in Defendant Hagedorn's own words, Hawthorne was worth "***zero, or less***", and Scotts' nearly $2 billion investment in cannabis nearly "***took [Scotts] down***."

210. On January 24, 2022, Scotts held its 2022 Annual Meeting of Shareholders during which CEO Hagedorn emphasized that Hawthorne remained a "strategic pillar" of the Company that was poised to capture the "emerging opportunities in cannabis." In addition, Hagedorn stressed that in 2021, Hawthorne "outperformed the competition and further demonstrated its leadership in the indoor cultivation space," and underscored Hawthorne was "in a category that is poised for significant growth for years to come."

211. The statements identified in ¶210 were materially false and misleading and omitted material information when made. As an initial matter, Defendants had no basis to tout Hawthorne as a "strategic pillar" of the Company that was "poised for significant growth" in light of Defendants' own admissions at the end of the Class Period. Indeed, Hagedorn himself admitted at the end of the Class Period that by no later than the start of 2022, a pronounced shift in "post-COVID consumer sentiment" dramatically weakened consumer demand for Scotts' lawn, garden and cannabis products. As Hagedorn himself ultimately admitted, because of these severe and pervasive demand and inventory issues, Hawthorne was completely and utterly worthless (worth "zero, or less").

212. Moreover, FEs confirm that Hawthorne had finished 2021 with crushing sales declines in every region, approaching 70-80% declines by fall 2021. As a former Hawthorne sales director recalled, Scotts was "sh*tting bricks because they weren't selling." As the pandemic-driven demand for Hawthorne's products subsided, Scotts and Hawthorne's retailers were left "stuffed" with excess inventory, and Hawthorne's customers across the nation were reducing and canceling orders, including "million-dollar PO's" for large commercial projects because they "didn't have the cash and space to take [Hawthorne's] products because they weren't selling them to the end consumer because there was a glut of inventory."

**D. First Quarter 2022**

213. On February 1, 2022, Scotts issued a press release announcing its financial results for the first quarter of 2022. During the accompanying earning call, Hagedorn stated that "we've doubled our distribution center footprint, ***that we've increased headcount pretty significantly just to match the scale and the growth of the category over the past few years."***

214. The statements identified in ¶213 were materially false and misleading and omitted material information when made. Defendant C. Hagedorn's representation that Hawthorne had "increased headcount pretty significantly" and "doubled [its] distribution center footprint" in order "to match the scale and growth" of the business, did not reflect reality. Indeed, by that time, Hawthorne's declining demand and excess inventory had become such a severe problem that, in order to ensure upcoming debt covenants were met, Scotts began closing distribution centers and "reducing headcount" through mass layoffs beginning in July 2021 and continuing through 2022. As FE 3 explained, because the Company was unable to offload enough inventory or sufficiently increase sales to offset these declines, Scotts was forced to start slashing its workforce.

215. Also on February 1, 2022, Scotts held an earning conference call in which Scotts' inventory levels, and those of its retailers, was a focal point given that U.S. Consumer's inventory had increased over $590 million compared to the prior year. During the call, CEO Hagedorn silenced any concern about Scotts' inventory levels, assuring that both the Company and its retailers were maintaining appropriate levels of inventory commensurate with the purportedly continuing surge in demand. Indeed, Hagedorn underscored that: "***We do not feel overextended ourselves. And we don't feel that way about retailers***. ***Retailers are ordering heavy right now. So there's no indication there's any sort of inventory at retail or with us that's an issue***." Significantly, CFO Miller added that U.S. Consumer inventories were not only "appropriate," but a "competitive advantage" in the industry, emphasizing: "***We remain comfortable with inventory***

***at this level and continue to see it as a competitive advantage***. We expect to see some competitors continue to struggle to meet demand this year, which we believe will work to our advantage."

216. The statements identified in ¶215 were materially false and misleading and omitted material information when made. Defendants had no basis to tout the Company's inventory levels as a "competitive advantage," or to otherwise portray to investors that there was no "issue" with Scotts' inventory levels. Indeed, Defendants themselves ultimately admitted that "***pandemic-driven excess inventories***" were the primary factor that ultimately led to the Company's massive losses at the end of the Class Period. Moreover, by this point, FEs corroborated that inventories had already dramatically spiked as demand had dramatically weakened, which was reflected in various "data," including a "daily feed" of sales data for every one of Scotts' customers, which was rolled up into daily "dashboards" and a variety of other tools Defendants used to track U.S. Consumer's demand, sales, and inventories. Indeed, FEs described that, months earlier, by no later than fall 2021, retailers had "so much inventory . . . that they wanted it off of their hands" because "it was not selling." As a result, Scotts was left with "barns stuffed with inventory," and Scotts was forced to dump returned and obsolete product because its warehouses were completely "at capacity."

### E. Second Quarter 2022

217. On May 3, 2022, Scotts issued a press release announcing its financial results for the second quarter of 2022. Reporting a decline in sales of lawn and garden products at its largest four retailers, CEO Hagedorn blamed the disappointing performance on bad weather and a late break to spring, stating "***[s]pring weather, frankly, has been lousy in most markets and the season broke about two to three weeks later than normal***." In the release, CFO Miller echoed Hagedorn's claim, stating "***[a] combination of external factors that evolved over the past two months*** now make it unlikely for us to meet our previous earnings target."

218. During the accompanying earnings call later that same day, Defendants reiterated that U.S. Consumer's disappointing performance was due to bad weather. Specifically, Hagedorn asserted that "***lousy weather resulted in fewer replenishment orders in the second half of March***." Nevertheless, Hagedorn assured investors that the "***fundamentals of our business remain strong***,*"* and "the ***business is on a pretty good track right now***. ***We just need to sort of keep that weather***." CFO Miller fully concurred, stating, "as Jim said, ***weather interrupted the reordering patterns from some of our retailers***," and "***because replenishment orders were impacted well into mid-April, we are facing a year-to-date deficit entering May***."

219. The statements identified in ¶¶217-18 were materially false and misleading and omitted material information when made. Contrary to Defendants' statements that the sales decline in the quarter was due to "lousy" weather, and contrary to their reassurances that the "fundamentals of our business remain strong" and "the business is on a pretty good track right now," in reality, the exact opposite was true. Indeed, as Defendants admitted at the end of the Class Period, weather was not to blame for Scotts' poor performance, as Hagedorn himself stated: "***I'm not blaming the weather***." Furthermore, as Defendants also ultimately admitted at the end of the Class Period, by no later than the start of 2022, a pronounced shift in "post-COVID consumer sentiment" had dramatically weakened consumer demand for Scotts' lawn, garden and cannabis products. This is entirely consistent with the FE accounts, which confirmed that demand for Scotts' lawn and garden products was down 20% by no later than in March or April 2021, and continued to plummet through 2022 and into 2023. Former employees reported that this reversal in demand was clearly reflected "in the data that [Scotts] had access to," including a "daily feed" of sales data for every one of Scotts' customers, which was rolled up into daily "dashboards" available on executives' PCs, iPhones, and iPads, as well as a variety of other tools Defendants used to meticulously track

U.S. Consumer's demand, sales, and inventories. By the end of 2021 and into the beginning of 2022 demand was so low that, Scotts was telling its corporate employees "to visit Home Depots on the weekend and meet with the merchandisers to help them sell more products."

220. With respect to Hawthorne, CEO Hagedorn sought to reassure investors during the earnings call that despite macro-industry headwinds in the cannabis space, Hawthorne remained a cut above its peers. Indeed, Hagedorn stated that "the issue of industry oversupply is one we can't control, but we do remain bullish on the category long term and are ***encouraged by the progress we've been making in East Coast markets where growth has been strong***."

221. The statements identified in ¶220 were materially false and misleading and omitted material information when made. Defendant Hagedorn's claim that declines at Hawthorne were merely due to "the industry oversupply" and that Hawthorne was making "progress" in markets where "growth has been strong," were false and misleading. In reality, consumer and retailer demand for Hawthorne's products had started to subside by mid-2021, was down 70-80% nationwide by fall 2021, and never recovered. As a former Hawthorne sales director recalled, Scotts was "sh*tting bricks because they weren't selling." Moreover, Hawthorne's declining demand and excess inventory had become such a severe problem that Scotts began implementing mass layoffs beginning in July 2021 and throughout 2022. Multiple FEs described how Scotts' management undertook a variety of cost cutting measures throughout the first half of 2022, including closing distribution centers, and "reducing headcount" by consolidating sales roles and firing Hawthorne's leadership in an effort to avoid breaching the Company's debt covenants. And Hagedorn himself ultimately admitted that because of these severe and pervasive issues, Hawthorne was completely and utterly worthless—in his own words, it was worth "***zero, or less***."

### F. Third Quarter 2022

222. On June 9, 2022, CFO Miller attended the William Blair 42nd Annual Stock Growth Conference. At the conference, Miller reiterated that the Company's disappointing performance in the second quarter of 2022 and lowered full-year outlook was due to "a delayed start to our spring season with weather in March and April that were just not cooperating with the business." Indeed, Miller claimed that weather had "most important impact on [Scotts'] business this year," and emphasized that without bad weather, "[t]he results in these months this year would have been considered near record."

223. The statements identified in ¶222 were materially false and misleading and omitted material information when made. Indeed, Defendants had no credible basis to assert to investors that Scotts' financial performance was due to inclement weather, or that without the effects of that purported bad weather, Scotts would have reported results that were "near record." To the contrary, Defendants admitted at the end of the Class Period that weather was not to blame for Scotts' poor performance, as Hagedorn himself stated: "I'm not blaming the weather." Defendants also expressly admitted at the end of the Class Period that, by no later than the start of 2022, a pronounced shift in "post-COVID consumer sentiment" had dramatically weakened consumer demand for Scotts' lawn, garden and cannabis products. Defendants' admissions were entirely consistent with the accounts of numerous FEs, who confirmed that demand for Scotts' lawn and garden products experienced sharp declines by at least in mid-2021 (down 20% no later than in March or April 2021) and continued on a downward spiral throughout 2022 and into 2023. Moreover, Defendants' attempt at blame-shifting were directly questioned by analysts, who noted that they "have not seen anything similar occur in the 20 years we have covered SMG."

224. During the conference, Miller also touted Hawthorne's supposedly leading place in the beleaguered cannabis market, hailing Hawthorne as "the leader in the durable side of the

business"—i.e., lighting systems, grow pots, water pumps, and other cannabis cultivation equipment—which purportedly "sets [the Company] up well to capture [market] expansion." Slides accompanying Miller's presentation repeated similar claims, stating that Hawthorne was the "[r]unway to capture growth as cannabis supply normalizes," "the long-term growth opportunities for Hawthorne remain strong," and that Hawthorne was "well-positioned" to capitalize on "[f]avorable long-term trends regarding cannabis."

225. The statements identified in ¶224 were materially false and misleading and omitted material information when made. Far from the wholly positive portrayal of Hawthorne that Defendants conveyed to the market, in reality, by June 2022, Hawthorne's business had cratered. In fact, Scotts' cannabis business was so far gone and the polar opposite of "well-positioned" that a year later, Defendants themselves were forced to admit that Hawthorne was completely and utterly worthless—in Defendant Hagedorn's own words, worth "zero, or less."

226. On August 3, 2022, Scotts issued its earnings release for the third quarter of 2022, reporting a reduced full-year sales and earnings outlook. In the release, CEO Hagedorn attributed lower-than-expected quarterly sales in the U.S. Consumer segment to the retailers' failure to properly manage their inventories in-line with continued strong consumer demand. Hagedorn stated: "We are extremely encouraged that consumer purchases in May and June were at near-record levels . . . Unfortunately, shipments to our retailer partners did not keep pace with consumer demand, as retailers in all channels took steps to lower their own inventory levels."

227. During the accompanying earnings conference call, Hagedorn took pains to clarify to investors that "it's easy to misread what's happened over the past few months"—namely, that while Scotts had reported disappointing financial results, in reality the Company's business remained extremely strong, and those results were attributable to outside factors beyond

Defendants' control. Indeed, Hagedorn boasted that "consumer engagement" remained strong—with U.S. Consumer third quarter sales that were the "second highest on record"—and Scotts' disappointing results and reduced guidance were due to "the way retailers are managing their inventory" and "lousy weather" in early spring. In fact, Hagedorn underscored that the blame should fall squarely on retailers, stating: "The single biggest change since May is the way retailers are managing their inventory." Hagedorn was emphatic, proclaiming that: "The fundamentals are still there. The consumers remain engaged and the future remains bright."

228. The statements identified in ¶¶226-27 were materially false and misleading and omitted material information. Defendants' statements attributing Scotts' disappointing results to "lousy weather" and a purported once-in-a-generation change in "the way retailers are managing their inventory," and Defendants' assurances that U.S. Consumer segment "consumers remain engaged," had no basis in reality. To the contrary, Defendants themselves admitted at the end of the Class Period that they were not blaming the weather for the Company's poor performance, as Hagedorn himself stated: "I'm not blaming the weather." Further, Defendants also admitted that, by no later than the start of 2022, a pronounced shift in "post-COVID consumer sentiment" had dramatically weakened consumer demand for Scotts' lawn, garden and cannabis products. These admissions were corroborated by numerous FEs, who confirmed that demand for Scotts' lawn and garden products were down 20% by no later than in March or April 2021, and that this precipitous decline in demand continued throughout 2022 and into 2023. Moreover, Defendants' attempt to blame U.S. Consumer's poor performance on a combination of retailer' inventory mismanagement and bad weather was questioned by analysts, who openly opined that "we have not seen anything similar occur in the 20 years we have covered SMG."

229. Also during the earnings call, Defendants continued to mislead investors regarding the true state of Scotts' cannabis operations. Indeed, after analysts noted that the cannabis environment was struggling and asked for Defendants' thoughts on Hawthorne's position in the industry, Hagedorn doubled down on Defendants' positive portrayal of the segment, emphasizing that Hawthorne maintained "strategic advantages" for the Company and that the segment was "the best house in the neighborhood":

> "[Y]ou go around this table and say do we like this business, do we think this business recovers, do we strategically think this is a good place for us to be. ***The answer to that is yes***. So you're not going to find us uncommitted to this space. . . ***And to be honest, I think as we look at our strategic advantages, what we have been building; I think we feel like we are, without a doubt, the best house in the neighborhood***."

230. The statements identified in ¶229 were materially false and misleading and omitted material information when made. Contrary to Defendants' statements that Hawthorne provided "strategic advantages" to the Company and was "without a doubt, the best house in the neighborhood," in reality, by June 2022, Scotts' Hawthorne house was ablaze. Indeed, just one year later, Defendants themselves ultimately admitted that Hawthorne was so completely and utterly worthless that, in Defendant Hagedorn's own words, the segment was worth "***zero, or less***."

### G. Fourth Quarter 2022

231. On November 2, 2022, SMG issued a press release and held an earnings call discussing financial results for the fourth quarter and full fiscal year of 2022. During the earnings call, Defendants continued to make materially false and misleading statements about virtually every aspect of the Company's business.

232. *First*, CEO Hagedorn assured investors as to the state of Scotts' lawn and garden business, stating that U.S. Consumer exited 2022 on a firm footing and was well positioned for future success: "***We emerged from fiscal '22 reaffirming the strength of our brands, the power***

***of our retail relationships and continued high consumer engagement***." Hagedorn stressed that "***[t]he fundamentals of our U.S. Consumer business are strong***," "***consumers are engaged***," and the division's total addressable market had soared given that "***80% of the 20 million new gardeners who entered the category during COVID continue to be in it***."

233. The statements identified in ¶¶231-32 were materially false and misleading and omitted material information when made. Contrary to Defendants' statements that the U.S. Consumer segment was experiencing "continued high consumer engagement," and that the "fundamentals" of the business were "strong," in reality, FEs confirmed that demand for Scotts' lawn and garden products plunged 20% by no later than March or April 2021, and continued to plummet throughout 2022 and into 2023. Multiple FEs confirm these issues never improved during the Class Period, and their accounts were corroborated by Defendants themselves. Indeed, Defendants admitted at the end of the Class Period that, by no later than the start of 2022, a pronounced shift in "post-COVID consumer sentiment" had dramatically weakened consumer demand for Scotts' lawn, garden and cannabis products.

234. *Second*, during the call, Defendants also reassured investors regarding U.S. Consumer's inventory levels, with Hagedorn touting that Scotts was now experiencing a "***tailwind on inventory***," putting U.S. Consumer's inventory "***in line with what we wanted and non inventory problem exiting the year***." Interim CFO Evans added that "***we'll start to see a decline in Q2, but then we should really see the big decline in inventory in Q3 and then Q4***."

235. The statements identified in ¶234 were materially false and misleading and omitted material information when made. Directly contradicting Defendants' positive assertions regarding Scotts' inventory levels, one year later, Defendants themselves ultimately admitted that "***pandemic-driven excess inventories***" were the primary factor that ultimately led to the

Company's massive losses at the end of the Class Period. Moreover, FEs corroborated that, long before this time, inventory levels had spiked as demand had rapidly weakened, which was reflected in various "data" points, including a "daily feed" of sales data that was rolled up into daily "dashboards" and a variety of other tools Defendants used to track U.S. Consumer's demand, sales, and inventories. Indeed, FEs described that a year earlier, by no later than fall 2021, retailers had "so much inventory . . . that they wanted it off of their hands" because "it was not selling." As a result, Scotts was left with "barns stuffed with inventory," and Scotts was forced to dump returned and obsolete product because its warehouses were completely "at capacity."

236. *Third*, Defendants again reassured investors regarding Hawthorne's continued viability, value, and growth as a supposed leader in the cannabis market. During the call, CEO Hagedorn stated that "***There is a huge amount of value that will be unlocked in Hawthorne once this [cannabis] rebound occurs***." Indeed, Hagedorn noted, Hawthorne's "***long-term growth rates are still greater than those of our core business. That's the big reason we got into this business in the first place***." Hagedorn stressed that Hawthorne continued to be a purported differentiator in the cannabis industry: "***No other company can do what Hawthorne does***."

237. The statements identified in ¶236 were materially false and misleading and omitted material information when made. Contrary to Defendants' portrayal of Hawthorne as an industry-leader with a "huge amount of value" that was just waiting to be "unlocked," the reality was the exact opposite. Indeed, by this point, Scotts' cannabis business was in shambles, and just one year later, Defendants themselves ultimately admitted that Hawthorne was so completely and utterly worthless that, in Defendant Hagedorn's own words, the segment was worth "***zero, or less***."

### H. First Quarter 2023

238. On February 1, 2023, Scotts issued a press release and held a conference call announcing its first quarter results for fiscal 2023. In both the release and conference call,

Defendants made a series of statements reassuring investors of the Company's successful, ongoing efforts to "reorient the business and strengthen the operational and financial performance of the Company," and in particular, its cannabis business.

239. In the Q1 2023 press release, CEO Hagedorn reassured investors of the Company's commitment to returning Hawthorne to profitability by the end of the fiscal year, and reinforced that notwithstanding Hawthorne's challenging market, ***"[o]verall, we are in a stable place and are well prepared to execute on our full-year plan***." During the conference call, CEO Hagedorn and other senior executives repeatedly reassured investors that Hawthorne was a valuable leader in the cannabis industry, a key part of the Company's long-term strategy, and that the Company's "end thesis" for Hawthorne was "still in place." First, Hagedorn discussed and "reaffirm[ed]" the Company's critical "5-pillar growth strategy," two pillars of which were built on Hawthorne. Hagedorn detailed a two-fold strategy for Hawthorne, "Number one," being "***we will retain Hawthorne's competitive advantage in the cannabis non-plant touching space and professional horticulture***," and reinforced that Hawthorne was "***the leading solution provider for growers***." CFO Garth echoed Hagedorn's "***excitement about the long-term prospects for Hawthorne and the potential for growth and value creation in the business***," and reassured investors "***[t]here are many reasons to be excited about the future of Hawthorne***," including that its "***glide path [to profitability] as we move through the year will be improving***." C. Hagedorn concurred, stating, while Hawthorne's "***upside***" has been "***pushed out a little bit***," "***the end thesis is still in place***."

240. The statements identified in ¶¶238-39 were materially false and misleading and omitted material information when made. Contrary to Defendants' portrayal of Hawthorne as "the leading solution provider for growers" with a "a competitive advantage" and both a positive near-term profitability trend and favorable "long-term prospects," the reality was the exact opposite.

Indeed, by this point, Scotts' cannabis business was in total disarray. Just months later, Defendants themselves were forced to admit that Hawthorne was so completely and utterly worthless that, in Defendant Hagedorn's own words, the segment was worth "***zero, or less***."

241. Next, in both the Q1 2023 earnings release and conference call, Defendants reported better-than-expected first quarter results, driven by "record December shipments" in the U.S. Consumer segment. CEO Hagedorn stated in the earnings release that "[r]ecord December shipments in the U.S. Consumer business contributed to a strong early season buildout demonstrating confidence in the lawn and garden season."

242. During the February 1, 2023 earnings call, Defendants assured investors about the enduring strength of the U.S. Consumer business and quelled concerns about retailers' high levels of inventory. CEO Hagedorn stated that a core priority of the Company was "building momentum and making sure retailers are fully loaded and all in with us," adding that "We accomplished this in Q1." However, analysts questioned whether retailer inventory levels were too high and if Scotts was pushing too much product on its lawn and garden retailers. An analyst specifically asked Defendants, "[s]ounds like they [retailer inventories] are a little heavy, how much of might that be to your shipments this year?" In response, COO Lukemire stated definitively, "***there is no problem with that pump***." Later in the call, CEO Hagedorn categorically dismissed concerns of excess retailer inventory, stating "***I don't think we have an inventory problem at all at retail***."

243. The statements identified in ¶¶241-42 were materially false and misleading and omitted material information when made. Contrary to Defendants' statements denying any inventory problems at the Company, just months later, Defendants themselves conceded that "***pandemic-driven excess inventories***" were the primary factor that ultimately led to the Company's massive losses at the end of the Class Period. Defendants further admitted that these

excess inventories were attributable to the fact that, by no later than the start of 2022, a pronounced shift in "post-COVID consumer sentiment" had dramatically weakened consumer demand for Scotts' lawn and garden products. These admissions were corroborated by numerous FEs, who confirmed that demand was down 20% by no later than in March or April 2021, and that this precipitous decline in demand continued throughout 2022 and into 2023. Additionally, Defendants reassurances that there were "no problem[s]" with inventory levels were false and misleading because, as a result of the sharp decline in demand, Scotts and its retailers were left holding massive levels of excess inventory—far more than Scotts or its retail partners could sell through to consumers. Declining demand had left Scotts saddled with so much excess inventory that the Company's warehouses were incapable of storing it all, and Scotts was forced to destroy large quantities of unsold inventory. Further, declining consumer demand and excess inventory had become such a severe problem that Scotts began implementing layoffs beginning in July 2021 and continuing through 2022.

244. On February 15, 2023, the Company held a "Fireside Chat" with Wells Fargo, which was livestreamed and later posted on the investor section of the Company's website. During this "special call," CFO Garth and C. Hagedorn and discussed Garth's recent hire as the Company's new CFO, the progress of Project Springboard, the Company's successful execution through its "transition period" and its "conservative" guidance for 2023. CFO Garth stressed that despite the Company's uneven post-pandemic experience, the "***fundamental basis of the company***" and all the "***key themes that we put together as our strategies to grow the company are still in play***." As for Hawthorne specifically, CFO Garth cited Hawthorne's "***really great strategy***" and "***really good growth program***," adding that "***the long-term opportunity in that space is pretty robust***."

245. On March 16, 2023, CFO Garth presented at UBS's 12th Annual Global and Retail Conference, where he continued to assure investors regarding the successful execution of Scotts' post-pandemic turnaround efforts, including at Hawthorne. Responding to an analyst's question about the Company's "realistic long-term growth expectation for Hawthorne," Garth provided a detailed response covering Hawthorne's market and operations, and asserted that "***Hawthorne is a full suite solution to the cannabis industry, whereby -- we have capabilities that are unmatched in the marketplace***." Garth underscored Hawthorne's enduing and significant value to the Company, stating: "***What I can tell you is we have, again, an extremely unique position and value proposition*** . . . . ***[W]e're in a position of strength because we have a unique offering, I think it enables us to exit this period of time, much, much stronger on the Hawthorne side***.

246. The statements identified in ¶¶244-45 were materially false and misleading and omitted material information when made. Contrary to Defendants' portrayal of Hawthorne as an industry leader with "capabilities that are unmatched in the marketplace" and "in a position of strength," the reality was precisely the opposite. Indeed, just months later, Defendants themselves admitted that Hawthorne was so completely and utterly worthless that, in Hagedorn's own words, the segment was worth "***zero, or less***."

**I. Second Quarter 2023**

247. On May 3, 2023, Scotts announced its results for the second quarter of 2023, including a 54% decline in Hawthorne sales. During the accompanying earnings call that same day, CEO Hagedorn described that "a wicked shakeout is underway" in the cannabis sector—and told investors it "will result in the top 25% getting even stronger" and leave Hawthorne "***in an enviable position***" and "***uniquely positioned to thrive***."

248. The statements identified in ¶247 were materially false and misleading and omitted material information when made. Contrary to CEO Hagedorn's assertion that a "wicked shakeout"

in the cannabis sector left Hawthorne in "an enviable position" and "uniquely positioned to thrive," in reality, Scotts' cannabis business was in such a state of disarray that it was completely worthless. Indeed, within months, Hagedorn himself was forced to admit that Hawthorne was so utterly devoid of value that it was worth "***zero, or less***." Further underscoring the falsity of Hagedorn's statements, Defendants soon revealed that despite spending a year looking for someone to purchase Hawthorne, there was not a single purchaser that was willing to buy the business.

## VI. ADDITIONAL ALLEGATIONS OF SCIENTER

249. As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the demand, inventory levels, and guidance for Company's key U.S. Consumer and Hawthorne segments were materially false and misleading when made.

### A. The Individual Defendants Updated Investors Every Quarter (Or More) About Demand, Inventory, and Hawthorne—Subjects Critically Important to Investors—Including In Response To Analysts' Direct Questions

250. As set forth above, throughout the Class Period, the Individual Defendants made dozens of statements every quarter discussing the demand, sales, profits, production, inventory levels, and a variety of other key performance metrics for the Company's core lawn and garden products, and cannabis growing products. These subjects were critically important to the Company and its investors, as they concerned the Company's two most important, and essentially only, business lines. Each time the Individual Defendants spoke to investors on these specific topics, they professed to be fully familiar with the facts, providing detailed and definitive responses, including in direct response to analysts' repeated and targeted questions. The Individual Defendants provided extraordinary detail for both the U.S. Consumer and Hawthorne segments on virtually every earnings call, for years, from mid-2020 through the end of the Class Period.

251. Defendants' repeated misstatements throughout the Class Period concerning the very subjects that were critically important to the Company and its investors, including direct responses to highly specific questions by securities analysts, supports a strong inference of scienter.

### B. The Individual Defendants Were Extremely Hands-On Executives Who Received Regular Reports And Meticulously Tracked the Company's Key Performance Metrics

252. The Individual Defendants knew throughout the Class Period of the declining demand and high inventory levels in the U.S. Consumer and Hawthorne segments, because they meticulously tracked performance through a variety of key performance metrics that were immediately accessible to them through sophisticated software on their office computers, laptops, iPhones, and iPads. Indeed, throughout the Class Period, when speaking to investors, the Individual Defendants often credited Scotts' SAP-created data management system, which provided them with increased "visibility" into key performance indicators, citing that as support for the reliability of their assessments of strong demand for the Company's products, their appropriate inventory levels, and the accuracy of their financial forecasts. Multiple former employees confirm that Defendants had access to, monitored, and analyzed a host of operational and financial metrics evidencing the performance of the U.S. Consumer and Hawthorne segments, including sales volume and inventory for each product offered by these segments, for all regions across the country, and for each of the Company's key customers, in real-time.

253. As discussed extensively on the Company's earnings calls, before and during the Class Period, the Individual Defendants meticulously tracked sales, inventories, and profits through a variety of systems that provided a clear "line of sight" into market conditions. For example, during the Q1 2020 Earnings Call, Defendant C. Hagedorn described a cloud-based data platform created by SAP which made granular detail regarding demand, inventory, and margins available to both Hawthorne's executives and its sales force. As C. Hagedorn noted, SAP enabled

"precise," "quick[]," and "better visibility to what our margin is by product line[,] category, and by retailer." He underscored, this precise "detail on how the business is actually operating down at the lower levels has really been important for us."

254. Then-CFO Coleman also touted the SAP system, asserting that "[w]e have a lot more visibility today, state by state, customers, product lines than we had before SAP." Similarly, during the Class Period, Hagedorn underscored that Scotts had "enough visibility" to "raise our full-year sales growth outlook for Hawthorne" for fiscal 2021 by 5-10%. Miller reiterated the Company's data-driven "good line of sight" supported "a high degree of confidence in our guidance." During the Q4 2021 earnings call, Hagedorn told investors, "***every cut of the data*** tells us [consumers] have stayed with the category and our brands throughout this past season."

255. Numerous former employees of both Scotts and Hawthorne confirm and expand on the detailed reports on market conditions the Individual Defendants had available during the Class Period. These include regular reports and updates on the performance of the U.S. Consumer and Hawthorne businesses, containing sales, pricing, inventories, demand, and growth data and metrics. These former employees assert that Defendants Miller and Lukemire were made "highly aware" of demand, sales, and inventory levels for Scotts branded consumer lawn and garden products, and Hawthorne's indoor growing products, through daily COO-led meetings, weekly COO Staff Meetings, twice weekly briefings, weekly Sales Director Meetings, detailed slide decks that were circulated in connection with these meetings, and daily operational reports showing inventory levels, production levels, and sales performance for each of Scotts' top customers. FE 3, who attended the daily COO-led meetings and weekly COO Staff meetings, emphasized that "we were constantly updated with information on inventory levels, production levels, and shipments to customers," and when inventory buildups were "hitting critical mass," we were "talking about that

pretty much every day." COO Lukemire and Defendant Miller, in turn, along with several other high-ranking senior executives regularly attended these meetings and updated Defendant Hagedorn. FE 5 confirmed Lukemire and others who regularly attended the weekly directors' meetings at Hawthorne, directly reported up to CEO Hagedorn, who former employees universally described as an "extremely hands-on CEO."

256. In addition, numerous FEs further report that the Individual Defendants, and Scotts' entire executive management team, had access to abundant, sophisticated software and other reporting tools tracking the performance of the U.S. Consumer Segment and the Hawthorne segment, often in real-time. These tools include Salesforce's Power BI, which tracked sales in real-time, and Power BI and Tableau, which provided visualization. As FE 5 confirmed, "anybody can go in and look at this [information]," and said it was clear senior management was reviewing this information because they were "up in our business like a helicopter mom when it came to sales and inventory." She added, "there's no f***king way they didn't know" demand was declining, as the executives were "dialed in." Indeed, FEs confirm that all manager-level employees and above, including c-suite executives, had a customized app on their iPhones, iPads, and other mobile devices that enabled real-time tracking of the Company's sales, inventories, pricing, and other performance metrics, which provided data nationally, regionally, by territory, and down to the individual store level, salesperson, and product.

257. Numerous former employees of both Scotts and Hawthorne similarly report that the Individual Defendants, and Scotts' entire executive management team, had access to software and other reporting tools tracking the sales and inventories of Scotts products in granular detail at the Company's top customers, including the "Big 3" – Home Depot, Lowe's, and Walmart – as well as certain Hawthorne customers. These former employees confirm that Scotts had access to daily

POS data and inventory levels for each of its major customers through SAP, and that this data was rolled up into dashboards that were accessible companywide in Tableau. As FE 3 explained, this "daily feed" allowed Scotts management to see firsthand the downturn in sales when COVID restrictions lifted. FE 1, who was personally responsible for creating these daily dashboards, confirmed that they "were readily available to everybody including C-Suite members," and asserted that, Scotts' executives "could definitely see the decline in sales once people started returning to the office and customers cutting back on their spend." FE 2 likewise stated that it would be "mind boggling" if Scotts' executives did not see the slow down coming in 2021 since declining sales were reflected "in the data that we had access to every week."

### C. The Individual Defendants Were Directly Involved In Making Sales To Scotts' Largest Customers, So Much So That CEO Hagedorn Referred to These Relationships As "Friendships"

258. Prior to and throughout the Class Period, Scotts senior management touted their close relationships with the Company's largest retail partners. For example, CEO Hagedorn bragged on numerous earnings calls before and during the Class period, that Scotts had the cooperation and support of its retailers who were "super engaged, [and were] working together [with Scotts] on a daily basis …" As to Hawthorne, Hagedorn similarly assured investors that "based on our ongoing conversations with our retail partners," Defendants were well aware of demand and sell-through because the Company operated not "as a distributor," [but] [i]nstead, we operate as a partner to the cultivators [that] use our products." These partnerships "or authority in the relationship with our retailers" were so strong that Hagedorn told investors he viewed "the most senior levels of our biggest retailers… as kind of personal friends" to whom the looked "when we are trying to make quarters, we—I have to go visit them and so does Mike [Lukemire]."

259. Multiple FEs confirm that Scotts executive management maintained close relationships with customers, including regular visits on the Company jets to visit important

customers and close large deals. For instance, a high-level executive at Scotts' corporate headquarters confirmed that Defendants J. Hagedorn, C. Hagedorn, Lukemire, and Miller, as well as Hawthorne COO Crabtree and other high-level executives at Scotts and Hawthorne, were directly and personally involved in sales efforts with large customers, "talked with their big customers" and "tried to close deals." Multiple high-level sales executives at Hawthorne similarly reported that Scotts' top executives were directly involved in Hawthorne's sales efforts and would travel to the various sales territories and attend sales meetings with the sales representatives. As FE 5 recalled, as Hawthorne started experiencing drastic sales declines, executives, including Defendant Miller and Crabtree, began making frequent site visits with the sales representatives and territory managers, using "company jets like they were toys." During these visits, which spanned multiple states, their so-called retailer friends made it "abundantly clear" that the record sales experienced during COVID were "never going to happen again"—a point reiterated by their own personnel who accompanied them on the visits.

260. From their regular contacts, purported close "friendships," and frequent personal visits to the Company's largest customers at both the U.S. Consumer and Hawthorne segments, the Individual Defendants witnessed firsthand of the severe declines in demand and rising inventories impacting its core businesses, as well as the high-pressure sales tactics, "selective price adjustments," and "incremental listings [*i.e.*, promotions] at top retailers" that enabled Scotts to flood the market with excess inventory. These facts reinforce a strong inference of scienter.

### D. By Their Own Admissions, Defendants Demonstrate They Knew Demand For Both U.S. Consumer and Hawthorne Had Dropped Precipitously By The Start Of 2022

261. At the close of, or shortly after, the Class Period, CEO Hagedorn made a series of stunning admissions that reinforce a strong inference that Defendants made each false and misleading statement with scienter.

262. *First*, on August 2, 2023, CEO Hagedorn admitted that despite having previously blamed weather or retailers own inventory management practices for Scotts' poor financial results and diminished outlook, neither caused Scotts' diminished financial condition during the Class Period. Remarkably, Hagedorn conceded that, at least 18 months earlier, a change in "post-COVID consumer sentiment" drove consumers to "shift the[ir] discretionary spending" to activities ***other*** than lawncare and gardening. Hagedorn, acknowledged that this critical reversal "***started in '22 as part of the post-Covid hangover and extended into '23***." Hagedorn revealed that this trend was identified in the Company's contemporaneous "consumer research," and in a study Scotts commissioned from the management consulting firm, McKinsey & Company.

263. *Second*, Hagedorn acknowledged soon after the Class Period ended that Defendants had no one but themselves to blame for the massive over-accumulation of inventory by Scotts and its retailers, that led to the "total earnings destruction" Scotts experienced at the end of the Class Period. As Hagedorn told investors, "***you can throw sh*t at us, we deserve it***."

264. *Third*, in a *Forbes* feature containing its observations from a prominent cannabis industry conference in December 2023, CEO Hagedorn admitted that Hawthorne was such a complete and total disaster that it was worthless, worth "***zero, or less***" and the losses attributable to cannabis "***almost took [Scotts] down***." This was a far cry from Hagedorn's assertions, as late as in May 2023, that Hawthorne was "growth driver" and "uniquely position to thrive." These seriatim admissions are powerful indicia of scienter.

### E. Defendants Spouted False Reasons For Scotts' Shortfall Which Analysts Eventually Identified As Illegitimate

265. Further supporting a strong inference of scienter, during the Class Period, the Individual Defendants consistently blamed disappointing sales on external factors, such as "lousy weather" and retailers' failure to keep their "replacement orders" on pace with consumer demand.

However, one can blame it on the rain only so many times, and analysts increasingly saw through the fiction and issued reports called out Defendants for failing to own up to the truth.

266. For example, Truist issued multiple reports lowering its rating on Scotts while reporting that management's blaming sluggish sales on the weather lacked any credibility. Indeed, on July 11, 2023, Truist issued a report titled, "***It's NOT About the Weather***" (emphasis in original) wherein it criticized management for misleading investors with the false narrative that "poor weather trends" were to blame for U.S. Consumer's poor performance in both the 2022 and 2023 spring growing season. Truist diagnosed the true reason—a "post pandemic hangover." As Truist commented, "we have been surprised by how much blame management has attributed to weather for the underperformance of its US Consumer business," as "***the key issue that continues to plague the segment is a post-pandemic hangover***."

267. Truist also questioned the truthfulness of CEO Hagedorn's claims that retailers were to blame for U.S. Consumer's poor performance during spring 2022 season by failing to replenish their orders on pace with consumer demand, yet were purportedly "just as excited as the company going into next year." Truist again noted that Defendants' explanation did not make sense, exclaiming "***we have not seen anything similar occur in the 20 years we have covered [Scotts]***." Tellingly, when Truist pressed CEO Hagedorn for an explanation on his simultaneous attempts to blame "bad weather," Hagedorn deflected, stating "It was just everything was kind of going against us. It's not that unusual." Yet, Truist was correct all along, as Hagedorn admitted at the end of the Class Period when he acknowledged that the Company's disastrous financial performance was actually attributable to a "***post-Covid hangover***" that started in 2022, and in fact, that the weather was not to blame, as Hagedorn stated: "***I'm not blaming the weather***."

### F. The U.S. Consumer And Hawthorne Segments Are Scotts' Core Business Operations Providing Nearly All Of The Company's Revenue

268. The Individual Defendants were intimately aware of the rapidly declining demand and soaring inventories for the U.S. Consumer and Hawthorne segments, because they represented essentially all of Scotts' business.

269. During the Class Period, Scotts had only three reportable business segments: (1) U.S. Consumer, which consists of the Company's U.S. lawn and garden business; (2) Hawthorne, which provides indoor (hydroponic) gardening equipment, with a focus on cannabis growers; and (3) Other, which consists of the Company's business outside of the United States. Throughout the Class Period, more than 90% of the Company's total revenue was derived from the U.S. Consumer and Hawthorne segments. For example, in 2022, sales from U.S. Consumer and Hathorne collectively reported sales of $3.6 billion, over 92% of Scott's $3.9 billion in Companywide sales.

270. Moreover, U.S. Consumer's sales are concentrated in only three "retail partners"—Home Depot, Lowe's, and Walmart. Throughout the Class Period, these "Big 3" customers comprised more than 60% of the Company's total revenues. As analysts aptly noted, "Scotts would be significantly affected should any of these retailers discontinue carrying its products." In 2022, for example, U.S. Consumer brought in $568.6 million in profit with over 60% of sales derived from Home Depot, Lowe's, and Walmart, Scotts' "Other" (international) segment generated just $20 million in profit—not even enough to offset Hawthorne's $21 million in losses.

271. As for Hawthorne, CEO Hagedorn described the Company's massive investment in the cannabis market as a foundation for Scotts' five "pillars of growth" during Class Period. Defendants touted "Hawthorne, our growth engine" as the next driver of sustainable, long-term growth, with Defendant Miller projecting "8% to 12% growth on a full-year basis" for Hawthorne during the same November 3, 2021 earnings call. Indeed, Defendants invested $1.7 billion—

representing nearly three years' worth of the Company's earnings—in the cannabis-focused business strategy, formed a new subsidiary around it, and hailed it as Scotts' next "growth engine."

272. In short, as *Forbes* reported in a feature article shortly after the Class Period, the Company's "audacious bets" on the cannabis industry were so huge—and disastrous—that, in CEO Hagedorn's own words, they "almost took us down."

273. These facts regarding the Company's core business operations upon which the Company invested massive amounts of capital and constituted virtually of the Company's business, strongly support scienter.

## VII. LOSS CAUSATION

274. During the Class Period, shares of Scotts' publicly traded common stock traded on the NYSE an open, well-developed, and highly efficient market.

275. Throughout the Class Period, the price of Scotts' common stock was artificially inflated and buoyed as a result of Defendants' materially false and misleading statements and omissions identified above in § V. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Scotts' stock, by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Scotts' stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Scotts' common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

276. By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Scotts' business. Defendants' false and misleading statements had the intended effect and caused Scotts' common stock to trade at artificially inflated levels throughout the Class Period.

277. Among the disclosures in this action that establish loss causation are the following.

278. On June 8, 2022, before the markets opened, Scotts issued a press release disclosing "lower-than expected replenishment orders from retail partners," which were more than $300 million below target for the month of May 2022 alone, with the Company slashing its full-year sales guidance and now expecting sales declines for FY 2022, including a 4%-6% sales decline in the Consumer segment and a staggering 40%-45% sales decline in the Hawthorne segment. Correspondingly, Scotts slashed its FY 2022 earnings guidance by nearly 50%. As set forth in detail in § IV.D., above, since mid-2021, Defendants had been aware of sharp declines in demand at both the U.S. Consumer and Hawthorne segments and had engaged in increasing desperate efforts to camouflage those declines. The June 8, 2022 disclosure, which was only partially corrective and did not reveal the whole truth or magnitude of Scotts' misrepresentations, was a consequence of the materially adverse events that were not timely disclosed to, and were concealed from, the market during the Class Period, as alleged in § IV.C., above.

279. In response to these fraud-related partially corrective disclosures of declining demand amidst rising costs and excessive inventory, Scotts' stock price plunged $9.05 per share, from a close of $102.18 on June 7, 2022, to close at $93.13 per share on June 8, 2022, a decline of 8.8%, on extraordinary trading volume of over 2.18 million shares.

280. On August 3, 2022, before the markets opened, Scotts issued a press release disclosing quarterly sales declines of 26% Companywide, with Consumer sales down 14%, and Hawthorne sales down 63%. The August 3, 2022 Press Release further disclosed that the Company would take on significant debt to cover restructuring charges related to the implementation of cost-saving measures and organizational changes under a new restructuring effort called Project Springboard. These restructuring charges, totaling $632.4 million, consisted largely of a write-

down of goodwill and other assets at Hawthorne. As set forth in detail above at ¶¶138-40, well-prior to the Class Period, Defendants were aware of sharp declines in demand in both the U.S. Consumer and Hawthorne segments. In addition, the substantial sales declines and relating Hawthorne write-down were indicia that contrary to a short-term oversupply of cannabis, the challenges facing Hawthorne were fundamental to its business.

281. On this news, constituting a fraud-related partial disclosure of truth, Scotts' stock price fell $5.28 per share, from a close of $87.43 on August 3, 2022, to close at $82.15 per share on August 3, 2022, a decline of 6%, on heavy trading volume of nearly 1.3 million shares. The August 3, 2022 disclosure, which was only partially corrective and did not reveal the whole truth or magnitude of Scotts' misrepresentations, was a consequence of the materially adverse events that were not timely disclosed to, and were concealed from, the market during the Class Period, as alleged in § IV.D., above.

282. After the close of markets on August 31, 2022, Scotts issued a press release disclosing the sudden termination of CFO Miller without any planned replacement. CFO Miller had just been named CFO only about one year earlier, on September 3, 2021, and was the second CFO to depart Scotts in less than two years. The press release further disclosed that Scotts was now expecting to lose about twice as much cash in 2022, by lowering the Company's projected full-year free cash guidance range from its previous guidance of "negative $150 million" down to "negative $275 million to negative $325 million." The disclosures regarding the departure of the CFO and the sharp declines in anticipated free cash flow indicated to the market that, *inter alia*, the growing Leverage Ratio would not support "long term opportunities" for the Company as the CFO Miller had stated months earlier.

283. In response to these fraud-related partially corrective disclosures, Scotts' stock price fell $4.38 per share, from $66.95 on August 31, 2022, to close at $62.57 per share on September 1, 2022, a decline of 6.5%, on unusually heavy trading volume of over 1.28 million shares.

284. On May 3, 2023, before the markets opened, Scotts issued a press release that disclosed quarterly sales declines of 9% Company-wide, with Consumer sales down 2%, and Hawthorne sales down by 54%. Scotts also provided an update on Project Springboard's cost saving measures, including the accelerated the closure of four warehouses. Finally, Scotts revealed that it was unable to provide top-line sales guidance until June due to unforeseen "industry challenges." The May 3, 2023 disclosures, which were only partially corrective and did not reveal the whole truth or magnitude of Scotts' misrepresentations, was a consequence of the materially adverse events that were not timely disclosed to, and were concealed from, the market during the Class Period, as alleged in § IV.D., above.

285. As a result of these fraud-related partial disclosures, Scotts' stock price fell $5.45 per share, from $69.34 per share on May 2, 2023, to close at $63.89 per share on May 3, 2023, a decline of more than 8%, on unusually heavy trading volume of nearly 1.48 million shares.

286. On August 2, 2023, Scotts issued a press release before the markets opened disclosing quarterly sales declines of 6% Company-wide, with Consumer sales up 1%, but Hawthorne sales crushed by 40%. Adjusted gross margin fell 1.5%, from 19.9% to 18.4%, and adjusted EPS plunged $0.81, from $1.98 to $1.17 per share, a 41% decline, for the quarter. Scotts also further cut its full year sales and earnings guidance and now forecast a sales decline of between 10% to 11% in fiscal 2023, down from its previous forecast of negative 8% to 9%. Finally, Scotts disclosed adjusted EBITDA guidance down a staggering 25%, compared to the previously

forecasted "[l]ow single-digits percentage decline" and disclosed yet another amendment to its debt covenants, expanding the Leverage Ratio to a maximum of 7x. These poor results were attributed to "post-COVID consumer sentiment[,]" which, as set forth in detail in § IV.D., above, Defendants were aware of because of declining demand throughout the Class Period. The August 2, 2023 disclosure, which was only partially corrective and did not reveal the whole truth or magnitude of Scotts' misrepresentations, was a consequence of the materially adverse events that were not timely disclosed to, and were concealed from, the market during the Class Period, as alleged in § IV.D., above.

287. As a direct result of these disclosures, Scotts' stock price fell $13.58 per share, from a close of $71.44 on August 1, 2023, to close at $57.86 per share on August 2, 2023, a decline of more than 17%, on extraordinary trading volume of 3.59 million shares.

288. The drastic and continuing decline in Scotts' stock price was a direct result of the nature and extent of Defendants' fraud gradually being revealed to investors and the market in the disclosures made on June 8, 2022; August 3, 2022; August 31, 2022; May 3, 2023; and August 2, 2023. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII. PRESUMPTION OF RELIANCE

289. At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

a) Scotts' common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b) As a regulated issuer, Scotts filed periodic reports with the SEC and the NYSE;

c) Scotts regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Scotts was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

290. As a result of the foregoing, the market for Scotts' common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock. All investors who purchased the Company's common stock during the Class Period suffered similar injury through their purchase of Scotts' common stock at artificially inflated prices, and a presumption of reliance applies.

291. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Scotts' business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

292. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

293. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Scotts who knew that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

294. Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased Scotts common stock between May 5, 2021, and August 1, 2023, inclusive (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Scotts at all relevant times, members of their immediate families, and their legal representatives, heirs,

agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

295. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Scotts' shares were actively traded on the NYSE. As of the start of the Class Period, the Company had more than 55.7 million shares outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

296. Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

297. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

298. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Scotts;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Scotts;

e) whether the market price of Scotts shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

299. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

300. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

301. Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Scotts shares; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Scotts shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

302. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Scotts shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

303. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Scotts' business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Scotts' business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Scotts and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

304. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

305. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Scotts' operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge

of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

306. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Scotts shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiffs and the other members of the Class purchased Scotts shares during the Class Period at artificially inflated prices and were damaged thereby.

307. At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that Scotts was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their Scotts shares, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

308. By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

309. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

310. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

311. The Individual Defendants acted as controlling persons of Scotts within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

312. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

313. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

314. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XII. PRAYER FOR RELIEF

315. WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIII. JURY DEMAND

316. Lead Plaintiffs demand a trial by jury.

Dated: May 9, 2025

Respectfully submitted,

By: */s/ David R. Kaplan*

**SAXENA WHITE P.A.**

David R. Kaplan*
Emily Bishop*
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
Email: dkaplan@saxenawhite.com
ebishop@saxenawhite.com

Lester R. Hooker*
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
Email: lhooker@saxenawhite.com

Steven B. Singer**
10 Bank Street, Suite 882
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
Email: ssinger@saxenawhite.com

**BARRACK, RODOS & BACINE**

Jeffrey A. Barrack**
Danielle M. Weiss*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel.: (215) 963-0600
Fax: (215) 963-0838
E-mail: jbarrack@barrack.com
dweiss@barrack.com

Stephen R. Basser*
Samuel M. Ward*
600 West Broadway, Suite 900
San Diego, CA 92101
Tel.: (619) 230-0800
Fax: (619) 230-1874
E-mail: sbasser@barrack.com
sward@barrack.com

*Co-Lead Counsel for Lead Plaintiffs*

**STRAUSS TROY CO., LPA**

Richard S. Wayne, Attorney Bar No. 0022390
William K. Flynn, Attorney Bar No. 0029536
Robert R. Sparks, Attorney Bar No. 0073573
150 East Fourth Street, 4th Floor
Cincinnati, OH 45202

Tel.: (513) 621-2120
Fax: (513) 629-9426
Email: rswayne@strausstroy.com
wkflynn@strausstroy.com
rrsparks@strausstroy.com

*Liaison Counsel for Lead Plaintiffs*

* Admitted *Pro Hac Vice*

** *Pro Hac Vice* forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

*/s/ David R. Kaplan*
David R. Kaplan