**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| | : |
| | : |
| | : **Case No. 2:24-cv-3132** |
| **IN RE THE SCOTTS MIRACLE-GRO** | : |
| **CO. SEC. LITIG.** | : **Judge Algenon L. Marbley** |
| | : |
| | : **Magistrate Judge Chelsey M. Vascura** |
| | : |
| | : |

## OPINION AND ORDER

Lead Plaintiffs Employees Retirement System of the City of St. Louis and the Detectives Endowment Association Annuity Fund (collectively referred to as "Plaintiffs") bring this securities fraud action against Defendants The Scotts Miracle-Gro Company, an Ohio corporation located in Marysville, Ohio ("Scotts"), its CEO James Hagedorn, its former CFO Cory Miller, its former interim CFO David Evans, its CFO and EVP Matthew Garth, its former COO Michael Lukemire, and its EVP and Hawthorne Gardening Company ("Hawthorne") Division President Christopher Hagedorn.[1]  Hawthorne is a business division of Scotts.

This matter comes before this Court on the Defendants' Motion to Dismiss the Consolidated Class Action Complaint for failure to state a claim.  (ECF No. 54).  For the following reasons, the Motion to Dismiss is **GRANTED in part and DENIED in part**.

---

[1] CEO refers to the Chief Executive Officer; CFO refers to the Chief Financial Officer; COO refers to the Chief Operating Officer; and EVP refers to an Executive Vice President.  Miller served as CFO from January 2021 until August 2022.  Evans served as interim CFO from August 2022 until December 2022.  Garth began serving as CFO in December 2022.  Lukemire served as COO from February 2016 until September 2023.

## I.    BACKGROUND

This case is a consolidated action for various securities cases regarding The Scotts Miracle-Gro Company.  (*See* ECF No. 26 at 4).  Plaintiffs filed their Consolidated Class Action Complaint on May 9, 2025.  (ECF No. 48).  They bring this action on behalf of themselves and all others who acquired common stock in Scotts from May 5, 2021 until August 1, 2023 (the "Class Period") and were damaged thereby.  (*Id.* at 1).

### A.  Factual Background

The Scotts Miracle-Gro Company is one of the largest companies making consumer products for recreational and professional lawn and garden care in the United States.  Scotts began as a seed company in 1868; it transitioned to selling grass seed to homeowners in the early 1900s, and then began to focus on consumer products for lawn and garden care.  (¶¶ 29–30).[2]  Scotts became a publicly-traded company in 1992 and merged with Miracle-Gro Products, Inc. in 1995 to become The Scotts Miracle-Gro Company.  (¶ 30).  Miracle-Gro Products, Inc. was founded by Horace Hagedorn, who was the father of Scotts' current CEO and Defendant James Hagedorn, and grandfather of Defendant Christopher Hagedorn.  (¶ 30 n.1).

Historically, Scotts reported flat or slow growth, and U.S. Consumer, its core domestic business, reported average annual growth of less than 5% from 2010 through 2020.  (¶ 30).  In 2015, Scotts launched a "bold new strategy to boost its growth" by expanding into the cannabis market with a wholly owned subsidiary, the Hawthorne Gardening Company.  Between 2015 and 2022, Scotts grew Hawthorne aggressively through acquisitions of sellers and manufacturers of the products used to grow cannabis, spending more than $1 billion in the process.  Ultimately,

---

[2] All references to "Compl.," "Complaint," or parenthetical paragraph citations "(¶ _)" cite to the Consolidated Class Action Complaint (ECF No. 48), unless otherwise stated.

Scotts would spend over $1.7 billion on Hawthorne. (¶ 31). Combined, U.S. Consumer and Hawthorne accounted for over 90% of Scotts' reported revenue and earnings during the Class Period. Approximately 60% of the U.S. Consumer business segment was concentrated at three retailers: Home Depot, Lowe's, and Walmart. (¶¶ 31–32).

Due to the cyclical nature of the U.S. Consumer business, most of Scotts' sales occurred during its third and fourth fiscal quarters, which aligned with the spring and summer growing periods.[3] Scotts would historically post losses in its first fiscal quarter, and relied on a revolving credit facility to meet its manufacturing, distribution, and operational costs. (¶ 33). Scotts' debt-to-earnings, or leverage, ratio would determine the cost of its borrowing. This number was "typically about 3% or less," which would result in low borrowing costs and allow Scotts to "profitably manage" the seasonality of its business. Scotts reported an average leverage ratio of 2.65x for over two years prior to the start of the Class Period. (¶ 34). Under Scotts' credit agreement with its lenders, Scotts' reported leverage ratio would define its borrowing costs, and thus impact Scotts' profitability. Thus, these "historically low borrowing costs" preceding the Class Period "helped [Scotts] boost its bottom line" such that U.S. Consumer reported profit margins exceeding 30% for the three fiscal years leading up to the Class Period. (¶ 35).

According to Plaintiffs, all this began to change during the Class Period due to: (1) a substantial decline in sales; (2) increased inventories; and (3) the "staggering" costs originating from Scotts' cannabis strategy. By the end of the Class Period, Scotts had negotiated two amendments to its credit facility that expanded the "maximum permitted" leverage ratio, allowing

---

[3] Scotts' fiscal year begins in October and runs through September. Its first fiscal quarter (Q1) ends on December 28; its second fiscal quarter (Q2) ends on March 29; its third fiscal quarter (Q3) ends on July 3, and its fourth fiscal quarter (Q4) ends on September 30. (¶ 38 n.2).

it to be as high as 7x, which in turn meant that borrowing costs were dramatically increased and profit margins concomitantly reduced. (¶ 36).

### 1. Gardening and Weed Boom During the Pandemic

In early 2020, the COVID-19 global pandemic led to limitations on public gatherings and interactions. Generally, Americans limited their activities to their homes. Although the global pandemic had catastrophic effects in many areas of life, Scotts inadvertently benefited from it. Stuck at home without much else to do, millions of Americans turned to home horticulture to keep themselves preoccupied: whether by taking up gardening and tending their lawns, or by growing and consuming cannabis. Scotts' businesses saw a surge in demand for lawn, garden, and cannabis growing products, and as 2020 progressed, the company saw "record sales and profits driven by the COVID-fueled surge in demand for garden and lawn products, and an accompanying boom in cannabis consumption." (¶¶ 37–39).

By November 2020, Scotts announced record Q4 and full year results, and its then-CFO Coleman observed that "retailers were working to rebuild depleted inventory levels," and noted that ideally, Scotts "would have probably had about another $100 million of inventory versus where [it] finished the year." (¶ 39). CEO Hagedorn was more sanguine, estimating that same month that U.S. Consumer and Hawthorne had been unable to make "probably $200 million" in additional sales due to a lack of inventory. (¶ 40).

Good news continued for the company into early 2021. On February 3, 2021, Scotts reported "record" results for Q1 2021, including a 147% increase in U.S. Consumer sales and a 71% sales increase at Hawthorne. CEO Hagedorn explained that Scotts' "shipments are significantly outpacing [point of sale transactions] right now as retailers build inventory ahead of

4

the season," and that Scotts was rapidly building inventory so that it would not "leave sales on the table" like it did the prior year.  (*Id.*).

Through these statements, the Defendants "consistently touted an influx of millions of new customers" whose interest in gardening, lawn care, and cannabis had outpaced Scotts' ability to produce and ship product to meet demand.  The Defendants assured investors that growth was sustainable due to Scotts' "deep understanding and meticulous tracking of consumer purchases," suggesting that rising inventory levels were not a cause of concern, and if anything, inventory was still too low.  Shortly before the Class Period, Scotts updated its full-year financial guidance, anticipating that Hawthorne would "perform on the high-end of its sales growth guidance range of 20-30 percent."  On April 8, 2021, CEO Hagedorn touted Hawthorne's "potential for substantial double-digit growth in the coming years."  (¶ 41).

Due to the pandemic-driven surge in demand for lawn, gardening, and cannabis products, Scotts' stock price rose from a closing price of nearly $93 per share on March 12, 2020, to a closing price of over $242 per share on May 5, 2021.  (¶ 42).

But Defendants allegedly already knew that this pandemic-related surge was not sustainable, and that the trend was already beginning to reverse as of early 2021.  First, they received "granular" point of sale data from retailers indicating that COVID-related growth was declining in key regions across the country by May 2021, following the end of pandemic lockdowns.  (¶ 43).  This data revealed 40-50% declines from COVID-related growth  at Hawthorne.  (*Id.*; *see also* ¶ 72 (Hawthorne sales were down by 30-50% in its leading regions by mid-2021)).  Second, they had massively overproduced product during the pandemic and had loaded their customers with excess inventory.  In so doing, they flooded their sales channels with "unneeded" product while falsely representing to investors that their new customers remained

5

highly engaged, their inventory levels were reasonable to meet consumer demand, and their foray into the cannabis industry would lead to real and sustainable growth.   (¶ 43).

### 2.   May 5, 2021 – Class Period Begins

The Class Period begins on May 5, 2021, when Scotts announced a 23% increase in U.S. Consumer sales, and a 66% increase in Hawthorne sales.  CFO Miller stated that the business was operating as well as he had seen in his 20-year tenure at the company; CEO Hagedorn emphasized his belief that both U.S. Consumer and Hawthorne were still "leaving sales on the table when [Scotts] couldn't deliver."  (¶ 45).  These statements were "highly material" for investors at a time when pandemic restrictions were ending.  (¶ 46).  Scotts' common stock price increased 6%, or $14 per share, the same day those statements were made.  (¶ 45).

Throughout the Class Period, the Defendants assured investors that demand for Scotts' products remained strong, and that Scotts did not have an inventory problem.  (¶¶ 46–58).  In reality, the opposite was true, and Scotts was experiencing slowing demand for both its U.S. Consumer and Hawthorne business segments.  (*See* ¶¶ 59–61).

### 3.   Slowing Demand for Scotts' Products

***U.S. Consumer Segment.***  Demand for Scotts' U.S. Consumer products began to slow at the start of the Class Period.  Scotts maintained sophisticated data systems providing insight into demand for its products, in part by "aggregating granular point-of-sale data delivered daily from [Scotts'] retail partners."  (¶ 62).  But this granular data did not show the demand growth that Scotts touted; indeed, by March or April 2021, it reflected a 20% decline in demand for the U.S. Consumer segment compared to 2020.  (¶ 63).  By mid-2021, the data "clearly showed consumer demand was reversing"; by late 2021, consumer demand had "cratered."  (¶ 64).

One former Scotts employee (FE 1),[4] who was tasked with analyzing daily information from Home Depot sales reports and aggregating it into data analytics software for senior management, stated that by August or September of 2021, Scotts' sales were trending down, including for Scotts' best-selling and most expensive lawn and garden products. (¶¶ 64–65). FE 1 also indicated that Scotts employees were told, by the end of 2021 and carrying on into 2022, that they should visit Home Depots on the weekend to help them sell more products. (¶ 68).

According to another former employee (FE 2), the U.S. Consumer segment's fertilizer and grass seed sales had dropped noticeably by early 2022, which the company had expected given the end of the pandemic-related lockdowns. (¶ 66).

A third former employee (FE 3), who reported directly to COO Lukemire's chief of staff, confirmed that Scotts "received daily reports from its top customers, including Lowe's and Home Depot, which allowed Scotts' senior executives to see its key retail partners' sales performance on a daily basis." This daily feed of information provided Scotts with visibility into the pandemic sales uptick, and the corresponding post-lockdown drop in sales. (¶ 67).

*Hawthorne Segment.* Similarly, Hawthorne employees confirmed that demand significantly declined for Hawthorne's cannabis growing products beginning in May 2021 as the cannabis market became saturated. (¶¶ 70–71). According to FE 3, by mid-2021, Hawthorne sales were down by 30-50% on average in its leading regions; by fall 2021, sales were down 70-80% across all regions nationwide. (¶ 72). Three other former Hawthorne employees (FEs 4, 5, 6) corroborated that Hawthorne sales teams saw the decline from the pandemic peak coming as early as February 2021, that by mid-2021 it was clear that COVID growth trends had reversed, and that

---

[4] Former employees of Scotts and Hawthorne were personally interviewed by Plaintiffs' counsel, and are anonymized throughout the Complaint to maintain their confidentiality. (¶ 61 n.5). All former employee (FE) designations are taken from the Complaint.

7

by summer 2021 sales employees were advising management to stop buying inventory and prepare for a downturn.  (¶¶ 73–76).  Despite these warnings, management apparently did not listen, and Hawthorne had a glut of inventory by November 2021.  (¶¶ 73, 77).

### 4.  Scotts' Internal Data and Reporting Systems

Scotts had an array of sophisticated data systems and tracking tools that allowed it to aggregate sales information from many of its customers and compare sales figures for a given day against sales figures to prior years.  These data systems and tracking tools aggregated the company's key performance indicators and were folded into a daily feed of information, making the Defendants fully aware that the company's period of pandemic-related growth was over by mid-2021.  (¶ 78; *see* ¶¶ 43, 62–63, 67, 252–55).

Scotts' management received regular reports showing demand, sales, and inventory levels for U.S. Consumer's lawn and garden products.  All the individual Defendants, with the possible exception of CEO Hagedorn but the notable inclusion of COO Lukemire and CFO Miller, received daily reports showing sales trends.  According to FE 3, these daily reports were discussed at routine COO-led meetings.  (¶ 79).  They provided granular detail, showing results for the prior day's sales compared to that same day a year prior and allowing company executives to see all sales trends—positive or negative—in real time for certain customers, including Lowe's and Home Depot.  (¶¶ 79–80).

Additionally, Scotts' management and leadership had access to internal software and reporting tools for both U.S. Consumer and Hawthorne.  According to former employees (FEs 2, 7), this internal information showed declining consumer sales that made clear that Scotts' expectations by 2022 were "completely unrealistic" and "based on market conditions that no longer existed," such that the company's internal numbers "didn't reflect" public statements,

8

which were "pie in the sky." (¶¶ 81–82). FE 5 reported that Scotts' directors and executives were "shitting bricks" because Hawthorne's products were not selling, "analyzed the numbers every 15 fucking minutes," and knew that numbers were inflated. (¶ 83) (cleaned up). Other former Hawthorne and U.S. Consumer employees (FEs 8, 9, 10, 11) confirmed that the information regarding declining sales and margins was readily available and circulated internally. (¶¶ 84–88).

Scotts' leadership was aware of the declining demand for Scotts' products and the buildup of inventory. According to FE 3, these daily reports were discussed at routine COO-led meetings, and once the inventory buildups "started hitting critical mass," they were discussed daily. (¶ 89). CFO Miller regularly attended COO Lukemire's meetings that would be held on Tuesdays, Wednesdays, and Thursdays each week. (¶ 90). FE 3 also observed that CFO Miller and COO Lukemire would also be very involved with executive leadership meetings held weekly on Mondays. (¶ 91). At all of these meetings, these sales and inventory issues were discussed. (¶¶ 90, 92). Moreover, CEO Hagedorn had a hands-on management style and would often attend these meetings. (¶ 91). According to a different former U.S. Consumer employee (FE 10), by the middle of 2021 CEO Hagedorn was constantly referring to 2020 as an "asterisk year, an anomaly, a blip year, a footnote in history" on monthly video calls, suggesting that 2020's artificially-inflated growth would "throw [Scotts'] data off for the next 15 to 20 years" and should be ignored. (¶ 93). One former Hawthorne employee (FE 5) confirmed that by mid-2021, CFO Miller and Hawthorne executives were aware of declining sales nationwide. (¶ 94).

Another former Hawthorne employee (FE 4) reported that although concerns regarding waning sales had been relayed by senior management to CEO Hagedorn, Christopher Hagedorn, and COO Lukemire, "they didn't want to hear sales were slowing" because they were "drunk on the sales" made during the pandemic. (¶ 95). A different former Hawthorne employee (FE 12)

9

indicated that Christopher Hagedorn was aware of why Hawthorne sales were struggling by October 2021, given his conversations with Hawthorne sales personnel at a national sales conference. (¶¶ 96–97). In sum, Hawthorne sales personnel (FEs 4, 7, 12) realized throughout the course of 2021 that Hawthorne's business was in serious trouble, a view shared with their managers and conveyed to Christopher Hagedorn. (*See* ¶¶ 98–101).

### 5. *Declining Sales, Excess Inventories*

Declining sales left Scotts with excess inventories, which first led Scotts to attempt to push inventories off onto customers, and then to remedy the company's tenuous situation by implementing cost-cutting measures.

Fewer sales left U.S. Consumer and Hawthorne with a glut of excess inventory that worsened over the Class Period, with Scotts beginning to destroy large quantities of unsold inventory by late 2021. (¶¶ 102–07). Indeed, Scotts apparently had so much excess inventory being destroyed outside its manufacturing plants that the destruction could be seen from satellite imagery. (¶ 106). Scotts' inventory woes were worsened by U.S. Consumer's repurchase program, under which Scotts was obligated to buy back unsold inventory from Lowe's and Home Depot, among other retailers, if they were unable to sell the inventory to their end customer within a certain time period. (¶¶ 108–10). This repurchase program meant that some "sales" effectively provided only a short-term, temporary boost in gross sales, since Scotts' retailers were already dealing with a glut of Scotts' products. (¶ 108).

Given this excess of inventory, Scotts attempted to push more sales through to its customers. U.S. Consumer began to offer extended payment terms on mulch in May 2021, and extended that practice to seed and fertilizer in fall 2021. (¶¶ 111–12). As Scotts stopped meeting its sales goals, the company pressured its sales teams to push inventory. (¶ 111). On the

Hawthorne side of the business, this meant aggressive sales tactics to push inventory on increasingly reluctant customers at the expense of margins. (¶¶ 120–28; *see also* ¶¶ 138–40). On the U.S. Consumer side, this meant loading inventory into stores and pressuring retailers like Home Depot and Lowe's to take more product than they wanted. (¶¶ 113–15). This was made easier with Home Depot because Scotts had the ability to control inventory levels and purchases at individual Home Depot locations, allowing Scotts to "dump excess inventory on the retailer." (¶ 116; *see* ¶¶ 117–19).

The compounding problems of declining sales and excess inventory led Scotts to take cost-cutting measures beginning in mid-2021. Scotts began by culling Hawthorne's leadership, but by 2022 had fired hundreds of employees across all levels and departments. (¶ 129; *see* ¶¶ 130–37).

### 6. Corrective Disclosures

According to Plaintiffs, the truth of Scotts' sales and inventory woes gradually became revealed through five partially corrective disclosures, but until the final disclosure, Defendants buoyed the stock price by issuing a series of false or misleading statements. (¶ 141).

***June 8, 2022 Press Release.*** First, Scotts announced "sharply reduced sales and earnings guidance" for fiscal 2022, driven by declines in customer replenishment orders. (¶ 142). Scotts disclosed that elevated inventory levels were adversely impacting the company's business. It further disclosed that it was forecasting a 4% to 6% sales decline in the U.S. Consumer segment and a 40% to 45% sales decline in the Hawthorne segment, slashing its earnings per share projection from "at least $8.00" to just $4.50 to $5.00, and was planning to take on additional debt, resulting in an increased leverage ratio of 4.5x debt-to-EBITDA—above its 3.5x "comfort zone." (¶¶ 142–43).

11

Analysts were alarmed by this mid-quarter announcement, and Scotts' stock price declined by nearly 9%, or approximately $9 per share from $102 on June 7, 2022 to $93 per share on June 8, 2022. (¶¶ 144–45).

Defendants prevented an even greater stock price decline by blaming lost sales on "unusually wet" weather in March and April, which prevented the gardeners, lawn-owners, and cannabis-growers from purchasing Scotts' products during those months. (¶ 146). Defendants highlighted a recent "surge" in sales and predicted further gains for the rest of the year, with CFO Miller emphasizing Scotts' long-term opportunities and touting Hawthorne as "the leader in the durable side of the business" on June 9, 2022. (¶¶ 146–48).

*August 3, 2022 Q3 Earnings Release and Conference Call.* Second, Scotts announced poor financial results for Q3 2022, and further reduced full-year guidance, noting that: Q3 sales had decreased 26% companywide, with the U.S. Consumer segment declining 14% and Hawthorne segment declining 63%; full-year adjusted earnings per share guidance had lowered to $4.00 to $4.20; GAAP earnings per share loss in the quarter of $8.01 per share; the full year sales decline would be negative 8% to 9% for U.S. Consumer; and the leverage ratio was currently 3.81x, with the upper limit increased to 6.5x. (¶ 149). CFO Miller explained during an earnings call that the company's inventory was high, and the company would need to reduce it in fiscal 2023. He attributed Scotts' issues largely to oversupply in the cannabis industry and overinvestment in Hawthorne's supply chain. (¶ 150). Scotts' share price fell by 6%, dropping by over $5 per share from $87 on August 2, 2022 to $82 per share on August 3, 2022. (¶ 151). Defendants continued to blame external factors, citing "lousy weather" and retailer inventory management changes, but suggested in their earnings release that consumer demand remained strong. (¶¶ 152–53). On an earnings call the following day, CEO Hagedorn provided assurances that consumer engagement

12

remained strong and point of sale data showed that the quarter had the second-highest recorded Q3 sales for Scotts' products. (¶ 153). Defendants' assurances and promises of "Project Springboard," a new cost-cutting measure, assuaged market concerns. (¶¶ 154–55).

*August 31, 2022 Announcement.* Third, Scotts announced the sudden departure of CFO Miller, stating that his "departure [was] not related to any disagreement regarding historical financial reporting, accounting, or legal matters." In reality, former employees confirmed that Miller's departure was "directly linked" to Scotts' diminished financial condition. One former employee (FE 8) stated Miller was fired due to financial and accounting issues, including inadequate forecasting. (¶ 156). Scotts also announced that its projected full year free cash guidance was being lowered to a range of negative $275 million to negative $325 million, almost double the previously-announced guidance of negative $150 million. (¶ 157). Scotts' share price fell by 6.5%, dropping $4.50 per share from $67 on August 31, 2022 to $62.50 per share on September 1, 2022. (¶ 158). Analysts immediately linked Miller's ouster to the company's declining financial condition. (¶¶ 159–61).

Thereafter, it appeared for some time that Scotts had righted the ship by focusing on cost reductions through Project Springboard with an aim to reduce the company's leverage ratio in 2023. Defendant Garth was brought on as the new CFO. CFO Garth spoke positively about the growth in the U.S. Consumer segment since 2019; and he and Christopher Hagedorn touted Hawthorne's long-term potential. (¶¶ 162–68).

*May 3, 2023 Q2 Earnings Release and Conference Call.* Fourth, Scotts announced further poor financial results for Q2 2023, disclosing 9% sales declines companywide, with U.S. Consumer sales down 2% and Hawthorne sales down 54%. It further announced that its leverage ratio had reached 6.01x. (¶ 169). CEO Hagedorn downplayed concerns about Hawthorne, noting

13

that there was a "wicked shakeout" in the cannabis sector, but suggesting that the top 25% cannabis companies would get even stronger, with Hawthorne "uniquely positioned to thrive." (¶ 170). CFO Garth noted that half of the Project Springboard savings were from Hawthorne, and CEO Hagedorn underscored that Hawthorne was becoming recognized as an industry leader, with other businesses looking to it for guidance on scaling up. (¶ 171). Following these statements, Scotts' share price fell 8%, from $69.50 per share on May 2, 2023 to $64 per share on May 3, 2023. (¶ 172). Analysts questioned Scotts' earlier "bullish" comments and criticized the false weather narrative, suggesting Scotts was experiencing a post-pandemic hangover. (¶¶ 173–74).

*August 2, 2023 Q3 Press Release and Earnings Call.* Fifth and finally, Defendants revealed the whole truth on August 2, 2023, when Scotts issued a press release announcing a Q3 sales decline of 6% companywide, with a 40% decline in the Hawthorne segment and 1% growth in U.S. Consumer. Adjusted earnings per share fell from $1.98 to $1.17, and the company forecasted a full-year sales decline of 10 to 11% and full-year adjusted EBITDA guidance to decline by 25%. (¶ 175). Scotts also revealed that the company had renegotiated its maximum leverage ratio to 7x. (¶ 176). At long last, CEO Hagedorn conceded that Scotts' poor financial results and outlook were not attributable to the weather or retailer inventory management, but due to a shift in post-COVID consumer sentiment away from lawn maintenance and gardening. He noted that this shift had occurred no later than the start of 2022, and admitted that Scotts' own consumer research—and a study commissioned by McKinsey & Company—confirmed that consumers were simply "spending [their] money elsewhere." (¶ 177). He further stated that Hawthorne was making negative earnings, necessitating a $1 billion deployment into inventory and other capital areas. (¶ 178). Scotts' stock price declined 17%, dropping $13.50 per share from $71.50 on August 1, 2023 to $58 per share on August 2, 2023. (¶ 179). The market was stunned;

14

Scotts' stock price had fallen 67% from its Class Period high, wiping out $6.6 billion in market capitalization.  (¶¶ 179–82).

Following the Class Period, CEO Hagedorn conceded that Hawthorne was worthless and acknowledged the blow that Scotts had endured post-pandemic.  On a November 2023 earnings call, he told investors and analysts: "you can throw shit at us.  We deserve it."  He also conceded that he was "not blaming the weather."  (¶ 183) (cleaned up).  In December 2023, CEO Hagedorn conceded that Hawthorne was worth "zero, or less," and Christopher Hagedorn noted that he did not want "to be the complete fucking idiot who damaged the family legacy."  (¶¶ 184–86) (cleaned up).  Seeking to pivot away from the cannabis industry, Scotts struggled to find a buyer for Hawthorne.  (¶ 187).

## B.  Procedural Background

Various lawsuits were filed against Scotts in the U.S. District Court for the Southern District of Ohio.  The Court consolidated related Scotts securities litigation in a March 3, 2025 Opinion and Order.  (ECF No. 26).  Thereafter, the Plaintiffs filed the instant Complaint on May 9, 2025.  (ECF No. 48).  In the Complaint, Plaintiffs identify a series of challenged statements by the Defendants that they allege constitute material misrepresentations and omissions, (¶¶ 188–248), made knowingly, (¶¶ 249–73), causing loss (¶¶ 274–88), for securities traded on an open and efficient market (¶¶ 289–91), and without any safe harbor protections, (¶¶ 292–93).  They assert one count for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5, (¶¶ 300–09), and one count for violations of Section 20(a) of the Securities Exchange Act, (¶¶ 310–314).  Plaintiffs seek to bring this action as a class.  (¶¶ 294–99).

The Defendants moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  (ECF No. 54).  That Motion is fully briefed (ECF Nos. 59; 62).  After Defendants filed their reply

15

brief, Plaintiffs requested leave to file a sur-reply, (ECF No. 63), which Defendants opposed. (ECF No. 65). Later, Defendants submitted a Notice of Supplemental Authority (ECF No. 67), and Plaintiffs responded. (ECF No. 68).

This matter is ripe for review.

## II.     STANDARD OF REVIEW

### A.  Motion to Dismiss for Failure to State a Claim

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss pursuant to Rule 12(b)(6) evaluates the sufficiency of the complaint, and permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such a motion tests the complaint's cause of action, and is "not a challenge to [its] factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). Thus, in evaluating a Rule 12(b)(6) motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept [all] allegations as true, and draw all reasonable inferences in [its] favor." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation marks and citation omitted). This favorable treatment of the complaint applies to well-pleaded factual allegations. Complaints cannot rest on legal conclusions, as "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" are insufficient; similarly, factual assertions cannot rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). In sum, the facts alleged must be sufficient to "raise a right to relief above the speculative level," such that the complaint states a claim for relief

that is "plausible on its face." *Twombly*, 550 U.S. at 555, 570; *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

Beyond the complaint itself, courts may also consider exhibits attached to the complaint, "public records, items appearing in the record of the case and exhibits attached to the defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430.

### B.  Pleading Standard for Section § 10(b) Securities Fraud Claims

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *La. Sch. Emp. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008)).  Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange":

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Thus, to state a claim for securities fraud in violation of Section 10(b) and Rule 10b-5, the complaint must allege:  (1) in connection with the purchase or sale of securities; (2) the misstatement or omission of a material fact; (3) made with scienter; (4) upon which the plaintiff justifiably relied; and (5) which proximately caused the plaintiff's injury.  *Newtyn*

*Partners LP v. Alliance Data Sys. Corp.*, 2025 WL 872967, at *10 (S.D. Ohio Mar. 20, 2025) (citing *La. Sch.*, 622 F.3d at 478).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") sets out specific pleading standards for bringing such claims. Where a complaint alleges that a defendant "made an untrue statement of a material fact" or "omitted to state a material fact necessary" to render statements made "not misleading," a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—i.e., scienter—where a particular state of mind is required. *Id.* § 78u-4(b)(2)(A). A "strong inference" of scienter means that scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### C. Heightened Pleading Standard for Fraud

The PSLRA does not provide the only pleading standard applicable in securities fraud cases. In general, when a complaint sounds in fraud, it must satisfy a more stringent burden by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This remains the case for securities fraud claims arising under Section 10(b), and the complaint must: (1) "specify the statements" that are allegedly fraudulent; (2) "identify the speaker"; (3) state where and when the statements were made"; and (4) "explain why the statements were fraudulent." *La. Sch.*, 622 F.3d at 478 (quoting *Frank*, 547 F.3d at 570); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100

(6th Cir. 2010) (noting that a complaint must allege the "time, place, and content of the alleged misrepresentation[s]" along with the "fraudulent scheme," the "fraudulent intent," and the injury).

In sum, the PSLRA and Rule 9 operate in tandem to "require a complaint to allege the 'who, what, where, when, and why' of the fraudulent statements. . . . If the complaint does not answer all of these questions, it fails to sufficiently plead securities fraud." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 810 (6th Cir. 2022) (citations omitted).

## III.   LAW AND ANALYSIS

### A.  Preliminary Matters

The Court first addresses the pending Motion for Leave to File a Sur-Reply (ECF No. 63) and the dispute regarding the Notice of Supplemental Authority (ECF No. 67) before turning to the Motion to Dismiss.

### 1.  *Sur-Reply and Supplemental Authority*

Defendants filed their Motion to Dismiss in July 2025.  Plaintiffs opposed in September, and Defendants filed their reply brief in November.  (ECF No. 62).  Defendants' reply brief cites the Sixth Circuit's opinion in *Lim v. Hightower*, (*id.* at 4–7, 15, 35, 46 n.46), an unreported case decided on October 21, after Plaintiffs had opposed the Motion to Dismiss but before Defendants filed their reply.  2025 WL 2965692, at *6 (6th Cir. Oct. 21, 2025).  On November 26, Plaintiffs requested leave to file a sur-reply under S.D. Ohio Civ. R. 7.2(a)(2), arguing that Defendants' reply brief "relies on new authority and raises new arguments that were not presented in Defendants' opening brief," seeking to clarify *Lim*'s impact on judicial notice, and requesting to address "an inadvertent error" in their opposition papers that Defendants pointed out.[5]  (ECF No. 63 at 1).

---

[5] That error is discussed in the analysis of the third *Helwig* factor.  *See* Section III(B)(2)(b), *infra*. To summarize, Plaintiffs erroneously argued that some February 2022 statements were made in *May* of 2022.  (*See* ECF No. 62 at 25–26; ¶¶ 142–43, 215).

19

Defendants opposed, arguing that Plaintiffs cannot show good cause unless the reply brief raises new legal or factual arguments not already made in the Motion to Dismiss.  (ECF No. 65 at 1).

Defendants are correct.  Under the local rules, no additional memoranda beyond the brief in support of the motion, the opposition, and the reply are permitted "except upon leave of the court for good cause shown."  S.D. Ohio Civ. R. 7.2(a)(2).  For permission to be granted, the reply brief must raise new grounds not presented in the movant's initial motion.  *E.g.*, *Streeter v. Adaptasoft, Inc.*, 2018 WL 4030546, at *3 (S.D. Ohio Aug. 23, 2018) (Marbley, J.); *De Angelis v. Nat'l Ent. Grp. LLC*, 2019 WL 1024954, at *2–3 (S.D. Ohio Mar. 4, 2019) (Marbley, J.).  In this instance, there is no need to grant Plaintiffs leave to file a sur-reply to address an apparent error in their opposition brief because if they misconstrued their own allegations in the Complaint and Defendants pointed that out, no "new grounds" have been raised in reply.  And there is no need to grant Plaintiffs leave to file a sur-reply to address the legal issues raised in *Lim*, because *Lim* has not altered the legal landscape.  Instead, *Lim* reiterates *Tellabs*' instruction that courts are to consider whether all the facts alleged, taken together, give rise to a strong inference of scienter.  *Lim*, 2025 WL 2965692, at *4 (citing *Tellabs*, 551 U.S. at 322–23); *see id.* at *4–6 (affirming judicial notice for public SEC filings); (*accord* ECF No. 65 at 2).

In sum, there is nothing new here in light of *Lim*, and further briefing on *Tellabs*, judicial notice, or the Federal Rules of Evidence would be unproductive.  Although the Sixth Circuit's *Lim* decision is new, its principles are not, which is why Defendants advanced the same argument for judicial notice at the beginning of their Motion to Dismiss.  (ECF No. 54-1 at 8 n.1 (arguing that courts "can take judicial notice" of SEC filings and other related public information, even if such documents are not attached to the complaint)).  Plaintiffs' Motion for Leave to File a Sur-Reply is **DENIED**.

20

In February 2026, Defendants submitted a Notice of Supplemental Authority (ECF No. 67) to bring to the Court's attention *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947 (6th Cir. 2026).  Plaintiffs filed a response, arguing that Defendants had impermissibly offered further argument in violation of S.D. Ohio Civ. R. 7.2(a), and that the Court should not consider the further argument offered in that Notice.  (ECF No. 68 at 1).  If the Court would consider further argument, however, Plaintiffs offered their own analysis of the Sixth Circuit's opinion and Defendants' further arguments.  (*Id.*).

The Court has been made aware of *Newtyn* and notes that a Notice of Supplemental Authority is not a vehicle for additional briefing beyond the memoranda permitted by S.D. Ohio Civ. R. 7.2(a).  Accordingly, the argumentative portions of Defendants' Notice (ECF No. 67) and Plaintiffs' response (ECF No. 68) addressing the substance of this case are **STRICKEN**.

### 2.  *Securities Filings*

Next, the Court considers the substance of Defendants' request to take judicial notice of the proffered securities filings and related materials such as earnings call transcripts.  (ECF Nos. 54-7–54-64; 62-2).  Plaintiffs counter that the Court should deny the request for judicial notice, arguing that many of the proffered documents are not referenced in the Complaint, are being offered to decide disputed facts, or are being offered for the truth of the matter asserted therein. (ECF No. 59 at 31–34).

Documents filed with the SEC are typically considered public records.  *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *8 (S.D. Ohio Sept. 29, 2023) (Marbley, J.). Additionally, courts may take judicial notice of other related, public documents.  *See In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 850 (S.D. Ohio 2016) (Marbley, J.) (taking judicial notice of public securities documents).  Thus, courts "may 'consider the full text of the

SEC filings, prospectus, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting [a Rule 12(b)(6) motion] into one for summary judgment." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001); *Newtyn*, 165 F.4th at 969 (same); *Lim*, 2025 WL 2965692, at *4–6 (affirming district court determination that public securities filings were relevant and appropriate for judicial notice, and noting that courts "should take judicial notice of accurate documents that contradict the complaint," such as Form 4s where insider trading is alleged).

Defendants' request is **GRANTED in part**, and the Court will take judicial notice of the public securities documents, including SEC filings and earnings call transcripts, for the fact that they were filed with their contents. The Court will *not*, however, accept the contents of those filings—that is, the substance within the text—for the truth of the matter asserted. *Upstart*, 2023 WL 6379810, at *8. For instance, the Court will accept that Scotts' 2021 Form 10-K for Fiscal Year 2021 was filed with the SEC on November 23, 2021, in the form provided by Defendants, (2021 Form 10-K, ECF No. 54-29; *see* ECF No. 54-6 at 2), but the Court *will not* take as true the contents of that Form 10-K. Such an approach would be improper at this stage of the case. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014) (hereinafter "*In re Omnicare*") ("[W]e could take notice only of the fact that Omnicare filed the Audit Committee Charter and what that filing said, but we could not consider the statements contained in the document for the truth of the matter asserted, even at the motion-to-dismiss stage.").

### B. Securities Fraud (Count I)

The Defendants challenge two elements of Plaintiffs' case, arguing that they have failed to plead a strong inference of scienter and that none of the identified statements constitutes a misstatement or omission of material fact. (ECF Nos. 54-1 at 23–70; 62 at 3–44). The Court first

22

evaluates whether any of the statements alleged in the Complaint constitutes an untrue misstatement or misleading omission of material fact, before turning to consider scienter.

### 1. *False and Misleading Statements and Omissions*

Section 10(b) and Rule 10b-5 "generally make it unlawful to use manipulation or deception in connection with a securities transaction." *Lim*, 2025 WL 2965692, at *6. To state a claim for securities fraud under § 10(b) or Rule 10b-5, "Plaintiffs must allege that Defendants made a misrepresentation or omission of a material fact that Defendant[s] had a duty to disclose." *Ley v. Visteon Corp.*, 543 F.3d 801, 807 (6th Cir. 2008), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48–50 (2011). For a statement or omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Such statements and omissions are actionable because "[w]hen a company chooses to speak, it must 'provide complete and non-misleading information.'" *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) (hereinafter "*Ind. State Dist. Council*") (citation omitted).

### a. *Challenged Statements*

Plaintiffs identify a series of statements (¶¶ 190, 191, 193, 196–97, 199, 201, 205, 208, 210, 213, 215, 217–18, 220, 222, 224, 226, 227, 229, 231–32, 234, 236, 238, 239, 241–42, 244, 245, 247) that they allege included material misrepresentations and omissions about Scotts' financial performance, operational condition, and growth prospects, including statements about

23

consumer demand for U.S. Consumer products, inventory levels at Scotts and its retail channels, and the conditions, performance, and prospects for Hawthorne. (¶ 188).

### b. Principles

Before addressing the merits of Defendants' Motion to Dismiss, a review of several background principles is in order.

*First*, puffery defenses go to the materiality requirement, which "filter[s] out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." *Basic*, 485 U.S. at 234 (quoting *TSC*, 426 U.S. at 448–49). "[V]ague, soft, puffing statements or obvious hyperbole upon which a reasonable investor would not rely are immaterial." *Lim*, 2025 WL 2965692, at *10 (citation and internal quotation marks omitted). Courts consistently find "rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace" immaterial because they are "loosely optimistic statements . . . so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important." *Ind. State Dist. Council*, 583 F.3d at 944 (citation and internal quotation marks omitted).

That being said, district courts must "tread lightly" in evaluating materiality at the motion to dismiss stage, "engaging carefully with the facts of a given case and considering them in their full context." *In re Omnicare*, 769 F.3d at 472. Thus, a motion to dismiss should not be granted on the basis of immateriality without first taking into careful consideration the context of the alleged misstatements, because a statement that appears to be puffery or mere opinion may be material based on the circumstances in which it was made. *Upstart*, 2023 WL 6379810, at *12; *cf. United States v. Maike*, 613 F. Supp. 3d 991, 1001 (W.D. Ky. 2020) ("[F]or both mail fraud and securities fraud, the jury generally decides whether the alleged misrepresentations satisfy the

elements of the offense or whether those statements are merely opinions, puffery, or sales talk."). Indeed, such statements might be made to "emphasize and induce reliance," *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989), or may otherwise be material if a reasonable investor hearing them would "understand [the] opinion statement[s] to convey facts about how the speaker has formed the opinion." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) (hereinafter "*Omnicare, Inc.*").

*Second*, disclosing "accurate historical data does not become misleading even if the company might predict less favorable results in the future." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (cleaned up). Thus, statements that just provide historically accurate data cannot themselves be misrepresentations. *Id.*

*Third*, the PSLRA contains a safe harbor provision for forward-looking statements. *See* 15 U.S.C. § 78u-5(c). Under the safe harbor provision, forward-looking statements that are identified and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ" cannot impose liability. *Id.* Forward-looking statements include statements that project revenues, income, future objectives, or future economic performance, as well as statements about the assumptions underlying or relating to those aforementioned types of statements. *Id.* § 78u-5(i)(1). If a forward-looking statement is accompanied by sufficiently meaningful cautionary language, the statement "is protected regardless of the actual state of mind." *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). If it lacks such cautionary language, then "actual knowledge" of its "false or misleading nature is required." *Id.* Thus, defendants can be liable for forward-looking statements "only if the statements were material; if defendants had actual knowledge that the statements were false or misleading; and if the statements

25

were not identified as 'forward-looking' or lacked meaningful cautionary language." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (en banc), *cert. denied*, 536 U.S. 935 (2002).[6]

### c. Particularity

Defendants raise several challenges to the particularity requirement of pleading, arguing that Plaintiffs have failed to plead any actionable misstatement because the challenged statements: (1) cannot become misleading by hindsight; (2) are not misleading if they accurately report historical facts; (3) fail to allege sufficiently any actionable misleading affirmative statement regarding demand, sales, or inventory; (4) are protected, insofar as they are forward-looking; (5) are inactionable, insofar as they are opinions; and (6) are inactionable, insofar as they are vague or constitute puffery. (ECF No. 54-1 at 45). The Court considers each argument in turn.

### 1) Hindsight

*First*, Defendants argue that many of the challenged statements rely on post-Class Period admissions by CEO Hagedorn in December 2023 that Hawthorne was "worth zero, or less." (*E.g.*, ¶¶ 185, 195). The fraud by hindsight doctrine counsels caution and skepticism in cases "where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier

---

[6] The parties do not explicitly brief the Bespeaks Caution Doctrine, though its principles are helpful to bear in mind when considering forward-looking statements. (*See* ¶ 292). The Bespeaks Caution Doctrine is related to the PSLRA safe harbor, survived the safe harbor's codification, and governs "situations in which optimistic projections are coupled with cautionary language, affecting the materiality and reasonableness of relying" on them. *Kolominsky v. Root, Inc.*, 100 F.4th 675, 688 (6th Cir. 2024) (citation and internal quotation marks omitted). Under the doctrine, "certain alleged misrepresentations are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language." *Id.* at 689 (cleaned up). The doctrine derives from the overarching principle that "statements must be analyzed in context." *See id.* at 688 (citation omitted). In *Kolominsky*, the Sixth Circuit held that "when companies . . . make forward-looking statements contained in a registration statement or in connection with an initial public offering, the Bespeaks Caution doctrine will shield those companies from liability when the forward-looking statements are accompanied by meaningful cautionary language so that a reasonable investor would understand the statements." *Id.* at 689.

that it would turn out badly." *La. Sch.*, 622 F.3d at 484 (citation omitted).  Courts cannot be "blinded by their *post hoc* knowledge in analyzing alleged misstatements." *Upstart*, 2023 WL 6379810, at *14.  At the same time, however, courts must also exercise caution at the motion to dismiss stage where "there has been little if any discovery and the court has no visibility into the evidence that was available to the corporate managers when they made the allegedly-false statements." *Id.*  At a minimum, "the allegation that a forecast has turned out to be inaccurate provides at least some affirmative evidence that fraud might have occurred." *Id.* (quoting Mitu Gulati, Jeffrey J. Rachlinski & Donald C. Langevoort, *Fraud by Hindsight*, 98 Nw. L. Rev.  773, 787 (2004)).  This is "especially true where the allegedly-false statement is about a fundamental aspect of the business." *Id.*; *cf. In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) (Marbley, J.).

In this case, to argue that certain statements made beginning in May 2021 through May 2023 were materially false or misleading, Plaintiffs rely on CEO Hagedorn's December 2023 admission that Hawthorne had become worthless.  (¶¶ 195, 198, 209, 216, 221, 225, 230, 237, 240, 246, 248).  Plaintiffs argue that their other allegations provide context and contemporaneous facts. (ECF No. 59 at 44–47).  This is true, in part.  While CEO Hagedorn's statement is removed in time from all of these challenged statements, Plaintiffs provide independent reasons why some statements were false or misleading.  For instance, they allege that Defendants' statements regarding growth numbers or the conditions of Hawthorne were false or lacked any basis.  (¶¶ 195, 198, 209, 221).  Thus, Plaintiffs do not impermissibly plead fraud by hindsight with these

27

statements, and CEO Hagedorn's November 2023 remarks may ultimately provide some further context for them.[7]

On the other hand, Plaintiffs also seek to use CEO Hagedorn's December 2023 remarks as the sole basis for finding other positive or optimistic remarks about Hawthorne's prospects were false or misleading.  (¶¶ 225, 230, 237, 240, 246, 248).  This impermissibly pleads fraud by hindsight, and Defendants are correct insofar as these alleged misrepresentations are insufficiently pleaded.  *See La. Sch.*, 622 F.3d at 485 ("Without specific allegations showing . . . the falsity of [the] statements at the time the statements were made, the fact that the statements later turned out to be false is irrelevant to a cause of action under [the] PSLRA.").  Thus, certain related alleged misrepresentations are inactionable.  (¶¶ 224, 229, 236, 239, 244–45, 247).

### 2)  Historical Accuracy

*Second*, Defendants argue that several challenged statements disclosed objectively verifiable historical data not alleged to be false.  (ECF No. 54-1 at 46–47).  The "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future," and there is no duty to update historically accurate data "so long as the data is not used to imply anything about the future."  *Kolominsky v. Root, Inc.*, 100 F.4th 675, 686 (6th Cir. 2024) (citations and internal quotation marks omitted).  As Defendants

---

[7] Similarly, Plaintiffs also make use of CEO Hagedorn's post-Class Period November 2023 admission that he was "not blaming the weather" in addressing Scotts' performance.  (¶ 183). Plaintiffs use this statement to evaluate Defendants' earlier, Class Period statements regarding U.S. Consumer performance given declining sales and decreasing demand.  (¶¶ 219, 223, 228).  For these challenged statements, Plaintiffs have provided independent allegations of falsity. Specifically, part of their allegations is that, according to former Scotts employees, Defendants were already aware of declining demand for Scotts' lawn and garden products when the challenged statements were made.  Thus, Plaintiffs do not impermissibly plead fraud by hindsight by using CEO Hagedorn's weather remark, because they do not allege fraud based on that *post hoc* statement standing alone.

observe, the Complaint challenges statements that reference Scotts' historic performance, including levels of consumer demand, sales increases, business growth, and financial results. (¶¶ 190, 191, 193, 196, 227). But as Plaintiffs point out, Defendants are alleged to have used this data "to support a misleading message about [Scotts'] current and future performance." (ECF No. 59 at 60).

Indeed, Plaintiffs instead argue that Defendants' statements failed to provide a complete and non-misleading picture of the company and its future, as they must when they "choose[] to speak" for the company. *Ind. State Dist. Council*, 583 F.3d at 943; *accord La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *13–14 (S.D. Ohio Sept. 27, 2021). For instance, Plaintiffs allege that Defendants touted Scotts' overall sales increase and Hawthorne's growth numbers in August 2021. (¶¶ 196–97). According to Plaintiffs, these positive reports of growth and positive trends were actually countered by sharp declines in retailer and consumer demand for Hawthorne's products, beginning with 30-50% reductions in demand in Hawthorne's leading regions by May 2021, to the extent that Hawthorne began laying off its staff in July 2021. (¶ 198). The fact that Plaintiffs do *not* allege that the reported data itself was false or inaccurate is beside the point.

### 3) Statements regarding Demand, Sales, or Inventory

*Third*, Defendants argue that Plaintiffs failed to allege any actionable misleading affirmative statement regarding demand, sales, or inventory, and thus all misstatement claims based on half-truths must be dismissed. (ECF No. 54-1 at 47–48). Defendants advance arguments regarding channel stuffing, sales practices, and sources of undisclosed information. (*Id.* at 48–57).

Regarding channel stuffing, Defendants argue that Plaintiffs have failed to plead sufficiently under a "channel stuffing" theory—pursuant to which the supposed channel stuffer

29

"ship[s] to [its] distributors more . . . product than [it] thinks [it] can sell," *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 709 (7th Cir. 2008)—because Plaintiffs have not actually alleged accounting fraud. Rather, Defendants point out that Plaintiffs have failed to address Scotts' supposed revenue recognition policy disclosed in its securities filings. (ECF No. 54-1 at 49). But Defendants attempt to rely on those securities filings for the truth of matters asserted within them, which is impermissible at the motion to dismiss stage. *In re Omnicare*, 769 F.3d at 467; *accord Upstart*, 2023 WL 6379810, at *8. It would be improper for the Court to evaluate whether Scotts' statements about any revenue recognition policy detailed in Scotts' securities filings could constitute a sufficient disclosure for any channel-stuffing allegations.

Moreover, as Plaintiffs point out, their theory of the case is that Defendants misrepresented and concealed declining demand for U.S. Consumer and Hawthorne products following the initial pandemic boom in gardening, lawn care, and marijuana-growing. It is not "necessarily" a theory of accounting fraud of violations of generally-accepted accounting principles, but rather that Defendants' "undisclosed practices" misled because they were "part of an effort to maintain a false façade of strong demand." (ECF No. 59 at 47–50). In sum, there is a difference between allegations that an "undisclosed sales practice itself was improper or that it resulted in inaccurate financial statements or accounting errors" and allegations that the "failure to disclose [the sales practice] to investors while touting positive revenue results misled investors into believing that the revenue results they touted were caused by other factors." *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *7–8, *11, *13 (N.D. Cal. Aug. 17, 2022); *see also Tellabs*, 551 U.S. at 325–26 (distinguishing the "illegitimate kind" of channel stuffing—from the "legitimate kind" of "offering customers discounts as an incentive to buy").

30

Defendants' arguments regarding the alleged aggressive sales practices and sources of undisclosed information fail for similar reasons. The Court will not evaluate the substantive nature of Scotts' securities filings for the truth of the matters asserted therein as compared to Plaintiffs' allegations of aggressive sales practices.[8] And to the extent that Defendants challenge the knowledge of the former employees, (*see* ECF No. 54-1 at 56), that challenge is unavailing. Plaintiffs have alleged that multiple former employees had access to inventory and sales metrics nationwide, and would have known about the information reaching senior management. (*E.g.*, ¶¶ 72, 67 n.9, 80–83). Plaintiffs' allegations here suffice at the pleading stage.

### 4) *PSLRA Safe Harbor*

*Fourth*, Defendants argue that the challenged statements are protected, insofar as they are forward-looking and fall within the PSLRA's Safe Harbor provision. The Safe Harbor provision provides that identified forward-looking statements accompanied by meaningful cautionary statements cannot impose liability, and even absent such cautionary language, actual knowledge of the statements' false or misleading nature is required. *See Miller*, 346 F.3d at 671–72. Defendants identify a series of challenged statements—made about both the U.S. Consumer and Hawthorne business segments—that they argue were, at least in part, forward-looking and thus protected. (ECF No. 54-1 at 59–65; *see* ECF Nos. 54-2; 54-3).

As a threshold issue, however, the question is whether the Defendants' challenged statements are forward-looking statements, or whether their "veracity can be determined at the

---

[8] The Court does note that there may be a mismatch between the generic statement Defendants identify and Plaintiffs' particular allegations of aggressive sales practices. (*Compare, e.g.*, 2021 Form 10-K, ECF No. 54-29 ("We invest substantial resources in advertising, consumer promotions and other marketing activities to maintain, extend and expand our brand image.") *with* ¶ 128 ("[W]hen on a phone call with another customer, . . . CFO Miller 'started being aggressive and making threats' over a $500,000 order."); *see generally* ¶¶ 111–28).

31

time the statement is made." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018). If a statement's veracity can be determined when the statement is made, it is not forward-looking, even if it concerns an event in the future. *Id.* Moreover, when challenged statements involved "mixed statement[s] of present fact and future prediction," non-forward-looking statements that are "easily separable" from the forward-looking statements, and are not mere assumptions undergirding those separable forward-looking statements, fall "outside the PSLRA safe harbor." *Id.* at 984 (citing *Miller*, 346 F.3d at 677–79). Plaintiffs argue that the majority of the challenged statements that Defendants identify as being "forward-looking" are really statements addressing present or historical fact, whose veracity can be determined even if they are made in conjunction with other future predictions. (ECF No. 59 at 56–57).

The Court finds that insofar as the challenged statements concern present or historical conditions, they are not protected by the safe harbor.[9] Although Defendants offer further language and context, other, separate forward-looking language that is unrelated to the statements at issue does not pull the challenged statements into the PSLRA's safe harbor.[10] The majority of the allegations challenge Defendants' statements regarding the *present* status of Scotts, U.S. Consumer, and Hawthorne, and thus the safe harbor is simply inapplicable to them. (¶¶ 190, 191, 193, 196–97, 201, 203, 210, 213, 217–18, 220, 222, 224, 226–27, 229, 231–32, 236, 241–42, 244, 245, 247).[11]

---

[9] (*E.g.*, ¶¶ 190 (challenging CEO Hagedorn's statements that "[r]etailer support for the category *remains* strong" and the Defendants were "encouraged by the level of consumer participation [they had] been seeing *so far* this season), 191 (challenging CEO Hagedorn's statements that the Defendants were "seeing encouraging trends *in recent weeks*" and "*continue* to see a high level of engagement in all retail channels") (emphases added))).

[10] (*E.g.*, ECF No. 54-2 at 3–4).

[11] Other statements made concurrently with these statements may be subject to the safe harbor provision (or otherwise may be protected as being vague puffery or optimistic projections coupled with sufficient cautionary language). But even taken in context, under *Dougherty*, those forward-

Other challenged statements are mixed statements, where challenged present statements are separable from forward-looking statements and fall outside of the safe harbor.  The forward-looking statements here include the anticipation that, in August 2021, Defendants expected U.S. Consumer would "retain[] nearly all of the growth [it] captured in 2020," (¶ 199), that in November 2021, the Defendants "expect[ed] sales growth on a full year basis" for Hawthorne, (¶ 208), and "d[id] not expect to have any problems getting [U.S. Consumer] customers at the appropriate inventory levels," (¶ 205), that in February 2022 Defendants expected U.S. Consumer's "competitors [would] continue to struggle" in 2022, (¶ 215), that in November 2022 the Defendants expected U.S. Consumer inventory levels would start to "decline in Q2" before experiencing a "big decline . . . in Q3 and then Q4," (¶ 234), and that in February 2023 Hawthorne's strategy would be to retain its competitive advantage, (¶¶ 238–39).  Thus, for these forward-looking statements, the question becomes whether they were made with the requisite meaningful cautionary language.  *Helwig*, 251 F.3d at 554.

Defendants argue that they issued abundant cautionary statements, both through their cautionary securities filings and in the context surrounding the challenged statements.  They note that they had warned that U.S. Consumer's customer behavior could shift following the pandemic—or even due to changes in a given season—and they had stressed the inherent uncertainties in the "volatile, still-emerging cannabis industry."  (ECF No. 54-1 at 60–62, 63–65; *see, e.g.*, 2021 Form 10-K, ECF No. 54-29 at 10, 13).  Plaintiffs counter that these generalized, conditional warnings were not meaningful because they characterized as potential risks that had already materialized.  (ECF No. 59 at 57–58, 59–60).

---

looking statements cannot inoculate separate and distinct statements of present fact challenged here.

Indeed, Plaintiffs have pleaded that the challenged forward-looking statements were made without meaningful cautionary language and with actual knowledge of their falsity. (¶¶ 292–93). Specifically, they allege that by the middle of 2021, internal Scotts data showed declining demand, and thus Defendants' tactics of pushing excess inventory into retailers were unsustainable. (ECF No. 59 at 60; ¶¶ 112–19; *see also* ¶¶ 198, 206–07, 216). The safe harbor provision is unavailable for the forward-looking statements detailed above in such circumstances because "[w]here the speaker is alleged to have been aware of undisclosed facts undermining the accuracy of the statement, the premise behind protecting predictions from liability falls apart—as does the meaningfulness of cautionary language." *Upstart*, 2023 WL 6379810, at *17; *see Helwig*, 251 F.3d at 557–58. The more generic warnings that Defendants point to are not meaningful in this case because they are not "tailored to the specific forward-looking statements" or "consistent with the historical facts when the statements were made." *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 102–03 (D.C. Cir. 2015). Plaintiffs have plausibly alleged that Defendants' forward-looking statements regarding U.S. Consumer and Hawthorne's growth, inventory levels at U.S. Consumer and its customers, and the competitive advantages offered by Hawthorne's strategy were made with knowledge of their falsity, and thus not subject to the PSLRA's safe harbor.

### 5) Puffery, Opinion, Vagueness

*Finally*, Defendants argue that the challenged statements are inactionable, insofar as they are opinions or vague. (ECF No. 54-1 at 65–70). The Court considers these arguments in tandem, given that they both can be considered species of puffery. *E.g.*, *Newtyn*, 2025 WL 872967, at *11; *Upstart*, 2023 WL 6379810, at *12.

Vague, optimistic, subjective statements that "lack[] a standard against which a reasonable investor could expect them to be pegged," like general statements emphasizing quality or the

34

superlative nature of a product, are simply "too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005); *accord Lim*, 2025 WL 2965692, at *10; *Ind. State Dist. Council*, 583 F.3d at 944. Similarly, opinion statements that are ultimately proven incorrect are not actionable unless it is alleged that the speaker does not hold the stated opinion, the stated opinion contains embedded false statements, or if a reasonable investor would understand the opinion to convey facts about how the opinion was reached. *Omnicare, Inc.*, 575 U.S. at 184–85, 188–89. For opinions, there are no "magic words" to be invoked—like "we believe" or "we think"—that can preface opinions to inoculate them entirely from liability. *Id.* at 193.

Again, the Court reiterates that Plaintiffs' allegations must be considered in their "full context." *In re Omnicare*, 769 F.3d at 472; *cf. Tellabs*, 551 U.S. at 326 (noting that, when evaluating vague or ambiguous allegations for scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). At the motion to dismiss stage, statements that appear to be puffery or opinion may be material based on their alleged circumstances. *Upstart*, 2023 WL 6379810, at *12.

Bearing this framework in mind, the Court turns to the statements at issue. Defendants challenge nearly every statement as being opinion, puffery, or both. (*See* ECF No. 54-2). They argue that many of the challenged statements are too general to be actionable, (ECF No. 54-1 at 69–70), and that certain challenged statements are inactionable opinions because Plaintiffs failed to allege that the speaker did not hold the professed beliefs. (*Id.* at 65–69). Plaintiffs counter that none of these statements is inactionable puffery because they must be read in context as statements of importance to investors, crafted to induce investor reliance, and introduced to investors

35

repeatedly. (ECF No. 59 at 51–53). They also argue that the purported opinion statements contain embedded untrue facts, omit material information about the opinion, or were simply not believed by the speakers. (*Id.* at 54–56).

Most of the challenged statements are not inactionable puffery, opinions, or otherwise vague statements. (¶¶ 190–91, 196, 199, 201, 205, 213,[12] 215, 217–18, 220, 222, 226–27, 231–32, 234, 238, 241–42). Although a few challenged statements that reference the "fundamentals of [U.S. Consumer's] business," state that "consumers are engaged," and that "the business is on a pretty good track" might appear in isolation to be inactionable puffery, (¶¶ 217–18, 231–32), these statements must be read in the surrounding context. "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Bridgestone*, 399 F.3d at 672 (quoting *Casella*, 883 F.3d at 808). To the extent that these challenged statements involve alleged misrepresentations and omissions from what might be construed as opinions regarding Scotts' business, U.S. Consumer's product demand and inventory levels, or the condition, performance, and prospects of Hawthorne, they are *not* inactionable. Plaintiffs have alleged that Defendants did not actually hold such opinions, omitted key information, or otherwise embedded untrue facts within their opinions. *See In re FirstEnergy Corp.*, 2022 WL 681320, at *13 (S.D. Ohio Mar. 7, 2022) (Marbley, J.).

On the other end of the spectrum, some of the challenged statements are inactionable as pleaded because they constitute puffery and are too vague to satisfy the particularity requirements. (¶¶ 224, 229, 244–45, 247). Most of these statements are, in essence, puffery and optimism about

---

[12] The Court assumes that Plaintiffs meant to attribute the statements identified in paragraph 213 to Christopher Hagedorn, not CEO James Hagedorn, (¶¶ 17–18, 213–14), consistent with how Defendants have treated this allegation. (*See* ECF No. 54-2 at 18).

Hawthorne that reasonable investors would not consider significant. They tout Hawthorne as a "leader" in the cannabis market, note its position to "capture [market] expansion," (¶ 224), suggest Hawthorne offered "strategic advantages" to Scotts and was "the best house in the neighborhood," (¶ 229), discuss Hawthorne's "really great strategies," "really good growth program," and "long-term opportunity," (¶ 244), herald Hawthorne's "unmatched" capabilities, "extremely unique position and value proposition," and "position of strength" stemming from a "unique offering," (¶ 245), or suggest that a "wicked shakeout" in the cannabis industry would leave Hawthorne "in an enviable position"—"uniquely positioned to thrive," (¶ 247). One challenged statement also included similarly inactionable language about Scotts, discussing its "fundamental basis" and suggesting that the "key themes" for its strategies "still [were] in play." (¶ 244).

Last, in the middle, there are some challenged statements that are partially actionable, but include statements that cannot be independently actionable because they too constitute puffery, are vague, or are inactionable opinion statements. (¶¶ 193, 197, 203, 208, 210, 236, 239). Again, most of these inactionable statements are puffery about Hawthorne. They include statements that Hawthorne would "distance [Scotts] from the competition," (¶ 193), was "positioning itself for long-term success" and had "built competitive advantages that others in the industry can't match," (¶ 197), was making Scotts "the clear leader" in the cannabis industry, and would "continue to lead the way in an industry, that remains poised for years of growth," (¶ 208), was set to capitalize on "emerging opportunities in cannabis," had "outperformed the competition" and "demonstrated its leadership in the indoor cultivation space" in 2021, and was "in a category that is poised for significant growth for years to come," (¶ 210), statements that "[n]o other company can do what Hawthorne does," (¶ 236), and statements that Hawthorne is a valuable leader in the cannabis industry, (¶ 239). They also include puffery opinion statements by CEO Hagedorn and CFO Miller

37

that that Scotts "would exit COVID as a fundamentally stronger company" and that "the deeper [Defendants] dig, the more [they] analyze, the more [they're] convinced that is exactly what's happened." (¶ 203). For this final group of challenged statements, while these identified excerpts are inactionable, the remainder of these statements are actionable.

### *2. Scienter*

Next, the Court turns to consider whether the Plaintiffs have adequately alleged a strong inference of scienter. Scienter is established by "either demonstrating a 'knowing and deliberate intent to manipulate, deceive, or defraud' or 'recklessness.'" *Astec Indus.*, 29 F.4th at 812 (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)). Recklessness is "akin to conscious disregard"—it is "highly unreasonable conduct" that departs from the ordinary standards of care to an "extreme." *Id.* (citations and internal quotation marks omitted). Courts generally require "multiple, obvious red flags" of an "egregious refusal to see the obvious or investigate the doubtful" before drawing an inference of recklessness. *Id.* A strong inference is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Where "two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Frank*, 547 F.3d at 570 (citing *Tellabs*, 551 U.S. at 324 n.5).

Courts in the Sixth Circuit apply a three-part test to answer whether scienter is adequately alleged. *Astec Indus.*, 29 F.4th at 812. First, all factual allegations in the complaint are accepted as true. *Id.* (quoting *Tellabs*, 551 U.S. at 322). Second, the court reviews the allegations "holistically" in order to "determine 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Dougherty*, 905 F.3d at 979 (quoting *Tellabs*, 551 U.S. at 322–

38

23). As a part of this holistic review, courts in the Sixth Circuit typically employ the non-exhaustive list of factors set forth in *Helwig v. Vencor, Inc. Id.* (citing, inter alia, *Helwig*, 251 F.3d at 552). Third, the court considers "'plausible opposing inferences'" and determines "whether 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323–24).

### a. Threshold Considerations

Defendants argue that Plaintiffs must plead that the Defendants actually knew the challenged statements were false. (ECF No. 54-1 at 24–25). Where misstatement claims are "based on statements of present or historical fact . . . scienter consists of knowledge *or* recklessness." *FirstEnergy*, 2022 WL 681320 at *17. For misstatements based on "soft information," recklessness does not suffice. *Id.* Plaintiffs' position is that the Defendants did indeed have actual knowledge of the falsity of the challenged statements. (*See* ECF No. 59 at 63–64; *e.g.*, ¶¶ 59–60, 79, 90–91, 97–98). This is sufficient for Plaintiffs to pursue their claims.

### b. Helwig Factors

Accepting Plaintiffs' factual allegations as true, the Court turns to consider the relevant *Helwig* factors, before weighing other holistic considerations. The nine *Helwig* factors are:

(1) insider trading at a suspicious time or in an unusual amount;
(2) divergence between internal reports and external statements on the same subject;
(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
(4) evidence of bribery by a top company official;
(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
(6) disregard of the most current factual information before making statements;
(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

39

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). "These factors merely assist the Court's scienter analysis; they are not a checklist of required showings." *FirstEnergy*, 2022 WL 681320, at *18; *see Dougherty*, 905 F.3d at 981 (inferring scienter with three *Helwig* factors shown).

Defendants argue that the first *Helwig* factor "undermines" scienter, factors two, three, six, and nine cannot apply given Plaintiffs' allegations, and factors four, five, six, seven, and eight "are not remotely implicated." (ECF No. 54-1 at 38, 40). Plaintiffs counter that *Helwig* factors two, three, and six support a strong inference of scienter, and that factor one does not weigh against scienter. (ECF No. 59 at 63–71, 82). Thus, the Court analyzes factors one, two, three, and six, given the lack of a dispute regarding the other *Helwig* factors.

*First*, the insider trading factor (*Helwig* factor one) is inapplicable here. Defendants offer securities filings to argue that every individual Defendant "significantly increased his share ownership by the end of the class period" or "when he left the Company," thus undermining any inference of scienter. (ECF No. 54-1 at 37–38). They point out that the Hagedorn family's investment vehicle "owned nearly a quarter of Scotts' stock" throughout the Class Period, suggesting that they were invested in the success of Scotts and gained nothing from the alleged fraud. (*Id.* at 38). They seek to show that Scotts repurchased millions of its own shares during the Class Period at the allegedly inflated prices, which would make no economic sense if the Defendants were seeking to profit by fraudulently and artificially inflating the value of Scotts' securities. (*Id.* at 39; *see generally* ECF No. 62 at 22–24).

40

Plaintiffs counter that motive is unnecessary to plead scienter adequately. (ECF No. 59 at 82). They also argue that the Court should reject Defendants' securities filings as extrinsic documents at this stage, but even if the Court considers the securities filings, they do not aid Defendants' argument because they reveal that the individual Defendants' only increases in company securities were from incentive compensation awards. (*Id.*). Finally, they suggest that other inferences can be drawn from Scotts' repurchase of stock. (*Id.*).

As previously mentioned, this Court will not accept the offered securities filings for the truth of the matters asserted within them at this stage in the litigation. *See* Section III(A)(2), *supra*. At any rate, the proffered securities filings are somewhat beside the point. The absence of insider trading does not defeat an inference of scienter. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004), *abrogated on other grounds by Frank*, 646 F.3d at 961; *see Dougherty*, 905 F.3d at 981–82; *cf. FirstEnergy*, 2022 WL 681320, at *19 n.22 ("The . . . absence of suspicious stock sales by [some defendants] does not negate their scienter."). It would be bizarre to reach any other conclusion in this case, given that Plaintiffs have not alleged insider trading. *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 344–45 (N.D. Cal. 2000); *see Dougherty*, 905 F.3d at 981 (insider trading factor inapplicable given lack of insider trading allegations); *PR Diamonds*, 364 F.3d at 691 (citing *Nuko*, 199 F.R.D. at 344–45). Thus, Defendants are correct insofar as they contend that the absence of insider trades does not help Plaintiffs establish scienter, but Plaintiffs are correct that the absence of insider trading does not defeat an inference of scienter, either— particularly given that Plaintiffs' theory of the case is not based on allegations of insider trading. In sum, the first *Helwig* factor does not favor scienter in this case. That is unsurprising, given that Plaintiffs do not allege insider trading and their theory would not necessarily be congruent with it.

41

*Second*, the divergence between internal reports and external statements on the same subject (*Helwig* factor two) and the disregard of current factual information before making statements (*Helwig* factor six) each weigh strongly in favor of Plaintiffs. This is particularly important given that the Sixth Circuit has instructed that the second factor is "key" in finding scienter. *Dougherty*, 905 F.3d at 981.

Defendants argue that the second and sixth factors do not apply for several reasons. (ECF No. 54-1 at 40). First, they argue that no historical financial number is alleged to be misstated. (*Id.* at 46–47; ECF No. 62 at 9–13). Second, they argue that Plaintiffs have not alleged with particularity that Defendants had any specific internal projection or forecast that diverged from any challenged statement. Third, they argue that Plaintiffs have not alleged with particularity that Defendants disregarded any internal projection before making any challenged statement. (ECF No. 54-1 at 29–35; ECF No. 62 at 14–20, 25).

Plaintiffs counter that their allegations of internal reports (and access to sales and inventory data), regular meetings, post-Class Period admissions, and channel-stuffing actions suffice to establish both of these factors. (ECF No. 59 at 63–69). First, they point out the individual Defendants were alleged to have had "access to copious contemporaneous data" available on their electronic devices, would regularly receive internal reports synthesizing that data, and could track the performance of the U.S. Consumer and Hawthorne segments through sophisticated tools, including a "daily feed" and access to data regarding to sales, performance metrics, and inventory at Scotts and its largest retailers. (*Id.* at 64; *see id.* at 67; ¶¶ 62–67, 69, 78–88). Second, they note that the individual Defendants allegedly attended regular meetings where these inventory, sales, and growth issues were discussed. (ECF No. 59 at 65–67; ¶¶ 89–96; *see* ¶¶ 97–98). Third, they argue that the post-Class Period admissions of CEO Hagedorn show that the individual Defendants

42

knew that demand for U.S. Consumer and Hawthorne products was in decline. (ECF No. 59 at 68; ¶ 177; *accord* ¶ 185). Last, Plaintiffs suggest that Defendants' actions in pushing sales through channel stuffing confirms their knowledge. (ECF No. 59 at 69; ¶¶ 111–28).

Taking the Complaint as a whole, Plaintiffs have pleaded with sufficient particularity that Defendants disregarded the most current factual information available to them before making the challenged statements, and that Defendants knew of internal reports that contradicted those external statements. Plaintiffs allege, and the Court must accept as true at this stage, *see Dougherty*, 905 F.3d at 981, that Defendants were receiving contemporaneous information about falling demand from U.S. Consumer and Hawthorne customers and rising inventories at Scotts' retailers that diverged from their public statements reassuring investors and analysts. (*E.g.*, ¶¶ 81–84). This information came in the form of granular and frequently-updated data from retailers regarding sales and inventory, internal software and reporting tools, regular (sometimes daily) reports, and high-level meetings with senior management. Former employee accounts confirm that the individual Defendants actually referred to and relied upon these reports. For instance, according to FE 3, daily reports providing up-to-date sales numbers were discussed at routine COO-led meetings.

To the extent that Defendants challenge the sufficiency of the internal reports or the statements by the former employees, those challenges are unavailing, and Defendants' reliance on *Konkol v. Diebold, Inc.* is misplaced. 590 F.3d 390 (6th Cir. 2009), *abrogated on other grounds by Matrixx*, 563 U.S. at 48–49. First, the internal reports alleged in this case are more substantial than those in *Konkol*, where it was unclear whether the reports actually were used to create the statements in the securities filings at issue. 590 F.3d at 397 (finding reports insufficient absent allegations about whether they were used where the complaint only included "[g]eneralized facts

43

alleging that the Defendants had access to . . . financial information"). Second, Plaintiffs have statements from thirteen former employees. Unlike in *Konkol*, these former employees' statements are specific, rather than general, and are bolstered by the detail given about their employment and interaction with Defendants. *Compare id.* at 399 ("Even less weight should be given to the Confidential Witnesses' allegations due to the lack of information about them.").

Generally, at the motion to dismiss stage, it is "premature" to expect Plaintiffs to have access to a company's internal documents, because prior to discovery, such documents can only be obtained by "a whistleblower or omniscience." *FirstEnergy*, 2022 WL 681320, at *20. Here, however, Plaintiffs are able to levy allegations regarding internal reports based on the statements of former employees, and have shown that the second and sixth *Helwig* factors favor a finding of scienter.[13] As the Sixth Circuit has instructed, "internal reports" need not be "formalistic" reports. *Dougherty*, 905 F.3d at 981. Thus, the regular, granular data that Scotts executives received, which addressed sales and inventory issues and was packaged through internal software and analytics tools, itself suffices as forms of internal reports. Moreover, according to the former employees, these issues were allegedly discussed at a variety of weekly meetings—some led by COO Lukemire, and often with CEO Hagedorn in attendance. The contents of these meetings themselves can constitute "'internal reports'" when "senior corporate officers were present." *Dougherty*, 905 F.3d at 981 (quoting *Bridgestone*, 399 F.3d at 688). Thus, both the second and sixth factors weigh in Plaintiffs' favor.

---

[13] The "admissions" made by CEO Hagedorn post-Class Period, as alleged, generally are not probative of scienter when standing alone. *See* Section III(B)(c)(1), *supra* (discussing fraud by hindsight). Indeed, post-Class Period admissions would appear generally inapplicable to the *Helwig* analysis because they are not indicative of any disregard toward then-current facts or any divergence from internal reports and external statements at the time the challenged statements were made. *See La. Sch.*, 622 F.3d at 484–85; (ECF No. 62 at 18–20).

*Third*, the closeness in time between allegedly fraudulent statements or omissions and the later disclosure of inconsistent information (*Helwig* factor three) also weighs in Plaintiffs' favor, although minimally so.  Under this third factor, a shorter turnaround between challenged statements and their corrective disclosures "'makes it less likely that the corporation did not know that its statement was misleading.'"  *Dougherty*, 905 F.3d at 981 (quoting *In re Omnicare*, 769 F.3d at 484) (cleaned up).  Although a four-month gap is considered too large for an inference of scienter, courts have found smaller gaps to be sufficient.  *Id.* (six weeks); *Upstart*, 2023 WL 6379810, at *22 ("Two months is at the outer edge of what has been considered 'close.'").

Defendants argue that the Complaint fails to allege any temporal proximity between alleged misstatements and later disclosure of inconsistent information.  (ECF No. 54-1 at 40–41).  Plaintiffs posit, however, that two corrective disclosures occurred following challenged statements by four and five weeks, respectively, which is within the applicable limits of the third *Helwig* factor.  (ECF No. 59 at 69–70).  First, they identify the June 8, 2022 statements regarding reductions in earnings and sales guidance due to inventory problems at retailers, despite earlier assurances to investors that retailers were "ordering heavy" on May 3, 2022.  (*Id.* at 70 (citing ¶¶ 142–44)).  Second, they identify the August 31, 2022 announcement that CFO Miller was departing and the company was reducing its in free cash flow projections, shortly after CEO Hagedorn had touted that sales were the "second highest on record," (*id.* (citing ¶ 156–57, 226–27)), and subsequent Wall Street Journal reporting that Miller had been fired due to inventory issues.  (*Id.* (citing ¶ 161)).  Defendants counter that the first challenged misstatements were alleged to have been made in February, not May, and the updated guidance was based on "mid-May" developments that could not have been disclosed on May 3.  (ECF No. 62 at 25–26).

Additionally, they argue that the August 3 statements are not inconsistent with the August 31 disclosures. (*Id.*).

As Defendants point out, some of the statements that Plaintiffs attributed to Scotts' June 8, 2022 press release—that retailers were "ordering heavy right now" and the company had "no indication [of] any sort of inventory [issue] at retail or with [Scotts]"—were actually made on a February 1, 2022 earnings call. (*Compare* ¶¶ 142–43 *with* ¶ 215; *see* ECF No. 54-2 at 17). Other statements, however, were made on May 3 and also allegedly revealed to be untrue on June 8, 2022. These May 3 statements suggested that the business had strong fundamentals and attributed the inventory and retail issues to weather interrupting retailers, (¶¶ 217–19; *see* ¶ 142), rather than elevated retailer inventories, as the June 8 statement revealed. (¶ 143). Thus, there is still a proximity in time between the May 3, 2022 statements and the later June 8, 2022 disclosures.

Additionally, although Defendants argue that the August 31, 2022 disclosures were not inconsistent with the August 3, 2022 statements, Plaintiffs have alleged that the magnitude of the future cash flow projections was doubled from negative $150 million to a range of between negative $275 million and negative $325 million. (¶ 157). The inquiry is merely whether the factor is "potentially probative of scienter," not that it definitively demonstrates scienter. *Dougherty*, 905 F.3d at 981. The third factor provides some minimal weight in showing scienter.

*Finally*, the Court finds no dispute regarding the remaining *Helwig* factors, and determines them to be inapplicable in this case in light of the fact that Plaintiffs have not alleged that the Defendants engaged in bribery, settled an ancillary lawsuit alleging fraud, disclosed Scotts' accounting information in a confusing manner, held a self-interested motive in preserving their salaries or jobs, or attempted to hide stock sales from disinterested directors. *Cf. Dougherty*, 905 F.3d at 981. Given that the *Helwig* factors are non-exhaustive, the absence of these factors, along

46

with the first factor, "does not meaningfully detract from a strong inference of scienter." *Strougo v. Tivity Health*, 551 F. Supp. 3d 839, 851 (M.D. Tenn. 2021); *see Bridgestone*, 399 F.3d at 687–88.

Considering the totality of the circumstances, the Court finds the alleged divergence between internal reports and external statements and the alleged disregard for current factual information before making those external statements particularly compelling. In this light, the applicable *Helwig* factors give rise to a strong inference of scienter of the Defendants' knowledge as to the truth of their representations regarding the state of Scotts' business and prospects as they concerned consumer demand, sales, and inventory levels for the U.S. Consumer and Hawthorne business segments.

### c. *Individual Defendants*

The Court takes a moment to consider the allegations against each individual defendant, *see Upstart*, 2023 WL 6379810, at *20; *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 791 (N.D. Ohio 2021), given that the Sixth Circuit has not determined whether group pleading has survived the PSLRA. In *Bridgestone*, the Sixth Circuit observed that some circuits have followed an exception to Fed. R. Civ. P. 9(b)'s requirement that the circumstances of fraud must be alleged with particularity, "premised on the assumption that '[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other group-published information, it is reasonable to presume that these are the collective actions of the officers.'" *Bridgestone*, 399 F.3d at 689 (citation omitted). The *Bridgestone* court did not determine "the current viability of the group-[pleading] doctrine." *Id.* at 690.

47

Defendants generally raise a scienter challenge for all individual Defendants, but focus on the absence of allegations regarding any intent to deceive on the part of Interim CFO Evans and CFO Garth. (ECF Nos. 54-1 at 27; 62 at 8 n.7). Plaintiffs do not raise any argument to counter the challenged scienter for Interim CFO Evans in their response brief, although they do so minimally for CFO Garth, arguing that he signed off on SEC filings. (ECF No. 59 at 75 n.29). Thus, Plaintiffs have waived any argument that Interim CFO Evans acted with the required scienter, and the claims against him cannot stand. *See Astec Indus.*, 29 F.4th at 814–16.[14]

Additionally, Plaintiffs' assertion that CFO Garth signed off on SEC filings (which is not pleaded with any particularity in their Complaint) is insufficient to rescue their scienter allegations against him. While the signing of SEC filings might "bolster[] other facts that support scienter" and can be considered in the overall scienter analysis, it cannot form the entirety of Plaintiffs' basis for asserting that CFO Garth had the requisite scienter. *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1086 (M.D. Tenn. 2022) (noting that an "inference of knowledge alone" based in part on preparation of SEC filings cannot lead to scienter, but is a "supplementary consideration"). Mr. Garth is alleged to have become Scotts' CFO only in December 2022—in the latter half of the Class Period. (¶ 20). And there are only a handful of allegations specifically relating to Mr. Garth. These few allegations are insufficient to support a strong inference of scienter. *See Bridgestone*, 399 F.3d at 690 (suggesting that, even if the group-pleading doctrine applies, a complaint still must

---

[14] Indeed, a review of the allegations specifically against Mr. Evans suggests that they are too thin to support a strong inference of scienter against him. The Complaint only alleges that Mr. Evans became CFO on an interim basis on August 31, 2022, and that on an earnings call on November 2, 2022, he made a statement that U.S. Consumer inventory levels would start to "decline in Q2" before experiencing a "big decline . . . in Q3 and then Q4." (¶¶ 156–57, 231, 234). This is the only misrepresentation specifically attributed to Mr. Evans. Other statements referenced as a part of that misrepresentation are attributed to CEO Hagedorn, and therefore the alleged misrepresentation stands in part.

"include allegations . . . that create a presumption that [challenged statements] [were] somehow . . . attributable to an individual defendant"). At most, Plaintiffs challenge several statements that CFO Garth made following Scotts' Q1 2023 announcement. (¶¶ 239, 244–45). The later statements are inactionable puffery. (¶¶ 244–45). The earlier statement is inactionable as fraud by hindsight. (¶ 239). Even if these statements could be actionable, though, Plaintiffs have failed to provide a strong inference as to CFO Garth's scienter when he made those statements. Thus, even if Plaintiffs have not waived their argument that Garth acted with scienter, their claims against him cannot stand.

By contrast, the remaining claims against the individual Defendants are sufficient. CFO Miller and COO Lukemire were specifically alleged to receive daily reports tracking key metrics that would have informed them of the issues with Scotts' sales and inventory levels. (¶¶ 79–82; *see* ¶ 255). C. Hagedorn, CFO Miller, and CEO Hagedorn all touted specific internal systems and tools that provided granular information regarding demand, inventory, and margins. (¶¶ 253–54). CEO Hagedorn, C. Hagedorn, COO Lukemire, and CFO Miller were closely involved with the company's sales—talking with customers, trying to close deals, and regularly taking company jets to go on-site. (¶ 259).

Allegedly, COO Lukemire also would lead regular meetings—often attended by CFO Miller and CEO Hagedorn—where sales and inventory issues were discussed. (¶¶ 90–91). CFO Miller would attend sales director meetings each week where the decline in sales was discussed. (¶ 94). CEO Hagedorn is further alleged to have conceded internally that "demand for Scotts' lawn and garden products was declining," and that 2020 would be an outlier in the company's history. (¶ 93). The inference for scienter for these individual Defendants is strengthened given that the alleged misstatements, omissions, and scheme occurred in the core areas of Scotts'

49

business, of particular interest to investors and to which the individual Defendants are alleged to have been focused on. (¶¶ 250, 260). Thus, Plaintiffs' claims against CEO Hagedorn, C. Hagedorn, CFO Miller, and COO Lukemire are pleaded with enough particularity and specificity to put these individuals on notice as to the nature of the claims against them. *See FirstEnergy*, 2022 WL 681320 at *17 (citing *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)). These claims may proceed. And because Plaintiffs have adequately pleaded scienter as to the individual Defendants (sans Garth and Evans), they have also adequately pleaded scienter as to Scotts. *Frank*, 646 F.3d at 963.

### d. Other Scienter Considerations

Finally, the Court evaluates additional considerations relevant to the holistic analysis. Defendants generally challenge the sufficiency of Plaintiffs' scienter pleadings, arguing that the Complaint's allegations regarding "core operations," internal reports and retailer contacts, anonymous former employees, post-Class Period admissions, leverage ratio, and CFO Miller's departure are insufficient. (ECF No. 54-1 at 24–37). Plaintiffs counter that the post-Class Period admissions that Hawthorne was worthless supports scienter when the Defendants had been touting Hawthorne's position in the market shortly beforehand. (ECF No. 59 at 71–72). They argue that Defendants "repeatedly" and "relentlessly" addressed these issues during earnings calls and investor conferences, holding themselves out as knowledgeable on these subjects and attempting to cover up the truth of U.S. Consumer and Hawthorne's declines by variously and repeatedly blaming the weather or retailer management practices. (*Id.* at 72–74). They point out that U.S. Consumer and Hawthorne were the "core" of Scotts' business operations, also arguing that allegations relating to retailer contacts, internal reports, and former employees are sufficient as pleaded. (ECF No. 59 at 71–81).

The Court finds that the post-Class Period admissions do not support a strong inference of scienter.  (*See* ECF No. 54-1 at 35).  For instance, the later Class Period statements that Plaintiffs seek to tie to CEO Hagedorn's August 2023 admissions are mostly inactionable puffery, containing generic optimistic statements about Hawthorne's business prospects.  (*See* ¶¶ 239, 244–45, 247; *compare* ECF No. 59 at 71–72).  It is unclear how they would provide a *strong* inference of scienter.  Moreover, it is not of much weight that after Hawthorne's supposed failure was apparent, some of the Defendants candidly discussed its failure.

Several other holistic considerations, however, support finding scienter.  The challenged statements "cover topics that the [Scotts] Defendants voluntarily and repeatedly discussed with the public, which 'demonstrates [their] sensitivity' towards the issues."  *Upstart*, 2023 WL 6379810, at *23 (quoting *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016)); *see Reese v. Malone*, 747 F.3d 557, 576–77 (9th Cir. 2014) (it would be "absurd to believe" that senior management lacked knowledge of information contradicting statements based on the "facts alleged in the complaint"), *overruled in part on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017).  The challenged statements were often made in answer to questions from investors or analysts, implying an intent to "emphasize and induce reliance upon" the statements.  *Casella*, 883 F.3d at 808.  And these statements were about U.S. Consumer and Hawthorne, which were the core parts of Scotts' business and with which the Defendants are alleged to have been intimately familiar.  "'[T]he more central a fact is to a company's core operations the more likely its executive[s] acted with scienter.'"  *Upstart*, 2023 WL 6379810, at *23 (quoting *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008)); *Cardinal Health*, 426 F. Supp. 2d at 724; *accord FirstEnergy*, 2022 WL 681320, at *22 ("It is difficult to imagine [the alleged facts] emerging

without scienter."). Moreover, the allegations regarding the leverage ratio fit Plaintiffs' overarching narrative by providing some motive for Defendants' attempts to redirect concerns away from the nature of the business to weather or retailer inventory management issues, (¶¶ 34, 36, 58–59; *see* ¶ 171), and they align with the allegations that Scotts was seeking to maintain the appearance of strong demand, (*e.g.*, ¶ 122).

Additionally, Defendants' challenge regarding the internal reports is not convincing at this early stage in the litigation, where Plaintiffs cannot fairly be required to display "omniscience." *Upstart*, 2023 WL 6379810, at *23; *accord FirstEnergy*, 2022 WL 681320, at *20; *see also Williams*, 681 F.3d at 803 ("Rule 9(b) does not require omniscience. . . . courts [are] reluctant to dismiss . . . action[s] where the facts underlying the claims are within the defendant's control." (citation and internal quotation marks omitted)). Moreover, Plaintiffs have made allegations regarding internal reporting and retailer data that provided Defendants with granular information regarding sales, inventory, and demand across U.S. Consumer and Hawthorne. (*E.g.*, ¶¶ 43, 62–64, 78, 256–57). As they allege, Scotts' "sophisticated data analytics software systems," regular meetings, and internal reports showed that Defendants knew the problems that they were concealing from the public. (ECF No. 59 at 39–40, 76–78). This is sufficient. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (scienter is adequately pleaded when it is alleged that reports were "automatically delivered to the management team," and senior executives constantly monitored relevant data); *Dougherty*, 905 F.3d at 981 (contents of meetings can constitute internal reports).

Defendants' related arguments challenging the accounts of the thirteen former employees also fail. The former employees' statements, taken as a whole, suffice to plead that "members of executive-level management, including individual defendants, had access to and used reports

documenting in real time" the decline in sales and demand, as well as the rise in unsold inventory, during the Class Period. *Quality Sys.*, 865 F.3d at 1145; *Huffy*, 577 F. Supp. 2d at 993, 1000. Some former employees explained that CFO Miller was fired due to financial and accounting issues related to the alleged fraud, (¶ 156), and this allegation must be considered based on the pleadings. *See Frank*, 646 F.3d at 960–62 (considering an executive's retirement within the holistic scienter context).

Viewing Plaintiffs' allegations as a whole, a "reasonable person" would "deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326.  The divergence between internal reports and external statements, the disregard for current factual information before external statements, and the allegations that the challenged statements go to the core of Defendants' business and were intended to reassure investors, support the inference of actual knowledge.  Plaintiffs' theory of the case is bolstered by the extensive corroboration they received by former Scotts employees, supporting allegations that Defendants actually knew U.S. Consumer and Hawthorne were facing shifting business realities post-COVID that could not be attributed to the weather or retailer inventory practices.  Although there is some weight due to the opposing inference—that the pandemic was a sui generis event, its impact was difficult to predict, and that the cannabis market had inherent volatility—that opposing inference is not stronger than the inference of scienter on the record for the instant motion to dismiss.

Plaintiffs have "adequately pleaded scienter," though whether they "can ultimately prove their allegations and establish scienter is an altogether different question." *Matrixx*, 563 U.S. at 49.  Thus, the following statements by the Defendants are actionable:  (¶¶ 190, 191, 193, 196–97, 199, 201, 203, 205, 208, 210, 213, 215, 217–18, 220, 222, 226–27, 231–32, 234, 241–42).  The Motion to Dismiss as to the preceding statements is **DENIED**.

The Motion to Dismiss as to claims alleging that any other statements were false or misleading in violation of federal securities law is **GRANTED**; those claims are **DISMISSED**. The Motion to Dismiss is also **GRANTED** as to Interim CFO Evans and CFO Garth; all security fraud claims against them are **DISMISSED**.

### C. Scheme Liability (Count I)

Plaintiffs also allege that the Defendants violated the scheme liability provision of Rule 10b-5 by not only promulgating false and misleading statements about Scotts' business and creating a false impression of strong demand for U.S. Consumer and Hawthorne products, but by engaging in unsustainable sales and inventory management practices that inflated the price of Scotts' securities. (*E.g.*, ¶¶ 61, 111–28, 275, 301). Rule 10b-5 prohibits any person from "'employ[ing] any device, scheme, or artifice to defraud' or 'engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'" *Teamsters Local 237 Welfare Fund v. ServiceMaster Global Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023) (quoting 17 C.F.R. § 240.10b-5(a), (c)). To state a scheme liability claim, the Plaintiffs must show: (1) that the Defendants committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter; and (4) reliance. *Id.* (citing *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)). In terms of scienter, scheme liability "connote[s] knowing [or] intentional practices." *FirstEnergy*, 2022 WL 681320 at *17 (quoting *Aaron v. SEC*, 446 U.S. 680, 696 (1980)).

Defendants argue that the Complaint fails to plead a claim for scheme other than making alleged misstatements, and therefore the scheme liability claim must be dismissed. (ECF No. 54-1 at 70–71). Plaintiffs counter that scheme liability is not mutually exclusive from misstatements

under Rule 10b-5(b), and that they have sufficiently alleged a scheme whereby Scotts manipulated retailer inventory.  (ECF No. 59 at 85–86; ¶ 117).  Plaintiffs' scheme allegations are sufficient at this stage in conjunction with the challenged statements to advance a scheme liability theory.  The provisions of Rule 10b-5(a) and (c) are "sufficiently broad to include within their scope the dissemination of false or misleading information with the intent to defraud," particularly given the "considerable overlap among the subsections of the Rule and related provisions of the securities law." *Lorenzo v. SEC*, 587 U.S. 71, 78, 80 (2019); *see Upstart*, 2023 WL 6379810, at \*24 (denying motion to dismiss scheme liability claim based on false and misleading misstatements); *see also FirstEnergy*, 2022 WL 681320, at \*7 (finding "[s]cheme liability may rest in part on the same statements or omissions that trigger misstatement liability").

That being said, Plaintiffs have failed to allege scienter or satisfy the heightened pleading requirements of Rule 9(b) with respect to the individual Defendants.  *See Dankse Bank A/S*, 11 F.4th at 105.  Indeed, Plaintiffs' channel stuffing allegations are light on allegations that connect any of the individual Defendants to the alleged scheme.  (*See* ECF No. 62 at 46).  At most, Plaintiffs allege that Hawthorne's COO engaged in aggressive sales practices in support of the scheme and reported to CEO Hagedorn, and that CFO Miller made threats over a sales order.  (¶¶ 127–28).  Beyond these passing references, Plaintiffs do not "draw the Court's attention to any additional, particularized allegations . . . that would support individual liability" for the individual Defendants. *York Cnty. ex rel Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1207 (N.D. Cal. 2024).

Defendants' Motion to Dismiss the scheme liability claim is **GRANTED** with respect to Defendants CEO Hagedorn, CFO Miller, interim CFO Evans, CFO Garth, COO Lukemire, and Christopher Hagedorn, because the Complaint does not include sufficient particularized allegations for their roles in the alleged scheme.  In addition, scienter has not been adequately

pleaded against Defendants Evans and Garth in general. The scheme liability claim against all individual Defendants is **DISMISSED** without prejudice. Defendant Scotts' Motion to Dismiss the scheme liability claim is **DENIED**.

### D. Control Liability (Count II)

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder," including Section 10(b) and Rule 10b-5, "shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To bring this claim, Plaintiffs must show that Scotts "committed 'an underlying violation of the securities laws . . .' and that 'the [individual] defendant . . . directly or indirectly controlled'" Scotts. *Upstart*, 2023 WL 6379810, at *25 (quoting *PR Diamonds, Inc.*, 364 F.3d at 696); *accord Pittman v. Unum Grp.*, 861 F. App'x 51, 53 n.1 (6th Cir. 2021). Control requires "the practical ability to direct the actions of the people who committed the violation." *FirstEnergy*, 2022 WL 681320, at *30.

Plaintiffs have alleged that the individual Defendants were corporate executives who "controlled" Scotts. (¶¶ 16–27, 311). Defendants do not challenge this.[15] Instead, they only

---

[15] The standard for control under Section 20(a) is "the subject of considerable debate." *FirstEnergy*, 2022 WL 681320, at *30. Some courts have determined that the controlling person must be "in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). Others have held that the controlling person must have "actually exercise[d] control over the company." *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 84 (1st Cir. 2016) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002)). Still others have said that the capacity to exercise control alone is enough. *See Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) ("Control person liability does not require participation in the fraudulent transaction."); *see also Fagan v. Nexo Cap. Inc.*, 2025 WL 2446301, at *8–9 (E.D. Tex. Aug. 25, 2025). The Sixth Circuit did not mention a culpability requirement in *PR Diamonds*, defining control as "'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *FirstEnergy*, 2022 WL 681320, at *30 (quoting *PR*

contest the underlying violation element, contending that Plaintiffs have failed to plead a primary violation. (ECF Nos. 54-1 at 71; 62 at 46). Given that Plaintiffs have sufficiently pleaded an underlying violation, the control person liability claim stands. *See Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *38 (M.D. Tenn. Aug. 17, 2022) (denying motion to dismiss control person liability count where defendants made no argument other than that "without a primary violation . . . there can be no secondary violation" for control person liability). Defendants' Motion to Dismiss the control person liability claim is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to File a Sur-Reply (ECF No. 65) is **DENIED**. Defendants' Notice (ECF No. 67) and Plaintiffs' response (ECF No. 65) are **STRICKEN** in part insofar as they contain argument.

The Motion to Dismiss is **GRANTED** in part and **DENIED** in part. For Securities Fraud under Count I, the Motion is **DENIED** with respect to most challenged statements (¶¶ 190, 191, 193, 196–97, 199, 201, 203, 205, 208, 210, 213, 215, 217–18, 220, 222, 226, 227, 231–32, 234, 241–42); it is otherwise **GRANTED** as to the allegations that any of the remaining statements were false or misleading in violation of federal securities law. For Scheme Liability under Count I, the Motion is **DENIED** with respect to Defendant The Scotts Miracle-Gro Company; it is otherwise **GRANTED** as to all individual Defendants, and those claims against them are

---

*Diamonds*, 364 F.3d at 696–97). Still, some courts in this circuit have followed the Second Circuit's approach in *Boguslavsky*. *E.g.*, *Porter v. Graftech Int'l Ltd.*, 2025 WL 2393087, at *40 (N.D. Ohio Aug. 18, 2025); *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 875 (S.D. Ohio 2013). Others have declined to reach the issue. *FirstEnergy*, 2022 WL 681320, at *31. In this case, it is unnecessary to reach the issue, as Defendants have not addressed it in their Motion to Dismiss, and have effectively waived argument on it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

**DISMISSED** without prejudice.  The Motion is also **GRANTED** in part as to Defendants David Evans and Matthew Garth; all claims against them under Count I are **DISMISSED** without prejudice.  The Motion to Dismiss is otherwise **DENIED** with respect to the Control Person Liability claim under Count II.

       **IT IS SO ORDERED.**

                                                              _____
                                                       **ALGENON L. MARBLEY**
                                                       **UNITED STATES DISTRICT JUDGE**

**DATED:  April 22, 2026**